## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LOGAN IRELAND, and NICHOLAS BEAR BADE,<br><br>           Plaintiffs,<br><br>v.<br><br>PETER B. HEGSETH, in his official capacity as Secretary of Defense;<br>1000 Defense Pentagon, Room 3E880<br>Washington, D.C. 20301<br><br>THE UNITED STATES OF AMERICA;<br>via Department of Justice<br>950 Pennsylvania Ave. NW<br>Washington, D.C. 20530<br><br>GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force;<br>1670 Air Force Pentagon<br>Washington, D.C. 20330<br><br>THE UNITED STATES DEPARTMENT OF THE AIR FORCE;<br>1670 Air Force Pentagon<br>Washington, D.C. 20330<br><br>           Defendants. | Civil A. No. _____<br><br><br><br><br><br>**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## <u>INTRODUCTION</u>

1.      This is a constitutional challenge to President Donald J. Trump's January 27, 2025, Executive Order 14183 (the "Executive Order"), to related provisions of President Trump's January 20, 2025, Executive Order 14168 (the "Gender Ideology Order"), and to memoranda of the Department of Defense and United States Air Force implementing those orders, all of which together reverse the existing policy of the United States Armed Forces by banning transgender people from military service and subjecting transgender service members to unequal, harmful, and demeaning treatment.

2.      Plaintiffs Master Sergeant Logan Ireland and Staff Sergeant Nicholas Bear Bade are transgender men who, for years, have served this nation honorably and with distinction as members of the United States Air Force. Both have recently served at Joint Base McGuire-Dix-Lakehurst, which is in this District. They have built their lives around their military service and hope to stay in the Air Force until retirement.

3.      But due to the Trump Administration's directives that this lawsuit challenges, Master Sergeant Ireland's and Staff Sergeant Bade's future in the Air Force is in jeopardy. Both have been placed on administrative absence and have been informed that they only can continue to serve if they do so in their birth sex (*i.e.*, as women). It is not possible, though, for either Plaintiff to serve as a woman because each one has medically transitioned to be and live as a man. And given the implementation timeline that the Trump Administration has publicized, both Plaintiffs reasonably fear that, as early as March 26, 2025, involuntary administrative separation proceedings will be initiated against them because of their transgender status.

4.      The Trump Administration's singling out of transgender people, including Plaintiffs, to brand them as inherently immoral and unfit and to restrict their ability to serve in the military violates the Equal Protection component of the Fifth Amendment.

5.      This lawsuit seeks declaratory and permanent injunctive relief against the implementation of the Trump Administration's discriminatory directives—in general and with respect to Plaintiffs in particular.

6.      Simply put, Master Sergeant Ireland and Staff Sergeant Bade have a constitutional right not to be separated from military service based on their transgender status, a characteristic that has nothing to do with their fitness or ability to serve.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over this action under 28 U.S.C. § 1331, which confers jurisdiction on the district courts over civil actions arising under the Constitution, and 28 U.S.C. § 1343, which confers jurisdiction on the district courts over civil actions to redress the deprivation of any right, privilege, or immunity secured by the Constitution.

8.      Venue is proper in this District under 28 U.S.C. § 1391(b) because acts described in this Complaint occurred in this District—specifically, at Joint Base McGuire-Dix-Lakehurst.

**PLAINTIFFS**

9.      Plaintiffs are both active-duty service members in the United States Air Force who are transgender.

10.     Master Sergeant Logan Ireland, Rank E7, has served with distinction in the United States Air Force for over fourteen years and hopes to remain in the Air Force until his retirement.

11.     He is currently stationed at Joint Base Pearl Harbor-Hickam in Hawaii, but until recently was in New Jersey as part of a multi-week training program at Joint Base McGuire-Dix-Lakehurst.

12.     Master Sergeant Ireland is a thirty-seven-year-old transgender man currently serving as a Flight Chief in the Office of Special Investigations.

13.     This is a recent photo of Master Sergeant Ireland:



14.     Since entering the Air Force, Master Sergeant Ireland has completed multiple overseas tours in support of Operation Enduring Freedom, Operation Freedom's Sentinel, and Operation Resolute Support. He has been deployed to Kandahar, Afghanistan; Qatar; South Korea; and the United Arab Emirates.

15.     Master Sergeant Ireland has earned numerous accolades throughout his career, including four Air Force Commendation Medals; two Air Force Achievement Medals; two Military Outstanding Volunteer Service Medals; three Non-Commissioned Officer of the Year awards; the Non-Commissioned Officer Academy's Commandant and Distinguished Graduate awards; and lead Command endorsements for promotion to both E6 and E7 ranks.

16.     In December 2024, Master Sergeant Ireland received his Command's number one endorsement recommendation to receive an Officer commission and, in January 2025, applied to Officer Training School.

17.     Master Sergeant Ireland recently reenlisted for an indefinite contract with the U.S. Air Force.

18.     Master Sergeant Ireland began his gender transition in 2012 after his enlistment in the Air Force. As part of his transition, he began taking male hormones prescribed by a medical provider. He continues to take male hormones to this day.

19.     In 2014, he obtained a court-ordered legal name change and had transition-related top surgery. He had additional medically necessary surgeries for his transition in 2017 (a hysterectomy and oophorectomy).

20.     His diagnosis of gender dysphoria has been confirmed by military medical providers.

21.     In 2016, Master Sergeant Ireland obtained a court-ordered gender marker change to reflect his male sex on his birth certificate, passport, and Social Security record. He also requested that his gender marker be changed from female to male in the Defense Enrollment Eligibility Reporting System ("DEERS"), which was done as requested.

22.     Were the prohibition on military service by transgender individuals to be implemented, Master Sergeant Ireland would lose the career he has spent years building and would be unable to continue to serve the United States as a member of the military. Master Sergeant Ireland would also lose his income and access to benefits afforded to military members and their families. Additionally, Master Sergeant Ireland, having already served for fourteen years, is on a path toward the military's retirement benefits and would have to forego the opportunities afforded to service members who retire from the military.

23.     Master Sergeant Ireland serves in the U.S. Air Force as a man, including adhering to male grooming standards, living in men's berthing units, using men's changing and bathing facilities, and being referred to as a man, including use of honorifics such as "Sir" when

appropriate. Master Sergeant has consistently been supported by his colleagues up and down the chain of command throughout his time in the Air Force.

24.    Master Sergeant Ireland has already been impacted by the ban. Until recently, he was on Temporary Duty ("TDY") at Joint Base McGuire-Dix-Lakehurst in New Jersey for a multi-week training and was supposed to remain there until March 29, 2025.

25.    On March 6, 2025, while on TDY at Joint Base McGuire-Dix-Lakehurst in New Jersey, Master Sergeant Ireland was told by his leadership that he would have to comply with female regulations and standards, including dress, grooming, and facilities standards. Because he is a man, he cannot do this.

26.    He was also told that he would have to return to his home base in Hawaii from his TDY in New Jersey one week early, on March 22, 2025. That early planned departure date was cut shorter still when Master Sergeant Ireland was made to involuntarily return to his home base on March 8, 2025.

27.    Since his return to Joint Base Pearl Harbor-Hickam, Master Sergeant Ireland has been forced to go on administrative absence against his will for no other reason than that he is transgender.

28.    Going on administrative absence means that Master Sergeant Ireland has been taken away from his job, fellow members of his unit, and opportunities for career advancement such as trainings and temporary duties.

29.    He also learned on March 14, 2025 that his application for Officer Training School was denied, without explanation.

30.    It is not possible for Master Sergeant Ireland to serve in the military as a woman, which he is not. He is a man, looks like a man, and has used men's facilities since his transition

without incident. It would be extraordinarily disruptive for him to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women. If others were required to refer to him by female pronouns or address him as "Ma'am," it would cause confusion and disruption, negatively impacting his ability to effectively perform the duties of his job. In short, if he cannot serve as a man in the military, he cannot serve at all.

31.    Master Sergeant Ireland wishes to remain in the Air Force and will not voluntarily separate.

32.    Based upon the new policies of the federal government and the implementation timeline publicized by the Trump Administration, Master Sergeant Ireland now reasonably believes that involuntarily administrative separation proceedings may be initiated against him as early as March 26, 2025.

41.    Staff Sergeant Nicholas Bear Bade has served with distinction in the United States Air Force for six years and hopes to stay in the Air Force for at least twenty years.

42.    Staff Sergeant Bade is a forty-four-year-old transgender man who until recently was deployed to the Ali Al Salem Airbase in Kuwait as a member of the base's Security Forces.

43.    This is a recent photo of Staff Sergeant Bade:



44.    Since enlisting in March 2019 and graduating in May of that year, Staff Sergeant

Bade has risen in the ranks from Airman First Class (A1C) to Senior Airman (E4) and, following

testing, was chosen for the highly selective E5 promotion. He began managing troops in 2023,

following graduation from Airman Leadership School.

45.    During his years of service, Staff Sergeant Bade has received numerous accolades,

including a Diamond Sharp Award, a Wing level scholarship, the Military Outstanding Volunteer

Service Medal, and an Achievement Medal. He has also been commended on his efforts as a Jewish

Lay Leader where he supported service members from multiple branches, as well as civilian

dependents.

46.    Staff Sergeant Bade is currently stationed at Joint Base McGuire-Dix-Lakehurst in

New Jersey, which is his home base.

47.    In 2014, five years before enlisting, Staff Sergeant Bade began his gender transition

and started taking male hormones prescribed by a doctor. He has a diagnosis of gender dysphoria

and continues to take male hormones.

48.    In 2015, Staff Sergeant Bade obtained a court-ordered legal name change and had transition-related top surgery. He also obtained a birth certificate and passport with a male gender marker.

49.    At the time of his enlistment, all of Staff Sergeant Bade's documentation indicated that he is male. His gender marker in DEERS has consistently been male.

50.    Were the prohibition on military service by transgender individuals to be implemented, Staff Sergeant Bade would be unable to pursue his vocation and lifelong career and continue to serve the United States as a member of the military. Staff Sergeant Bade would also lose his income and access to benefits afforded to military members and their families. Additionally, Staff Sergeant Bade, having already served for six years, is on a path toward the military's retirement benefits and would have to forego the opportunities afforded to service members who retire from the military.

51.    Staff Sergeant Bade has already been impacted by the ban. Following the ban, his leadership gave him three options: to leave his deployment and voluntarily begin separation; to decline and be involuntarily separated; or to leave his deployment and temporarily go on administrative absence. Staff Sergeant Bade was supposed to remain on deployment in Kuwait until April 2025.

52.    Staff Sergeant Bade wished to continue his service and would not voluntarily separate. He chose to go on temporary administrative absence and was forced to return early from his deployment in Kuwait to his home base in New Jersey.

53.    Going on administrative absence means that Staff Sergeant Bade has been taken away from his job, fellow members of his unit, and opportunities for career advancement such as

trainings and temporary duties.

54.    Having to return to his home base because of the ban has also resulted in Staff Sergeant Bade's status as a transgender male being made generally known to other members of the military, exposing information that he previously treated as private medical information.

55.    Staff Sergeant Bade serves in the U.S. Air Force as a man, including adhering to male grooming standards, living in men's berthing units, using men's changing and bathing facilities, and being referred to as a man, including use of honorifics such as "Sir" when appropriate. He has consistently been supported by his colleagues up and down the chain of command throughout his time in the Air Force.

56.    The ban requires Staff Sergeant Bade to abide by female regulations and standards, including dress, grooming, and facilities standards. Because he is a man, he cannot do this. The ban also requires that he refer to himself using female pronouns and that others do so as well.

57.    It is not possible for Staff Sergeant Bade to serve in the military as a woman, which he is not. He is a man, looks like a man and has used men's facilities since his transition without incident. It would be extraordinarily disruptive for him to use women's restrooms and showers, sleep in women's berthing units, or otherwise access sex-segregated facilities for women. If others were required to refer to him by female pronouns or address him as "Ma'am," it would cause confusion and disruption, negatively impacting his ability to effectively perform the duties of his job. In short, if he cannot serve as a man in the military, he cannot serve at all.

58.    Staff Sergeant Bade wishes to remain in the Air Force and will not voluntarily separate.

59.    Based upon the new policies of the federal government and the implementation timeline publicized by the Trump Administration, Staff Sergeant Bade now reasonably believes

that involuntarily administrative separation proceedings may be initiated against him as early as March 26, 2025.

## **DEFENDANTS**

60.     Defendant United States of America includes all federal government agencies and departments responsible for the implementation of the President's decision.

61.     Defendant Peter B. Hegseth is the United States Secretary of Defense. He is the leader of the Department of Defense.

62.     Defendant Gary Ashworth is the Acting United States Secretary of the Air Force. He is the leader of the Department of the Air Force.

63.     Defendant Department of the Air Force is one of three military departments of the Department of Defense and is responsible for the administration and operation of the United States Air Force.

64.     All of the individual Defendants are sued only in their official capacities.

## **TRANSGENDER PEOPLE**

65.     A transgender person is a person who lives, or would live if able, in a sex different from their birth sex.

66.     Gender dysphoria is a treatable medical condition experienced by a transgender person who is unable to live, or prohibited from living, in a sex different than their birth sex.

67.     Being transgender has no relevance to a person's character, integrity, honesty, capabilities, or fitness to serve in the military.

68.     Being transgender is an immutable characteristic; it has a biological foundation and is not subject to voluntary control and cannot be changed through any medical or mental health intervention.

69.     Requiring a transgender person to live in their birth sex is harmful and efforts to make someone do so is akin to conversion therapy, just as requiring a gay person to be in a different-sex relationship would be. International human rights organizations and medical experts have recognized that such practices are harmful, abusive, and can rise to the level of torture.

70.     As U.S. courts have recognized, no person should be required to suppress the immutable characteristic of being transgender to avoid governmental discrimination or persecution.

## STATEMENT OF FACTS

**Background on 2016 Policy Permitting Service by Transgender Service Members**

71.     In May 2014, then-Secretary of Defense Chuck Hagel, a decorated U.S. Army combat veteran, recommended that the military conduct a review of whether transgender people should be permitted to serve in the Armed Forces.

72.     In August 2014, the Department of Defense issued a new regulation that eliminated its categorical ban on service by transgender persons and instructed each branch of the Armed Forces to reassess whether maintaining a service-wide ban on service by transgender persons was justified. *See* Department of Defense Instruction 1332.18.

73.     Secretary Hagel explained that "[e]very qualified American who wants to serve our country should have an opportunity to do so if they fit the qualifications and can do it."

74.     Secretary Hagel was succeeded as Secretary of Defense by Ashton B. Carter, who had previously served many years within the Department, including as Deputy Secretary of Defense, Under Secretary of Defense for Acquisition, Technology and Logistics, Assistant Secretary of Defense for International Security Policy, and as a member of the Defense Policy Board and the Defense Science Board. In July 2015, Secretary Carter announced that the military

would begin a comprehensive analysis of whether to maintain the prohibition on military service by transgender people.

75.     In an order establishing a working group to carry out this analysis, made effective as of July 13, 2015, Secretary Carter directed that no servicemember could be involuntarily separated or denied reenlistment or continuation of active or reserve status based on their transgender status without the approval of the Under Secretary of Defense for Personnel and Readiness.

76.     Over the course of a year, Secretary Carter oversaw a comprehensive review of this issue by a working group of the military and civilian leadership of the Armed Services, the Joint Chiefs of Staff, the service secretaries, and personnel, training, readiness, and medical specialists from across the Department of Defense. The working group was chaired by Under Secretary of Defense for Personnel and Readiness Brad Carson.

77.     That year-long process examined copious data on the relevant issues, including but not limited to existing studies and research and input from transgender service members and their commanders, outside expert groups, and medical professionals.

78.     The process also included a careful review of the eighteen other countries that permit military service by transgender people.

79.     The process also included consultation with doctors, employers, and insurance companies regarding the provision of medical care to transgender people.

80.     The Department of Defense also commissioned the RAND Corporation, an organization formed after World War II to connect military planning with research and development decisions, and which now operates as an independent think tank financed by the U.S. government, to analyze relevant data and studies to determine the impact of permitting transgender

service members to serve. Specifically, the RAND Corporation was tasked with (1) identifying the health care needs of the transgender population and the health care costs associated with providing transition-related care; (2) assessing the readiness implications of allowing transgender service members to serve; and (3) reviewing the experiences of foreign militaries that permit transgender individuals to serve.

81.    The study, titled "Assessing the Implications of Allowing Transgender Personnel to Serve Openly" (the "RAND Study") and issued in May 2016, concluded that allowing transgender people to serve would "cost little and have no significant impact on unit readiness."

82.    The RAND Study noted that the Military Health System already provides the types of health care required by transgender service members to other service members and concluded that health care costs for transgender service members would represent "an exceedingly small proportion of [the Department of Defense's] overall health care expenditures."  The RAND Study also concluded that this minimal incremental cost would likely be offset by savings through diminished rates of other health care costs that would be achieved by providing service members with necessary transition-related medical care.

83.    With respect to the experiences of foreign militaries that permit transgender individuals to serve, the RAND Study noted that the most extensive research on the effects of transgender service have been conducted in Canada, which has permitted transgender individuals to serve since 1998. Researchers have "found no evidence of any effect on operational effectiveness or readiness.  In fact, the researchers heard from commanders that the increased diversity improved readiness by giving units the tools to address a wider variety of situations and challenges . . . . They also found no evidence of any effect on unit or overall cohesion."   This is consistent with research conducted in the United Kingdom, Australia, and Israel, which all permit

service by transgender individuals, that found "no significant effect on cohesion, operational

effectiveness, or readiness."

84.    Based on the results of this comprehensive, year-long review process and on the

RAND Study, the Department of Defense concluded that the needs of the military would be best

met by permitting transgender people to serve on equal terms with others.

85.    As laid out by Secretary Carter in remarks delivered on June 30, 2016, that

conclusion was based on a number of considerations, including: the need to "recruit[] and retain[]

the soldier, sailor, airman, or Marine who can best accomplish the mission" of our nation's Armed

Forces; the fact that thousands of "talented and trained" transgender people are already serving

and that the military has already invested "hundreds of thousands of dollars to train and develop

each" transgender servicemember; the benefits to the military of retaining individuals who are

already trained and who have already proven themselves; the need to provide both transgender

service members and their commanders with "clear[] and consistent guidance" on questions such

as deployment and medical treatment; and the principle that "Americans who want to serve and

can meet our standards should be afforded the opportunity to compete to do so."

86.    On June 30, 2016, Secretary Carter announced that "[e]ffective immediately,

transgender Americans may serve openly. They can no longer be discharged or otherwise

separated from the military just for being transgender."

87.    Also on June 30, 2016, Secretary Carter issued Directive-Type Memorandum 16-

005, titled "Military Service of Transgender Service Members." The memorandum states: "The

policy of the Department of Defense is that service in the United States military should be open to

all who can meet the rigorous standards for military service and readiness. Consistent with the

policies and procedures set forth in this memorandum, transgender individuals shall be allowed to

serve in the military. These policies and procedures are premised on my conclusion that open service by transgender Service members while being subject to the same standards and procedures as other members with regard to their medical fitness for duty, physical fitness, uniform and grooming, deployability, and retention, is consistent with military readiness and with strength through diversity."

88.    The year-long review process by the Department of Defense also concluded that transgender people should be permitted to accede to the military so long as they had completed all medical treatment associated with their transitions and had been stable in their gender for eighteen months. The accession policy was scheduled to take effect on July 1, 2017, to allow the branches of the Armed Forces additional time to develop necessary standards and policies.

89.    In September 2016, the Department of Defense issued an implementation handbook entitled "Transgender Service in the United States Military," setting forth guidance and instructions to both military service members and commanders about how to implement and understand the new policies enabling service of transgender service members.

90.    Within 90 days of the lifting of the ban, on October 1, 2016, the Office of the Undersecretary of Defense for Personnel and Readiness issued "DoD Instruction 1300.28—In-Service Transition for Transgender Service Members."  The instruction set forth further guidance to ensure service by transgender service members, including details regarding revisions to medical treatment provisions. This instruction was further implemented by a memorandum issued by the Acting Assistant Secretary of Defense for Health Affairs entitled "Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members."

91.    Also within 90 days of the lifting of the ban, the Department of Defense issued medical guidance for providing transition-related care to transgender service members. As a result,

transgender service members were able to begin the process of officially changing their gender marker in the military's personnel management system.

92.    Over the next nine months, between October 2016 and June 2017, the services conducted training of the force based on detailed guidance and training materials regarding the policy change.

93.    On November 29, 2016, the Department of Defense revised "DoD Directive 1020.02E—Diversity Management and Equal Opportunity in the DoD" to prohibit discrimination and harassment on the basis of gender identity.

94.    On June 30, 2017, the day before the policy permitting transgender people to accede to the military was to take effect, Secretary Mattis extended the period for the development of relevant standards by six months.

### First Trump Administration's Ban on Transgender Service Members

95.    Early in the morning of July 26, 2017, without any prior indication that he would address military transgender policy, President Trump announced in a series of tweets that the military would no longer permit the service of transgender Americans.

96.    His tweets read: "After consultation with my generals and military experts, please be advised that the United States government will not accept or allow transgender individuals to serve in any capacity in the U.S. military.  Our military must be focused on decisive and overwhelming victory and cannot be burdened with the tremendous medical costs and disruption that transgender in the military would entail."

97.    Shortly after the announcement, the new policy met with substantial criticism from members of Congress belonging to both political parties. These critics included Senator John McCain, Chairman of the Senate Armed Services Committee, who said in a statement that "there

is no reason to force servicemembers who are able to fight, train, and deploy to leave the military—regardless of their gender identity."  Senator Joni Ernst, another Republican member of the Senate Armed Services Committee, also publicly expressed opposition to the new policy.

98.    Also shortly after the announcement, fifty-six former generals and admirals issued a public statement denouncing the new policy:

> The Commander in Chief has tweeted a total ban of honorably serving transgender troops.  This proposed ban, if implemented, would cause significant disruptions, deprive the military of mission-critical talent, and compromise the integrity of transgender troops who would be forced to live a lie, as well as non-transgender peers who would be forced to choose between reporting their comrades or disobeying policy.  As a result, the proposed ban would degrade readiness even more than the failed 'don't ask, don't tell' policy. Patriotic transgender Americans who are serving—and who want to serve—must not be dismissed, deprived of medically necessary health care, or forced to compromise their integrity or hide their identity. President Trump seeks to ban transgender service members because of the financial cost and disruption associated with transgender military service. We respectfully disagree, and consider these claims to be without merit.  The RAND Corporation, as well as research in the *New England Journal of Medicine*, found that the financial cost of providing health care to transgender troops would be, at most, $8.4 million per year.  This amounts to one one-hundredth of one percent of the military's annual health care budget. As for ostensible disruptions, transgender troops have been serving honorably and openly for the past year, and have been widely praised by commanders.  Eighteen foreign nations, including the UK and Israel, allow transgender troops to serve, and none has reported any detriment to readiness.

99.    Admiral Mike Mullen, former Chairman of the Joint Chiefs of Staff, likewise issued a public statement denouncing the policy: "I led our armed forces under the flawed 'don't ask, don't tell' policy and saw firsthand the harm to readiness and morale when we fail to treat all service members according to the same standards. Thousands of transgender Americans are currently serving in uniform and there is no reason to single out these brave men and women and

deny them the medical care that they require."

100.    Despite the widespread denouncement of the new policy, the President signed a formal directive to the Secretary of Defense and the Secretary of Homeland Security on August 25, 2017. The directive ordered that the military return to its pre-June 2016 policy forbidding transgender people from joining or serving in the military.

101.    Shortly after the President's formal directive, the Department of Defense announced that transgender service members could continue to serve while the Department of Defense developed an implementation plan.

102.    On March 23, 2018, the White House released a report, endorsed by Secretary of Defense James N. Mattis, purporting to provide support for the President's policy (the "Mattis Report").

103.    The American Psychological Association promptly responded to the Mattis Report, stating that it was "alarmed by the administration's misuse of psychological science to stigmatize transgender Americans and justify limiting their ability to serve in uniform and access medically necessary health care."

104.    The American Medical Association also responded, stating that "there is no medically valid reason—including a diagnosis of gender dysphoria—to exclude transgender individuals from military service" and stating that the Mattis Report "mischaracterized and rejected the wide body of peer-reviewed research on the effectiveness of transgender medical care."

105.    The Mattis Report was also followed by an extensive report issued by a panel of retired military Surgeons General and scholars from the Palm Center (the "Palm Center Report") refuting the rationale for reinstating the ban on transgender military service. The expert panel noted

that the Mattis Report made "a series of erroneous assertions and mischaracterizations about the scientific research on the mental health and fitness of individuals with gender dysphoria . . . . Scholarly research and DoD's own data confirm that transgender personnel . . . are deployable and medically fit." The panel further explained that "[t]he [Mattis Report] offers no evidence that inclusive policy has compromised or could compromise cohesion, privacy, fairness, or safety . . . . [T]he military's top Admirals and Generals have explicitly stated that, while the impact on cohesion is being 'monitored very closely,' they have received 'precisely zero reports of issues of cohesion, discipline, morale,' and related concerns after two years of inclusive service."

106.    Congressional testimony by the Chiefs of the Army, Navy, and Air Force, as well as the Commandant of the Marine Corps and the incoming Commandant of the Coast Guard, further confirmed that a non-discriminatory service policy did not compromise unit cohesion. Army Chief of Staff General Mark Milley testified, "I have received precisely zero reports of issues of cohesion, discipline, morale and all those sorts of things."  The incoming Coast Guard Commandant Vice Admiral Karl Schulz similarly testified, "I am not aware of any disciplinary or unit cohesion issues resulting from the opening of the Coast Guard to transgender individuals." Navy Chief of Staff Admiral John Richardson testified that he was "not aware of any issues" of "unit cohesion, disciplinary problems, or issues with morale resulting from open transgender service." The other service chiefs offered consistent testimony that they were not aware of any issues resulting from service by transgender individuals.

107.    The Mattis Report outlined a formal policy allowing service members who had already medically transitioned to continue serving but barring medical and social transition going forward and banning accession by transgender individuals. However, the policy did not go into effect until April 12, 2019, after injunctions blocking the ban were lifted.

**Background on 2021 Austin Policy**

108.    On January 25, 2021, President Joseph R. Biden issued an executive order overturning the prior ban and directing the Secretary of Defense and Secretary of Homeland Security Lloyd Austin to take all necessary steps "to ensure that all transgender individuals who wish to serve in the United States military and can meet the appropriate standards shall be able to do so openly and free from discrimination." The executive order relied on "substantial evidence that allowing transgender individuals to serve in the military does not have any meaningful negative impact on the Armed Forces," including "a meticulous, comprehensive study requested by the Department of Defense," 2018 testimony by "the then-serving Chief of Staff of the Army, Chief of Naval Operations, Commandant of the Marine Corps, and Chief of Staff of the Air Force [who] all testified publicly to the Congress that they were not aware of any issues of unit cohesion, disciplinary problems, or issues of morale resulting from open transgender service,"and a statement by a "group of former United States Surgeons General . . . that 'transgender troops are as medically fit as their non-transgender peers and that there is no medically valid reason—including a diagnosis of gender dysphoria—to exclude them from military service or to limit their access to medically necessary care."

109.    In March 2021, the Office of the Undersecretary of Defense for Personnel and Readiness memorialized guidance regarding accession in "DoD Instruction 6130.03—Medical Standards for Appointment, Enlistment, or Induction into the Military Services." This instruction sets forth guidance on the circumstances under which transgender individuals may enlist in the military. In addition to meeting generally applicable accession standards, transgender individuals with a history of gender dysphoria seeking to enlist must have been stable in their gender identity for 18 months prior to enlistment.

110.    On April 30, 2021, the Office of the Undersecretary of Defense for Personnel and Readiness issued "DoD Instruction 1300.28—In-Service Transition for Transgender Service Members." The instruction set forth guidance to ensure service by transgender service members, including details regarding medical treatment provisions. This guidance is "based on the conclusion that open service by transgender persons who are subject to the same high standards and procedures as other Service members with regard to medical fitness for duty, physical fitness, uniform and grooming standards, deployability, and retention is consistent with military service and readiness."

111.    The Military Departments and Services promptly issued policies implementing DoD Instruction 1300.28. Each policy subjects transgender service members to the same high standards as their peers.

112.    On October 1, 2021, the Department of Defense issued an implementation handbook entitled "Transgender Service in the United States Military." The 72-page document set forth guidance and instructions to both military service members and commanders about how to implement and understand the policies enabling service by transgender service members.

113.    Under the Austin Policy, transgender service members have served honorably and, in many cases, with distinction, with support from their peers and commanding officers. Permitting transgender service members who are otherwise qualified to serve has not resulted in any detrimental impacts to military readiness.

### The Ban on Transgender Service Members

114.    President Trump made animosity toward transgender individuals a cornerstone of his campaign for a second term. In February 2023, President Trump released a  video in which he promised to "sign a new Executive Order instructing every federal agency to cease all programs

that promote the concept of sex and gender transition at any age." He followed this pronouncement in April 2023 with a statement that, "[upon his] inauguration, [he] will direct the FDA to convene . . . an independent outside panel to investigate whether transgender hormone treatments and ideology increase the risk of extreme depression, aggression and even violence. I think most of us already know the answer . . . ."

115.    In August 2023, President Trump indicated at a campaign rally that "I will ban the Department of Veterans Affairs from wasting a single cent to fund transgender surgeries or sex change procedures. Those precious taxpayer dollars should be going to care for our veterans in need, not to refund radical gender experiments for the communist Left." He further elaborated, "I'll also restore the Trump ban on transgender [sic] in the military."

116.    President Trump's campaign platform further listed "Republicans Will End Left-wing Gender Insanity" as a pillar and announced plans, among other things, to "ban Taxpayer funding for sex change surgeries."

117.    In the final weeks before the 2024 presidential election, President Trump's campaign also released a campaign video juxtaposing clips from "Full Metal Jacket" (captioned "THEN") with clips of LGBTQ+ service members, drag performers, and transgender Assistant Secretary for Health Rachel Levine (captioned "NOW" and "THE BIDEN HARRIS MILITARY").

118.    On December 22, 2024, President Trump announced, "[w]ith the stroke of my pen on day one, we are going to stop the transgender lunacy. And I will sign Executive Orders to . . . get transgender [sic] out of the military . . . . And that will likewise be done on day one . . . . Under the Trump administration it will be the official policy of the United States government that there are only two genders, male and female."

119.    It is highly unusual for the military to abruptly change its personnel policies to exclude a class of persons from service with no inquiry into their ability to serve under a policy that has been in effect for years.

120.    On January 20, 2025, President Trump signed an executive order revoking the January 25, 2021 executive order that established the Austin Policy.

121.    Also on January 20, 2025, President Trump signed Executive Order 14168 (the "Gender Ideology Order"), titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," which requires all application and interpretation of federal law by the Executive Branch to apply a definition of "sex" that refers to "an individual's immutable biological classification as either male or female" at birth and provides that sex "does not include the concept of 'gender identity.'" A true and correct copy of the Gender Ideology Order is attached as Exhibit 1. The Gender Ideology Order defines "gender ideology" as based on a "false claim that males can identify as and thus become women and vice versa." The order further defines "gender identity" as reflecting "a fully internal and subjective sense of self . . . that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."

122.    The Gender Ideology Order provides:  "[T]he following definitions shall govern all Executive interpretation of and application of Federal law and administration policy: (a) 'Sex' shall refer to an individual's immutable biological classification as either male or female. 'Sex' is not a synonym for and does not include the concept of 'gender identity.' (b) 'Women' or 'woman' and 'girls' or 'girl' shall mean adult and juvenile human females, respectively. (c) 'Men' or 'man' and 'boys' or 'boy' shall mean adult and juvenile human males, respectively. (d) 'Female' means a person belonging, at conception, to the sex that produces the large reproductive cell. (e) 'Male'

means a person belonging, at conception, to the sex that produces the small reproductive cell."

123.    The definitions of sex, male, female, women, girls, men, and boys were adopted to expressly ensure that no federal laws or policies recognize transgender people.

124.    Prior to the adoption of the Gender Ideology Order, there was no federal, comprehensive definition of the terms sex, male, female, women, girls, men, or boys.

125.    On January 27, 2025, President Trump issued Executive Order 14183 (the "Executive Order") revoking "all policies, directives, and guidance issued pursuant to" the order that established the Austin Policy and directing the Department of Defense "to take all necessary steps to implement the revocations" to exclude transgender people from military service. A true and correct copy of the Executive Order 14183 is attached as Exhibit 2.

126.    The Executive Order states that "the medical, surgical, and mental health constraints on individuals with gender dysphoria" and "use of pronouns that inaccurately reflect an individual's sex" are inconsistent with "the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."

127.    The Executive Order states: "Consistent with the military mission and longstanding DoD policy, expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service.  Beyond the hormonal and surgical medical interventions involved, adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life. A man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member."

128.    Section 3 of the January 27, 2025, Executive Order expressly incorporates the

definitions of "sex, "gender identity," and "gender ideology" from the Gender Ideology Order.

129.    The Executive Order further states that the Government's policy of "establish[ing] high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity . . . is also inconsistent with shifting pronoun usage or use of pronouns that inaccurately reflect an individual's sex." Accordingly, the Executive Order directs the Secretary of Defense to "promptly issue directives for DoD to end invented and identification-based pronoun usage."

130.    The Executive Order provides: "Absent extraordinary operational necessity, the Armed Forces shall neither allow males to use or share sleeping, changing, or bathing facilities designated for females, nor allow females to use or share sleeping, changing, or bathing facilities designated for males."

131.    The Executive Order provides that "all policies, directives, and guidance issued pursuant to Executive Order 14004 [which permitted military service by transgender individuals] shall be rescinded to the extent inconsistent with the provisions of this order."

132.    The Executive Order directs the Secretary of Defense to, within 30 days of the issuance of the order: "(i) identify all additional steps and issue guidance necessary to fully implement this order; and (ii) submit to the President through the Assistant to the President for National Security Affairs a report that summarizes these steps."

133.    The Executive Order provides: "(a) Within 60 days of the date of this order, the Secretary of Defense (Secretary) shall update DoDI 6130.03 Volume 1 (Medical Standards for Military Service: Appointment, Enlistment, or Induction (May 6, 2018), Incorporating Change 5 of May 28, 2024) and DoDI 6130.03 Volume 2 (Medical Standards for Military Service: Retention (September 4, 2020), Incorporating Change 1 of June 6, 2022) to reflect the purpose and policy of this Order."

134.    The Executive Order invokes no study of the effectiveness of transgender service members for the past four years, of their ability to serve, or of their integrity and selflessness in volunteering to serve their country. The directive's stated rationale is refuted by substantial research and testimony, as well as by years of capable and honorable service by transgender servicemembers without issue.

135.    On January 31, 2025, Defendant Secretary of Defense Hegseth issued a Memorandum for Senior Pentagon Leadership, Commanders of the Combatant Commands Defense Agency, and DOD Field Activity Directors ("First Hegseth Memo") implementing the Gender Ideology Order. A true and correct copy of the First Hegseth Memo is attached as Exhibit 3. Pursuant to the First Hegseth Memo and the Gender Ideology Order, the Department of Defense must "[e]nsure that intimate spaces for women, girls, or females (or for men, boys, or males) are designated by biological sex and not gender identity."

136.    On February 4, 2025, Gwendolyn R. DeFilippi, Acting Assistant Secretary of the Air Force for Manpower and Reserve Affairs, issued a Memorandum implementing the Gender Ideology Order by requiring the Air Force to "[c]ease the use of 'preferred pronouns' (he/him, she/her, or they/them) to identify one's gender identity in professional communications" and to "[e]nsure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by biological sex and not gender identity." A true and correct copy of the February 4, 2025 Air Force Implementing Memorandum is attached as Exhibit 4.

137.    On February 7, 2025, Defendant Secretary of Defense Hegseth issued a Memorandum for Senior Pentagon Leadership, Commanders of the Combatant Commands Defense Agency, and DOD Field Activity Directors ("Second Hegseth Memo") implementing the Executive Order. A true and correct copy of the Second Hegseth Memo is attached as Exhibit 5.

The memo states that "[e]ffective immediately, all new accessions for individuals with a history of gender dysphoria are paused, and all unscheduled, scheduled, or planned medical procedures associated with affirming or facilitating a gender transition for Service members are paused."

138.    The Second Hegseth Memo further directs that "[t]he Under Secretary of Defense for Personnel and Readiness is authorized and delegated the authority to provide additional policy and implementation guidance outside of the normal DoD issuance process, including guidance regarding service by Service members with a current diagnosis or history of gender dysphoria, to implement this direction." Deviating from the normal DoD policy issuance processes, especially in a situation where it involves a reversal of existing policy, is highly unusual. Ordinarily, changes to existing policy would only be undertaken after careful study and review and only in response to significant, documented problems with existing policy. Similarly, the implementation of new policy by the DoD ordinarily is rolled out in a careful, orderly fashion that provides clear and timely guidance and with due regard for the interests and stability of affected individuals, their commanding officers and units, and the stability of the military as a whole. All such considered policy review and guidance is absent here.

139.    On February 26, 2025, Darin S. Selnick, who is Performing the Duties of the Under Secretary of Defense for Personnel and Readiness, issued a Memorandum with the subject "Additional Guidance on Prioritizing Military Excellence and Readiness" (the "Implementing Policy"). The attachment to the Memorandum outlines policy guidance governing implementation of the Executive Order (the "Implementing Guidance"), which the Memorandum declares "is effective immediately." A true and correct copy of the Implementing Policy and Guidance is attached as Exhibit 6.

140.    The Implementing Guidance declares that "the medical, surgical, and mental health

constraints on individuals with gender dysphoria or who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria" are incompatible with the "high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity." Accordingly, the Implementing Guidance declares that "[i]ndividuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are no longer eligible for military service" and "will be processed for separation from military service."

141.    Although the Implementing Guidance purports to include a waiver to the retention portion of the ban, *see* Section 4.3(c), the waiver set forth does not actually apply to transgender persons, as it only applies to service members who (a) demonstrate 36 months of stability in their birth sex, (b) demonstrate that they have never attempted to transition, and (c) agree to serve in their birth sex. Neither of the Plaintiffs can demonstrate that they have not attempted to transition, as they both have completed transitions. Similarly, neither can demonstrate 36 months of stability in their birth sex because they both currently live in a sex different than their birth sex and have done so for many years.

142.    Neither of the Plaintiffs can serve in their birth sex.

143.    The Implementing Guidance also incorporates the definition of sex from the Gender Ideology Order, which denies the existence of transgender persons, and provides that "[a]ll Service members will only serve in accordance with their sex, defined in Executive Order 14168 [i.e., the Gender Ideology Order]."  Accordingly, "[w]here a standard, requirement, or policy depends on whether the individual is a male or female . . . all persons will be subject to the standard, requirement, or policy associated with their sex" and "[p]ronoun usage when referring to Service members must reflect a Service member's sex." The Implementing Guidance further requires service members "to use . . . sleeping, changing, or bathing facilities designated for" their birth

sex.

144.    The Implementing Guidance directs the Secretaries of the Military Departments, within 30 days, to "establish procedures and implement steps to identify Service members" subject to involuntary administrative separation procedures based on the terms of the guidance. Section 3.4(e).

145.    The Implementing Guidance further directs the Secretaries, within 30 days of "identification pursuant to 3.4(e)," to "begin separation actions." Section 3.4(f).

146.    The Implementing Guidance also directs the Secretaries to ensure that all service members identified by the Department who "are assigned to the Office of the Secretary of Defense, Defense Agencies, DoD Field Activities, Combatant Commands, and all other Joint assignments" are "reassigned to their respective Military Services for the purpose of initiating administrative separation processes." Section 3.4(g).

147.    On February 28, 2025, Tim Dill, who is Performing the Duties of the Assistant Secretary of Defense for Manpower and Reserve Affairs, issued a Memorandum with the subject "Clarifying Guidance on Prioritizing Military Excellence and Readiness" (the "Clarifying Guidance"). A true and correct copy of the Clarifying Guidance is attached as Exhibit 7. This Clarifying Guidance states that transgender service members "are encouraged to elect to separate voluntarily by March 26, 2025."

148.    On March 1, 2025, Gwendolyn R. DeFilippi, Acting Assistant Secretary of the Air Force for Manpower and Reserve Affairs, issued "Additional Guidance for Executive Order 14183, 'Prioritizing Military Excellence and Readiness'." A true and correct copy of the March 1, 2025 Air Force Additional Guidance is attached as Exhibit 8. The Additional Guidance states that transgender service members "are encouraged to elect to separate voluntarily no later than 26

March 2025." The Additional Guidance also states that the Implementing Guidance "provides commanders the latitude to place members on administrative absence to promote good order and discipline while they are being processed for separation."

149. Due to their transgender status, both Plaintiffs have been removed from their regular duties and put on administrative absence, taking them away from their jobs, fellow members of their units, and opportunities for career advancement. On March 8, 2025, Master Sergeant Ireland's TDY at Joint Base McGuire-Dix-Lakehurst in New Jersey was cut short and he was forced to return to his station in Hawaii, where he was placed on administrative absence. Staff Sergeant Bade had to return early from his deployment in Kuwait to go on administrative absence at Joint Base McGuire–Dix–Lakehurst in New Jersey.

150. Plaintiffs wish to continue serving in the Air Force and will not voluntarily separate.

151. Involuntary administrative separation is the way the U.S. Military fires people. It is a process typically used for misconduct or failing to meet standards, not for treatable medical conditions where the service member meets the requirements for service, including both job performance and fitness standards. As such, involuntary administrative separation carries with it a stigma that can follow a service member beyond their time in the military.

152. If a service member is involuntarily separated from service, they will be given a characterization of service. The three possible characterizations of separation are Honorable, General, or Other Than Honorable ("OTH"). A service member who receives an OTH stands to lose virtually all post-service benefits, such as the GI Bill and some Veterans Administration benefits. An OTH could also impact the service member's employment opportunities in the future.

153. A treatable medical condition normally does not automatically require a person to be discharged from service even if able to serve. In the typical circumstance, when a service

member presents with a medical condition, they go through the Medical Evaluation Board ("MEB") process. From there, they would be referred to the Disability Evaluation System ("DES"), which allows the military to consider how a person's medical condition impacts their individual service and potential deployability.

154.    Based on the federal government's new policies and the implementation timeline publicized by the Trump Administration, Plaintiffs reasonably fear that they may be subject to involuntary administrative separation proceedings as early as March 26, 2025.

## COUNT I

### (Fifth Amendment – Equal Protection – Exclusion from Service)

155.    All previous paragraphs are incorporated as though fully set forth herein.

156.    The Due Process Clause of the Fifth Amendment prohibits the federal government from denying any person equal protection of the laws.

157.    A policy banning transgender people from serving in the military discriminates against Plaintiffs based on their sex and based on their transgender status, without lawful justification, in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

158.    Subjecting transgender service members to differential terms for discharge, administrative separation, or any other terms of service or severance from service because they are transgender violates the Equal Protection component of the Due Process Clause of the Fifth Amendment.

159.    President Trump's Executive Order banning transgender people from serving in the military was based on unsupported generalizations and a political goal of purging the military of transgender people, rather than on evidence about the effectiveness of transgender service members

during the past four years or evidence of any problems that may have arisen from their service. The Implementing Guidance issued by the Department of Defense merely effectuates this unsupported Order.

160.    Rather than being based on any legitimate governmental purpose, the ban reflects animosity toward transgender people because of their transgender status.

161.    The class-based exclusion of transgender people from military service lacks a rational basis, is arbitrary, and cannot be justified by sufficient federal interests.

162.    Through the actions above, Defendants have violated the Equal Protection component of the Due Process Clause of the Fifth Amendment.

## COUNT II

**(Fifth Amendment – Equal Protection – Requirement to Serve in Birth Sex)**

163.    All previous paragraphs are incorporated as though fully set forth herein.

164.    The Due Process Clause of the Fifth Amendment prohibits the federal government from denying any person equal protection of the laws.

165.    A policy requiring transgender people to serve in in the military only in their birth sex (with respect to, *inter alia*, pronouns, housing, facilities, restrictions on the medical care one can receive, and how they describe themselves to others) discriminates against Plaintiffs based on their sex and based on their transgender status, without lawful justification, in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

166.    President Trump's Executive Order requiring individuals to serve only in their birth sex was based on unsupported generalizations and a political goal to eradicate transgender people, rather than on evidence about the effectiveness of transgender service members during the past four years or evidence of any problems that may have arisen from their service. The Implementing

Guidance issued by the Department of Defense merely effectuates this unsupported Order.

167.    Rather than being based on any legitimate governmental purpose, the restrictions reflect animosity toward transgender people because of their transgender status.

168.    The class-based policy requiring transgender people to suppress their transgender identity and serve in their birth sex lacks a rational basis, is arbitrary, and cannot be justified by sufficient federal interests.

169.    Plaintiffs challenge each and every provision of the Executive Order and the Implementing Guidance that subjects them to differential terms of service because they are transgender.

170.    Through the actions above, Defendants have violated the Equal Protection component of the Due Process Clause of the Fifth Amendment.

## COUNT III

### (Fifth Amendment – Equal Protection – Discriminatory Definition of Sex)

171.    All previous paragraphs are incorporated as though fully set forth herein.

172.    The Due Process Clause of the Fifth Amendment prohibits the federal government from denying any person equal protection of the laws.

173.    A policy that defines "sex" based only on an "immutable biological classification" at "conception" or otherwise requires transgender people to serve in in the military only in their birth sex (with respect to, *inter alia*, pronouns, housing, facilities, restrictions on medical care, and how they describe themselves to others), discriminates against Plaintiffs based on their sex and based on their transgender status, without lawful justification, in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

174.    President Trump's Gender Ideology Order and Executive Order defining "sex" in

a manner that requires individuals to serve only in their birth sex were based on unsupported generalizations and a policy predicated on the goal of attempting to eradicate transgender people and exclude them from any legal recognition or protection in any arena, including military service. The policy is not based on evidence and was issued without regard to transgender people's ability to serve as demonstrated through the years of service by these Plaintiffs and the thousands of other transgender service members who have courageously served and continue to do so. The Implementing Guidance issued by the Department of Defense merely effectuates these unsupported Orders.

175.    Rather than being based on any legitimate governmental purpose, the definition reflects animosity toward transgender people because of their transgender status.

176.    Applying a definition of "sex" that creates a class-based policy requiring transgender people to suppress their transgender identity and serve in their birth sex lacks a rational basis, is arbitrary, and cannot be justified by sufficient federal interests. It is also unprecedented in federal law to have a sweeping definition of sex that applies throughout federal law and policy. And doing so for the purpose of denying transgender people the law's protection violates equal protection guarantees in the most fundamental way by making a group of people strangers to the law.

177.    Through the actions above, Defendants have violated the Equal Protection component of the Due Process Clause of the Fifth Amendment.

## COUNT IV

### (Procedural Due Process)

178.    All previous paragraphs are incorporated as though fully set forth herein.

179.    Defendants have deprived Plaintiffs of procedural due process in violation of the

Fifth Amendment. Plaintiffs reasonably relied on the military's previous policy allowing service by transgender people in a sex different than their birth sex, including the Austin Policy under which they were serving at the time the President issued the Executive Order prohibiting transgender people from serving in the military.

180.    Plaintiffs reasonably relied on the Austin Policy by continuing to satisfy all fitness standards and other requirements needed to serve in their sex following transition and by actually serving in their sex after transition (including complying with grooming standards, living in berthing units, and using changing and bathing facilities based on their post-transition gender marker in DEERS). Plaintiffs also reasonably relied on representations from their chain of command as alleged herein.

181.    Plaintiffs have a protectible liberty interest in their continued military service in their sex following transition.

182.    Plaintiffs have a protectible property interest in their continued military service in their sex following transition. The Executive Order and effectuating Implementing Guidance deprive them of their careers and the related current and future benefits that they have earned through their military service.

183.    Defendants have provided no adequate procedural protections for Plaintiffs. The Executive Order and effectuating Implementing Guidance declare the class of transgender people unfit for service and require their exclusion, rendering futile any procedures that otherwise might apply to protect service members from separation.

184.    Through the actions above, Defendants have violated the Due Process Clause of the Fifth Amendment.

## COUNT V

## (Estoppel)

185.    All previous paragraphs are incorporated as though fully set forth herein.

186.    Plaintiffs had settled expectations based on the military's policy permitting service by transgender service members in a sex different than their birth sex and reasonably relied on that policy by serving in compliance with the Austin Policy.

187.    Plaintiffs reasonably relied on the Austin Policy by continuing to satisfy all fitness standards and other requirements needed to serve in their sex following transition and by actually serving in their sex after transition (including complying with grooming standards, living in berthing units, and using changing and bathing facilities based on their post-transition gender marker in DEERS). Plaintiffs also reasonably relied on representations from their chain of command as alleged herein.

188.    Plaintiffs were induced to inform their commanding officers that they are transgender and otherwise to complete all requirements to serve in their sex following transition. The Executive Order deprives them of property and liberty interests by eliminating the stability and certainty they previously had in their future careers and benefits, including post-military and retirement benefits that depend on the length of their service.

189.    The Executive Order and effectuating Implementing Guidance work a serious injustice on Plaintiffs by punishing them for doing what Defendants explicitly induced them to do by complying with the requirements of the Austin Policy and related assurances from their commanders to serve openly as transgender service members. Enforcing the Executive Order and effectuating Implementing Guidance to deprive Plaintiffs of their careers and benefits would lead to an egregiously unfair result that a court of equity should not permit.

190.    Defendants therefore should be equitably estopped from implementing the Order and the Implementing Guidance as applied to Plaintiffs.

## PRAYER FOR RELIEF

Plaintiffs ask the Court to grant the following relief:

a.    Issue a declaratory judgment that the Executive Order's class-based exclusion of transgender people from military service and class-based policy that transgender people be required to serve in their birth sex (including with respect to pronouns, housing, facilities, and how they describe themselves to others) is unconstitutional;

b.    Issue a permanent injunction prohibiting enforcement of the class-based exclusion of transgender people from military service or the class-based policy that transgender people be required to serve in their birth sex (including with respect to pronouns, housing, facilities, and how they describe themselves to others);

c.    Issue a permanent injunction prohibiting enforcement of the class-based exclusion of the named Plaintiffs from military service on the basis of their transgender status and the class-based policy that transgender people be required to serve in their birth sex (including with respect to pronouns, housing, facilities, and how they describe themselves to others), including ordering that Plaintiffs Master Sergeant Logan Ireland and Staff Sergeant Nicholas Bear Bade may not be separated from the military, denied reenlistment, demoted, denied promotion, denied medically necessary treatment on a timely basis, required to serve in their birth sex (including with respect to pronouns, housing, facilities, or how they describe themselves to others), or otherwise receive adverse treatment or differential terms of service on the basis of Executive Orders 14183 or 14168 or the Implementing Guidance or the fact that they are transgender;

d.    Issue a preliminary injunction requiring Defendants to hold open the voluntary

separation offer outlined in Section 4.4(a)(4) of the Implementing Guidance as applied to Plaintiffs

pending resolution of this action;

e.     Award Plaintiffs their reasonable costs and attorneys' fees; and

f.     Issue any other relief the Court deems appropriate.

DATED: March 17, 2025

Respectfully submitted,

**GLBTQ LEGAL ADVOCATES &
DEFENDERS**

Jennifer Levi
    (*pro hac vice application forthcoming*)
Michael Haley
    (*pro hac vice application forthcoming*)
18 Tremont Street, Suite 950
Boston, MA 02108
617.426.1350
jlevi@glad.org
mhaley@glad.org

**NATIONAL CENTER FOR LESBIAN
RIGHTS**

Shannon P. Minter
    (*pro hac vice application forthcoming*)
870 Market Street, Suite 370
San Francisco, CA 94102
415.392.6257
sminter@nclrights.org

**STAPLETON SEGAL COCHRAN LLC**

By: */s/ John S. Stapleton*        
   John S. Stapleton, ID 032622005
Eli Segal, ID 030792007
    (*application to District pending*)
Jonathan Cochran, ID 028142012
Lowry Yankwich, ID418582022
Four Greentree Centre
601 Route 73 N, Suite 303
Marlton, NJ 08053
856.259.3300
jstapleton@stapletonsegal.com
esegal@stapletonsegal.com
jcochran@stapletonsegal.com
lyankwich@stapletonsegal.com

**LANGER GROGAN & DIVER P.C**

By: */s/ John Grogan*        
   John Grogan, ID 995549
Mary Catherine Roper
    (*pro hac vice application forthcoming*)
Daniel Nagdeman
    (*pro hac vice application forthcoming*)
1717 Arch Street, Suite 4020
Philadelphia, PA 10001
215.320.5662
jgrogan@langergrogan.com
mroper@langergrogan.com
dnagdeman@langergrogan.com

*Attorneys for Plaintiffs*