# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LOGAN IRELAND and NICHOLAS BEAR BADE,<br><br>Plaintiffs,<br><br>v.<br><br>PETER B. HEGSETH, in his official capacity as Secretary of Defense; THE UNITED STATES OF AMERICA; GARY ASHWORTH, in his official capacity as Acting Secretary of the Air Force; and THE UNITED STATES DEPARTMENT OF THE AIR FORCE,<br><br>Defendants. | Civil A. No. 25-cv-01918-CPO-AMD<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TRO** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................... iv

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 2

I.      **Relevant Policy History** ................................................................................. 2

    A.    The 2016 Carter Policy ............................................................................. 2

    B.    First Trump Administration Ban ............................................................... 2

    C.    The 2021 Austin Policy ............................................................................. 3

    D.    President Trump's Second Ban ................................................................... 4

    E.    DOD Implementation of the Second Ban .................................................. 5

II.    **Plaintiffs' Military Service** ............................................................................ 7

    A.    Service of Plaintiff Ireland ........................................................................ 7

    B.    Service of Plaintiff Bade ........................................................................... 10

ARGUMENT .................................................................................................................. 12

I.      **Plaintiffs Will Suffer Irreparable Harm Absent an Injunction** .................. 13

II.    **Plaintiffs Are Likely to Succeed on the Merits of Their Equal Protection
Claims** ............................................................................................................ 16

    A.    The Order and Implementing Guidance Are Motivated by Unconstitutional
Animus and, But for Animus, Would Not Have Been Enacted .................. 17

    B.    The Order and Implementing Guidance Warrant Heightened Scrutiny Because
They Facially Classify Based on Sex and Transgender Status and Mandate
Disparate Treatment of Transgender Service Members. ............................. 20

        1.   *The Order and Guidance facially exclude transgender people from military
service.* ............................................................................................. 22

        2.   *The Order and Guidance facially discriminate against transgender people by
requiring them to suppress their transgender identity and barring anyone who
has transitioned.* ................................................................................ 23

        3.   *The Order and Guidance facially discriminate against transgender people by
incorporating a definition of "sex" that deliberately excludes transgender
people.* ............................................................................................. 26

        4.   *Classifications based on transgender status warrant heightened scrutiny.* ............... 28

    C.    The Order and Guidance Also Violate Equal Protection Because They Were
Adopted at Least in Part for a Discriminatory Purpose. ............................. 29

    D.    The Order and Guidance Cannot Survive Any Level of Review. ............... 31

          1.   *Deference to military judgment does not shield a facially discriminatory policy from heightened scrutiny.* ................................................................. *31*

          2.   *Defendants cannot meet their burden under heightened scrutiny and the challenged policy fails even rational basis review.* .................................... *33*

              (i)    The Ban does not promote military readiness................................ 34

              (ii)   Defendants' arguments about unit cohesion are circular and rest on impermissible gender stereotypes. .................................... 36

              (iii)  Banning transgender people from military service cannot be justified based on cost. ....................................................................... 38

**III.**     **The Balance of Equities Favors an Injunction** ........................................... **40**

# TABLE OF AUTHORITIES

*A.C. v. Metro. Sch. Dist. of Martinsville*,
    75 F.4th 760 (7th Cir. 2023) ............................................................ 37

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200 (1995) ......................................................................... 16

*Adkins v. City of New York*,
    143 F. Supp. 3d 134 (S.D.N.Y. 2015) ............................................. 28

*Anderson v. Davila*,
    125 F.3d 148 (3d Cir. 1997) ............................................................. 13

*Austin v. U.S. Navy SEALS*,
    142 S. Ct. 1301 (2022) ..................................................................... 15

*B.H. v. Easton Area Sch. Dist.*,
    725 F.3d 293 (3d Cir. 2013) ............................................................. 13

*B.P.J. v. W. Va. State Bd. of Educ.*,
    98 F.4th 542 (4th Cir. 2024) *cert. denied*, 145 S. Ct. 568 (2024) .................................... 28

*Bd. of Educ. of Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*,
    208 F. Supp. 3d 850 (S.D. Ohio 2016) ............................................ 28

*Bd. of Trustees of Univ. of Alabama v. Garrett*,
    531 U.S. 356 (2001) ......................................................................... 35

*Bostic v. Schaefer*,
    760 F.3d 352 (4th Cir. 2014) ........................................................... 36

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020) ................................................................... 21, 24

*Bowman v. Twp. of Pennsauken*,
    709 F. Supp. 1329 (D.N.J. 1989) ..................................................... 13

*Brandt v. Rutledge*,
    677 F. Supp. 3d 877 (E.D. Ark. 2023) ............................................. 25

*Brocksmith v. United States*,
    99 A.3d 690 (D.C. 2014) .................................................................. 29

*Cabrera v. Att'y Gen. United States*,
    921 F.3d 401 (3d Cir. 2019) ............................................................. 16

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ......................................................................... 30

*Cisek v. Cisek*,
    80 C.A. 113, 1982 WL 6161 (Ohio Ct. App. July 20, 1982) ........... 29

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ................................................................... 19, 33

*Con, Inc. v. City of Philadelphia,*
    120 F.4th 346 (3d. Cir. 2024) ........................................................................ 16

*ConverDyn v. Moniz,*
    68 F. Supp. 3d 34 (D.D.C. 2014) .................................................................... 40

*Crawford v. Cushman,*
    531 F.2d 1114 (2d Cir. 1976) .......................................................................... 36

*Daly v. Daly,*
    715 P.2d 56 (Nev. 1986) .................................................................................. 29

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
    591 U.S. 1 (2020) ............................................................................................ 16

*Diaz v. Brewer,*
    656 F.3d 1008 (9th Cir. 2011) ........................................................................ 39

*Dillard v. Brown,*
    652 F.2d 316 (3d Cir. 1981) ............................................................................ 31

*Dodds v. U.S. Dep't. of Educ.,*
    845 F.3d 217 (6th Cir. 2017) .......................................................................... 21

*Doe 1 v. Trump,*
    275 F. Supp. 3d 167 (D.D.C. 2017) ................................................... 28, 38, 40

*Doe 2 v. Shanahan,*
    755 F. App'x 19 (D.C. Cir. 2019) ................................................................ 3, 40

*Doe 2 v. Trump,*
    315 F.Supp.3d 474 (D.D.C. 2018) ................................................................... 3

*Doe by & through Doe v. Boyertown Area Sch. Dist.,*
    897 F.3d 518 (3d Cir. 2018) ..................................................................... 24, 37

*Doe v. Austin,*
    No. 22-cv-368, 2024 WL 4653290 (D. Me. Nov. 1, 2024) ............................ 25

*Doe v. City of Philadelphia,*
    No. 24-cv-468, 2024 WL 3634221 (E.D. Pa. Aug. 2, 2024) .......................... 25

*Doe v. Horne,*
    115 F.4th 1083 (9th Cir. 2024) ...................................................................... 27

*Doe v. Ladapo,*
    737 F. Supp. 3d 1240 (N.D. Fla. 2024) ............................................. 17, 30, 31

*ECRI v. McGraw-Hill, Inc.,*
    809 F.2d 223 (3d Cir. 1987) ............................................................................ 13

*Eknes-Tucker v. Governor of Ala.,*
    80 F.4th 1205 (11th Cir. 2023) ...................................................................... 29

*Evancho v, Pine-Richland Sch. Dist.,*
    237 F. Supp. 3d 267 (W.D. Pa. 2017) ................................................. 22, 28, 37

*F.V. v. Barron*,
   286 F. Supp. 3d 1131 (D. Idaho 2018) .......................................................................... 28

*Flack v. Wis. Dep't of Health Servs.*,
   328 F. Supp. 3d 931 (W.D. Wis. 2018) ......................................................................... 25

*Fowler v. Stitt*,
   104 F.4th 770 (10th Cir. 2024) ......................................................................... 21, 29, 30

*Frontiero v. Richardson*,
   411 U.S. 677 (1973)........................................................................................................ 32

*Goldman v. Weinberger*,
   475 U.S. 503 (1986)........................................................................................................ 32

*Graham v. Richardson*,
   403 U.S. 365 (1971) ....................................................................................................... 39

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020)................................ 24, 28, 37

*Hassan v. City of New York*,
   804 F.3d 277 (3d Cir. 2015), *as amended* (Feb. 2, 2016)......................................... 16, 29

*Hecox v. Little*,
   104 F.4th 1061 (9th Cir. 2024), *as amended* (June 14, 2024) ............................. 21, 27, 28

*Hecox v. Little*,
   479 F. Supp. 3d 930 (D. Idaho 2020) ........................................................................... 31

*Kadel v. Folwell*,
   100 F. 4th 122 (4th Cir. 2024) .................................................................................. 21, 25

*Karem v. Trump*,
   960 F.3d 656 (D.C. Cir. 2020) ...................................................................................... 40

*Kyle-Labell v. Selective Serv. Sys.*,
   364 F. Supp. 3d 394 (D.N.J. 2019) ............................................................................... 32

*L.E. by Esquivel v. Lee*,
   728 F. Supp. 3d 806 (M.D. Tenn. 2024)........................................................................ 27

*Latta v. Otter*,
   771 F.3d 456 (9th Cir. 2014) ......................................................................................... 36

*M.B. v. D.W.*,
   236 S.W.3d 31 (Ky. Ct. App. 2007) .............................................................................. 29

*M.A.B. v. Bd. of Educ. of Talbot Cnty.*,
   286 F. Supp. 3d 704 (D. Md. 2018)............................................................................... 28

*Mem'l Hosp. v. Maricopa Cnty.*,
   415 U.S. 250 (1974)........................................................................................................ 39

*Navy SEAL 1 v. Austin*,
   586 F. Supp. 3d 1180 (M.D. Fla. 2022)......................................................................... 15

*Ne. Lumber Manufacturers Ass'n v. Sky of New York Corp.*,
No. 16-cv-9487, 2016 WL 7491903 (D.N.J. Dec. 29, 2016)........................................... 13

*Nken v. Holder*,
556 U.S. 418 (2009)........................................................................................................ 40

*Norsworthy v. Beard*,
87 F. Supp. 3d 1104 (N.D. Cal. 2015) ........................................................................... 28

*Owens v. Brown*,
455 F. Supp. 291 (D.D.C. 1978) ..................................................................................... 32

*Palmore v. Sidoti*,
466 U.S. 429 (1984)........................................................................................................ 38

*Parents for Privacy v. Barr*,
949 F.3d 1210 (9th Cir. 2020) ........................................................................................ 37

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979)........................................................................................................ 30

*PFLAG, Inc. v. Trump*,
No. 25-cv-337, 2025 WL 68514 (D. Md. Mar. 4, 2025) ................................................. 26

*Plyler v. Doe*,
457 U.S. 202 (1982)................................................................................................... 39, 40

*Roe v. Dep't of Def.*,
947 F.3d 207 (4th Cir. 2020), *as amended* (Jan. 14, 2020) ........................................... 15

*Romer v. Evans*,
517 U.S. 620 (1996).............................................................................................. 17, 19, 20

*Rostker v. Goldberg*,
453 U.S. 57 (1981)..................................................................................................... 31, 32

*Schelske v. Austin*,
649 F. Supp. 3d 254 (N.D. Texas 2022) ......................................................................... 15

*Tirrell v. Edelblut*,
748 F. Supp. 3d 19 (D.N.H. 2024)................................................................................... 27

*U.S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973)................................................................................................... 16, 17

*U.S. Navy SEALS 1-26 v. Austin*,
578 F. Supp. 3d 822 (N.D. Tex. 2022) ........................................................................... 15

*U.S. Navy SEALS 1-26 v. Biden*,
27 F.4th 336 (5th Cir. 2022) ........................................................................................... 15

*United States v. Pollard*,
326 F.3d 397 (3d Cir. 2003)............................................................................................ 16

*United States v. Virginia*,
518 U.S. 515 (1996).......................................................................................... 21, 22, 33

*United States v. Windsor,*
    570 U.S. (2013) ................................................................................................ 20, 27

*Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp.,*
    429 U.S. 252 (1977) .......................................................................................... *passim*

*Washington v. Davis,*
    426 U.S. 229 (1976) ................................................................................................ 30

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
    858 F.3d 1034 (7th Cir. 2017), *cert. dismissed*, 138 S. Ct. 1260 (2018). ............. 21, 24, 38

*WindSoft Inc. v. Intercon Sys. (1988) Ltd.,*
    1995 WL 903453 (D.N.J. Sept. 12, 1995) ...................................................... 13

## INTRODUCTION

Master Sergeant Logan Ireland and Staff Sergeant Nicholas Bear Bade, two transgender men with exemplary United States Air Force careers, face administrative separation proceedings that will end their military service beginning as soon as March 26, 2025. These proceedings stem from an Executive Order issued by President Trump on January 27, 2025, directing the purge of transgender people from military service, and subsequent Implementing Guidance issued by the Secretary of Defense and the Air Force in January, February, and March 2025 (collectively "Orders") that reversed nearly a decade of policy permitting transgender individuals to serve in the military subject to the same standards and requirements applied to others.

While the constitutionality of these new policies is currently being challenged in two separate actions seeking nationwide injunctions (*Talbott v. Trump*, No. 25-cv-240 (D.D.C.) and *Schilling v. Trump*, No. 25-cv-241 (W.D. Wash.)), Plaintiffs, who are not parties to either of those actions, require immediate relief to prevent irreparable harm. Both were abruptly pulled from their duties just over a week ago. Master Sergeant Ireland was removed from an assignment at Joint Base McGuire-Dix-Lakehurst ("JB MDL"). Staff Sergeant Bade was pulled from deployment in the Middle East and returned to his home base at JB MDL. Both are in administrative limbo and face immediate and irreparable harm within days if the Court does not intervene.

Plaintiffs seek emergency relief to prevent Defendants from initiating administrative separation proceedings for them until the constitutionality of these Orders can be finally determined.[1] This temporary restraining order is necessary to prevent the irreparable harm that will occur if separation proceedings commence while the nationwide challenges remain pending.

---

[1] Plaintiffs have reached out to counsel for Defendants to provide a copy of the Complaint (with formal notice to follow) and this motion. Plaintiffs are requesting that the Court schedule the show cause hearing on this matter in sufficient time for the Court to issue its ruling by March 24, ahead of the March 26 date set for the initiation of administrative separation proceedings.

## STATEMENT OF FACTS

I.     <u>Relevant Policy History</u>

A.     **The 2016 Carter Policy**

In 2016, following a comprehensive study and review by senior military leadership, Secretary of Defense Ashton Carter adopted a policy permitting transgender individuals to serve openly in the military.  Declaration of Alex Wagner ("Wagner Decl."), ¶¶ 14, 15.  This decision was based on rigorous research, including a RAND Corporation study commissioned by the Department of Defense, which concluded that allowing transgender individuals to serve openly would have no adverse impact on unit cohesion, operational effectiveness, or readiness.  Wagner Decl. ¶ 13 Declaration of Shawn Skelly ("Skelly Decl."), ¶¶11–13. *See* Declaration of John ("Stapleton Decl."), Ex. A (Copy of RAND Report).

The Carter Policy, implemented through Directive-Type Memorandum 16-005, established that "service in the United States military should be open to all who can meet the rigorous standards for military service and readiness," and that transgender individuals meeting those standards would be allowed to serve.  Wagner Decl. ¶¶ 14–16.  The Carter Policy authorized gender transition during military service and the enlistment of transgender individuals who had already transitioned. *See* Stapleton Decl. Ex. B (Directive-Type Memorandum 16-005).

B.     **First Trump Administration Ban**

On July 26, 2017, President Trump announced that the government "will not accept or allow Transgender individuals to serve in any capacity in the U.S. military."  Stapleton Decl. Ex. D at 2.  This was formalized in a presidential memorandum on August 25, 2017 ("White House Directive" or "Directive").  Stapleton Decl. Ex. E.  That White House Directive ordered the Secretary of Defense to return to the policy in place "prior to June 2016" that prohibited transgender people from serving, halted all use of DoD resources for "sex reassignment surgical

- 2 -

procedures for military personnel," and directed Secretary Mattis to develop an implementation plan. *Id.* at 3.

Secretary Mattis released the "Mattis Plan" on February 22, 2018, which reversed the Carter Policy by barring transgender individuals from military service. Stapleton Decl. Ex. F (Mattis Plan). The Mattis Plan included a grandfather provision for transgender service members who were already openly serving but barred any other transgender people from joining the military or seeking to transition after joining. [2]

### C.    The 2021 Austin Policy

On January 25, 2021, President Biden issued Executive Order 14004, "Enabling All Qualified Americans to Serve Their Country in Uniform," which repealed the Trump Administration's transgender military ban.  Exec. Order No. 14,004, 86 F.R. 7471 (Jan. 25, 2021) Stapleton Decl. Ex. G.  The Executive Order stated that "it shall be the policy of the United States to ensure that all transgender individuals who wish to serve in the United States military and can meet appropriate standards shall be able to do so openly—free from discrimination." *Id.* § 1.

Secretary of Defense Lloyd Austin implemented this directive by revising military policy to again permit transgender troops to serve openly and on equal terms with other service members. Declaration of Gil Cisneros ("Cisneros Decl."), ¶¶ 8–11.  The framework was established through two key instructions:

1. DoD Instruction 6130.03, Volume 1 (Accessions), which authorizes transgender individuals to enlist in a sex different than their birth sex if they have been stable for 18 months following gender transition—i.e., living in a different sex than their

---

[2] The Mattis Plan, like the Directive, was initially enjoined, *Doe 2 v. Trump*, 315 F. Supp. 3d 474 (D.D.C. 2018), but the Court of Appeals for the District of Columbia vacated the preliminary injunction as it applied to the Mattis Plan, without prejudice, holding that the Mattis Plan represented a "significant change" from the originally enjoined policy and was not "a blanket ban on transgender service." *Doe 2 v. Shanahan*, 755 F. App'x 19, 25 (D.C. Cir. 2019). The Court of Appeals did not decide the constitutionality of the Mattis Plan.

birth sex and have no anticipated need of additional medical care for treatment of gender dysphoria other than continued hormone use.  Stapleton Decl. Ex. G §§ 6.13.g; 6.14.n; 6.28.t (DOD 6130.03);

2. DoD Instruction 1300.28, which details procedures for in-service gender transition. The instruction requires transgender service members to receive a gender dysphoria diagnosis and a medical treatment plan for gender transition, follow that treatment plan, and change their sex marker in DEERS.  Upon changing their sex marker in DEERS, the service member is subject to all military standards for others service members of the same sex as determined by a person's DEERs marker.  Stapleton Decl. Ex. H.

This policy has been successfully implemented for over four years.  Plaintiffs' military witnesses know of no studies or other information available through military sources that demonstrates transgender people as a group have been serving other than honorably and meeting military standards.  Wagner Decl., ¶¶ 33–45; Cisneros Decl., ¶¶ 12–18, 22–29, 36.

### D.    President Trump's Second Ban

On January 27, 2025, President Trump issued Executive Order 14183, titled "Prioritizing Military Excellence and Readiness."  Exec. Order No. 14,183, 90 F.R. 8757 (Jan. 27, 2025) (the "Order"), Complaint Ex. 2.  The Order directs the Secretary of Defense to ban transgender individuals from military service, based on the view that being transgender is inherently incompatible with "high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."  *Id.* § 2.

The Order states that "expressing a false 'gender identity' divergent from an individual's sex cannot satisfy the rigorous standards necessary for military service."  *Id.* § 1.  It further declares that "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life."  *Id.* It also states that a "man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member."  *Id.*

- 4 -

The Order further excludes transgender service members by requiring them to serve in their birth sex and be treated by others based on their birth sex. *Id.* § 3. It does so by incorporating definitions from Executive Order 14168 that define "sex" as "an individual's immutable biological classification as either male or female" at birth, and then providing that, effective immediately, "the Armed Forces shall neither allow males to use or share sleeping, changing, or bathing facilities designated for females, nor allow females to use or share sleeping, changing, or bathing facilities designated for males." Exec. Order No. 14,168, 90 F.R. 8615 (Jan. 20, 2025) ("Gender Ideology Order") Complaint Ex. 1 at § 2(a)–(e); Order § 4(d). The Order also directs that transgender service members may not use "identification-based" pronouns, the Order § 4(b), meaning that they must use pronouns based on their birth sex.

### E.    DOD Implementation of the Second Ban

On February 26, 2025, the Department of Defense carried out the direction of the President in the Order and issued a memorandum titled, "Additional Guidance on Prioritizing Military Excellence and Readiness," which ends transgender people's ability to serve in the military. Office of the Secretary of Defense, *Additional Guidance on Prioritizing Military Excellence and Readiness* (Feb. 26, 2025), Complaint Ex. 6 (the "Implementing Guidance"). The Implementing Guidance sets a 30-day period for the military to identify transgender service members and an additional 30-day period to initiate administrative separation proceedings. *Id.* at 5.

The Implementing Guidance declares that "the medical, surgical, and mental health constraints on individuals who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria are incompatible with the high mental and physical standards necessary for military service," directly reversing previous policies that allowed transgender service members to serve. *Id.* at 1–2 (listing rescinded policies).

- 5 -

Section 1.f. states that the Department is adopting the definitions of sex set forth in Executive Order 14,168, *id.*, which define sex as fixed at birth, for the express purpose of excluding transgender people from military service. *Id.* at 3. Section 1.g. reinforces the exclusion of transgender service members by requiring that all military standards related to "medical fitness for duty, physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards" will be based on birth sex. *Id.*

Sections 4.1, 4.3, and 4.4 set forth the operative provisions for administratively separating all transgender service members. Section 4.1 revises the standards for enlistment in the military to exclude transgender people. *Id.* at 6. Section 4.3 does the same for retention standards—that is, standards for continuing to serve once already in the military. *Id.* at 8.

The retention provision, Section 4.3, purports to create a "waiver," but that supposed waiver is unavailable to any transgender person. It excludes anyone with "a current diagnosis or history of . . . gender dysphoria," anyone showing "symptoms consistent with gender dysphoria" (§ 4.3(a)), anyone with "a history of cross-sex hormone therapy or sex reassignment surgery" (§ 4.3(b)), and anyone who has "attempted to transition" (§ 4.3(c)(2))—disqualifying both Plaintiffs. It further requires "36 consecutive months of stability in the Service member's" birth sex without clinically significant distress (§ 4.3(c)(1)), which Plaintiffs' declarant, Dr. Brown, explains is medically impossible for transgender people. Office of the Secretary of Defense, *Clarifying Guidance on Prioritizing Military Excellence and Readiness* (Feb. 28, 2025), Complaint Ex. 7; Declaration of George Brown ("Brown Decl."), ¶ 34.

Section 4.4 states that any troops identified by the procedures set forth in the February 26 memo "will be processed for administrative separation." *Id.* at 8. Under Section 4.4(a)(1), such troops are barred from the Disability Evaluation System (DES), which is normally used for medical

evaluations and would provide service members with much greater protections. *Id.*; Cisneros Decl. ¶¶ 39-41.

The rest of the Implementing Guidance establishes a very short period—30 days—within which transgender service members may self-identify and separate "voluntarily" in exchange for financial incentives and to avoid the potentially draconian financial impact of involuntary separation. Complaint Ex. 7 at 9.

On February 28, 2025, Tim Dill, who is Performing the Duties of the Assistant Secretary of Defense for Manpower and Reserve Affairs, issued a Memorandum with the subject "Clarifying Guidance on Prioritizing Military Excellence and Readiness," which states that transgender service members "are encouraged to elect to separate voluntarily by March 26, 2025." Department of Defense Clarifying Guidance, February 28, 2025, Complaint Ex. 7. On March 1, 2025, Gwendolyn R. DeFilippi, Acting Assistant Secretary of the Air Force for Manpower and Reserve Affairs, issued "Additional Guidance for Executive Order 14183, 'Prioritizing Military Excellence and Readiness,'" which states that transgender service members "are encouraged to elect to separate voluntarily no later than 26 March 2025." Air Force Additional Guidance, March 1, 2025, Complaint Ex. 8.

## II.    **Plaintiffs' Military Service**

### A.    **Service of Plaintiff Ireland**

Master Sergeant Logan Ireland is a thirty-seven-year-old transgender man serving as a Flight Chief in the Office of Special Investigations. Declaration of Logan Ireland ("Ireland Decl."), ¶¶ 1, 4. While currently stationed at Joint Base Pearl Harbor-Hickam in Hawaii, he was, until recently, serving in New Jersey as part of a multi-week training program at Joint Base McGuire-Dix-Lakehurst. *Id.* ¶¶ 1, 24.

He holds the Rank of E7, has served with distinction in the United States Air Force for over fourteen years, and hopes to remain in the Air Force until his retirement. *Id.* ¶¶ 1, 2,  20. This is a recent photo of Master Sergeant Ireland:



Since entering the Air Force, Master Sergeant Ireland has completed multiple overseas tours in support of Operation Enduring Freedom, Operation Freedom's Sentinel, and Operation Resolute Support.  He has been deployed to Kandahar, Afghanistan; Qatar; South Korea; and the United Arab Emirates. He has earned numerous accolades, including four Air Force Commendation Medals; two Air Force Achievement Medals; two Military Outstanding Volunteer Service Medals; three Non-Commissioned Officer of the Year awards; the Non-Commissioned Officer Academy's Commandant and Distinguished Graduate awards; and lead Command endorsements for promotion to both E6 and E7 ranks. *Id.* ¶¶ 5–6.

In December 2024, Master Sergeant Ireland received his Command's number one endorsement recommendation to receive an Officer commission and, in January 2025, applied to

Officer Training School. *Id.* ¶ 8. He has recently reenlisted for an indefinite contract with the U.S. Air Force. *Id.* ¶ 7.

Master Sergeant Ireland was diagnosed with gender dysphoria and medically transitioned in 2012 after his enlistment in the Air Force. *Id.* ¶ 9, 16. In 2014, he obtained a court-ordered legal name change and had transition-related surgery. *Id.* ¶ 11. He had additional medically necessary surgeries for his transition in 2017. *Id.* ¶ 16.

Were the prohibition on military service by transgender individuals to be implemented, Master Sergeant Ireland would lose the career he has spent years building and would be unable to continue to serve the United States as a member of the military. *Id.* ¶¶ 27–34. Additionally, Master Sergeant Ireland, having already served for fourteen years, is on a path toward the military's retirement benefits and would have to forego the opportunities afforded to service members who retire from the military.

Master Sergeant Ireland has already been impacted by the ban.  Until recently, he was on Temporary Duty ("TDY") at Joint Base McGuire-Dix-Lakehurst in New Jersey for a multi-week training and was supposed to remain there until March 29, 2025. *Id.* ¶¶ 22, 24. But on March 6, 2025, while on TDY at Joint Base McGuire-Dix-Lakehurst in New Jersey, Master Sergeant Ireland was told by his leadership that he would have to comply with female regulations and standards, including dress, grooming, and facilities standards, which he cannot do. *Id.* ¶¶ 22-23, 27.

He was also told that he would have to return to his home base in Hawaii from his TDY in New Jersey one week early, on March 22, 2025.  *Id.* ¶ 24. That early planned departure date was cut shorter still when Master Sergeant Ireland was made to involuntarily return to his home base on March 8, 2025. *Id.* ¶ 24. Since his return to Joint Base Pearl Harbor-Hickam, Master Sergeant

Ireland has been forced to go on administrative absence against his will for no other reason than that he is transgender. *Id.* ¶ 25.

Going on administrative absence means that Master Sergeant Ireland has been taken away from his job, fellow members of his unit, and opportunities for career advancement such as trainings and temporary duties. On March 14, 2025, he learned that his application for Officer Training School was denied, without explanation. *Id.* ¶ 24.

Based on the implementation timeline publicized by the Trump Administration, Master Sergeant Ireland reasonably believes that involuntarily administrative separation proceedings may be initiated against him as early as March 26, 2025.

### B.    Service of Plaintiff Bade

Staff Sergeant Nicholas Bear Bade is a forty-four-year-old transgender man who, until recently, was deployed to the Ali Al Salem Airbase in Kuwait as a member of the base's Security Forces. Declaration of Nicholas Bear Bade ("Bade Decl."), ¶¶ 1, 3. He has served with distinction in the United States Air Force for six years and hopes to stay in the Air Force for at least 20 years. *Id.* ¶¶ 2, 14. This is a recent photo of Staff Sergeant Bade:



Since enlisting in March 2019 and graduating in May of that year, Staff Sergeant Bade has risen in the ranks from Airman First Class (A1C) to Senior Airman (E4) and, following testing, was chosen for the highly selective E5 promotion. *Id.* ¶¶ 6. He began managing troops in 2023, following graduation from Airman Leadership School. *Id.* ¶ 6.

During his years of service, Staff Sergeant Bade has received numerous accolades, including a Diamond Sharp Award, a Wing level scholarship, the Military Outstanding Volunteer Service Medal, and an Achievement Medal. *Id.* ¶ 7. He has also been commended on his efforts as a Jewish Lay Leader where he supported service members from multiple branches, as well as civilian dependents. *Id.* Staff Sergeant Bade is currently stationed at Joint Base McGuire-Dix-Lakehurst in New Jersey, which is his home base. *Id.* ¶ 1.

In 2014, five years before enlisting, Staff Sergeant Bade was diagnosed with gender dysphoria and medically transitioned. *Id.* ¶ 8. In 2015, Staff Sergeant Bade obtained a court-ordered legal name change and had transition-related surgery. *Id.* ¶ 9. He also obtained a birth certificate and passport with a male gender marker. *Id.* At the time of his enlistment, all of Staff

Sergeant Bade's documentation indicated that he is male. *Id.* His gender marker in DEERS has consistently been male. *Id.*

Were the prohibition on military service by transgender individuals to be implemented, Staff Sergeant Bade would be unable to pursue his vocation and career and continue to serve the United States as a member of the military. Staff Sergeant Bade would also lose his income and access to benefits afforded to military members and their families.  Having already served for six years, he is on a path toward the military's retirement benefits, which he would lose.

Staff Sergeant Bade has already been directly affected by the ban. His leadership offered him three choices: voluntarily separate and leave deployment, face involuntary separation, or return from Kuwait on temporary administrative absence. *Id.* ¶ 18. Though scheduled to remain deployed until April 2025, and despite wanting to continue serving, he chose administrative absence and was forced to return early to New Jersey. *Id.* ¶ 18.

This has taken him away from his job, fellow members of his unit, and opportunities for career advancement such as trainings and temporary duties. It has also resulted in Staff Sergeant Bade's status as a transgender man being made generally known to other members of the military, exposing information that he previously treated as private medical information. *Id.* ¶ 24.

Staff Sergeant Bade wishes to remain in the Air Force and will not voluntarily separate. *Id.* ¶ 15.

Based on the implementation timeline publicized by the Trump Administration, Staff Sergeant Bade now reasonably believes that involuntarily administrative separation proceedings may be initiated against him as early as March 26, 2025.

## ARGUMENT

This Court should enjoin Defendants from initiating administrative separation proceedings for Plaintiffs here because the Order and Implementing Guidance that authorize them violate

Plaintiffs' Fifth Amendment equal protection rights, causing serious, irreparable harm that will destroy the military careers of these two service members along with their reputations. Plaintiffs easily satisfy the standard for obtaining a preliminary injunction here, as they have established: (1) that they are likely to succeed on the merits, (2) that they will suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. *B.H. v. Easton Area Sch. Dist.*, 725 F.3d 293, 302 (3d Cir. 2013) (en banc) (discussing four factors in preliminary injunction analysis); *see also Ne. Lumber Manufacturers Ass'n v. Sky of New York Corp.,* No. 16-cv-9487, 2016 WL 7491903, at *2 (D.N.J. Dec. 29, 2016) ("standard used to evaluate … the issuance of a temporary restraining order … is the same as that used to evaluate … the issuance of a preliminary injunction") (citations omitted).

The purpose of a TRO or preliminary injunction is to preserve the status quo, not to decide the merits of the case. *Anderson v. Davila*, 125 F.3d 148, 156 (3d Cir. 1997); *see also WindSoft Inc. v. Intercon Sys. (1988) Ltd.,* CIV. A. 95-1858, 1995 WL 903453, at *3 (D.N.J. Sept. 12, 1995) ("Preserving the status quo of an action pending final determination is the primary purpose of a preliminary injunction.").

## I.    <u>Plaintiffs Will Suffer Irreparable Harm Absent an Injunction</u>

 "[A]n injunction will not be granted unless the moving party demonstrates irreparable injury that cannot be adequately compensated by damages. While a plaintiff must establish more than a risk of irreparable harm and it is Plaintiff's burden of proving a clear showing of immediate irreparable injury," *Bowman v. Twp. of Pennsauken*, 709 F. Supp. 1329, 1348 (D.N.J. 1989) (internal quotation marks omitted) (citing and quoting *ECRI v. McGraw-Hill, Inc*., 809 F.2d 223, 226 (3d Cir. 1987)), Plaintiffs Master Sergeant Ireland and Staff Sergeant Bade easily meet that standard. The challenged policies are not merely threatening future harm—they are inflicting irreparable injury on Plaintiffs right now. Plaintiffs seek relief from this Court to stop the bleeding.

Both Master Sergeant Ireland and Staff Sergeant Bade have already been identified by the Air Force as disqualified from military service because of being transgender as set forth in the February 26, 2025, Implementing Guidance, Complaint Ex. 6. *See* Sections 4.3 (a), (b). The Air Force has already taken concrete actions against them on that basis: Master Sergeant Ireland was pulled from his temporary duty assignment in New Jersey under circumstances that demean his character and abilities despite him meeting all standards, and Staff Sergeant Bade was pulled back from a deployment also in a manner that demeans his character and tars his reputation. Both were placed on administrative absence, preventing them from performing their duties, rendering them nondeployable and making it impossible for them to meet military goals and standards. This removal from duty has already eroded the trust that their commands and troops have in them—a professional reputational harm that cannot be undone.

Key to this proceeding, the Plaintiffs have grave and well-founded concern that the U.S. Air Force will imminently initiate administrative separation proceedings to end their honorable careers. Section 4.4(a) of the Implementing Guidance explicitly directs that Master Sergeant Ireland and Staff Sergeant Bade "will be processed for separation" because they have gender dysphoria and have transitioned. There is no waiver available to them to avoid these proceedings. They have both transitioned, and Section 4.3(c)(2) prevents them from obtaining a waiver. And the Department of Defense and Air Force each have issued Guidance encouraging transgender service members to voluntarily separate by March 26, 2025, the clear implication of which is that involuntary separation will follow for those who do not. The immediacy of this harm to Plaintiffs cannot be overstated.

Plaintiffs ask this Court to halt Defendants from taking steps to initiate administrative separation proceedings against them. The stigma and reputational damage of being processed for

administrative separation—a procedure used to remove those who engage in misconduct or fail to meet standards—will create lasting harm to Plaintiffs simply because of who they are divorced from their abilities to do their jobs. Cisneros Decl. 35-37; Soper Decl. ¶¶ 14-16.  For Plaintiffs, military service is far more than a job—it is a career and a calling to which they have devoted years of their lives. *See, e.g.,* Ireland Decl. ¶¶ 1-9 (detailing service history and aspirations for the future); Bade Decl. ¶¶ 1-3 (same).

Multiple courts have recognized that the mere initiation of separation proceedings in violation of constitutional rights and where such proceedings are unrelated to a person's ability to perform their duties constitutes irreparable injury warranting preliminary relief, even before those proceedings conclude. *See*, *e.g.*, *Roe v. Dep't of Def.*, 947 F.3d 207, 229 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (holding that military discharges due to HIV status constituted irreparable harm because they were based on "outmoded policies" that bore "no relationship to the [plaintiffs'] ability to perform their jobs" and compounded stigma by forcing service members to reveal their HIV status); *Navy SEAL 1 v. Austin*, 586 F. Supp. 3d 1180, 1203 (M.D. Fla. 2022) (Marine who refused Covid-19 vaccine on religious grounds "face[d] immediate processing for separation or other punishment," and thus "irreparable harm will result absent injunctive relief"); *Schelske v. Austin*, 649 F. Supp. 3d 254, 275 (N.D. Texas 2022) (threatened separation proceedings constituted irreparable harm); *U.S. Navy SEALS 1-26 v. Austin*, 578 F. Supp. 3d 822, 839 (N.D. Tex. 2022) (holding that injuries such as removal from training, relief from leadership duties, and threatened separation are irreparable when "inextricably intertwined with Plaintiffs' loss of constitutional rights"), *stay denied sub nom U.S. Navy SEALS 1-26 v. Biden*, 27 F.4th 336 (5th Cir. 2022), *partial stay granted sub nom Austin v. U.S. Navy SEALS*, 142 S. Ct. 1301, 1302 (2022) (leaving in place preliminary injunction as to military separation).

A temporary restraining order is urgently needed to prevent this irreversible harm.

**II.**    **Plaintiffs Are Likely to Succeed on the Merits of Their Equal Protection Claims**

"The Fifth Amendment's Due Process Clause 'contains the same guarantee of equal protection under the law as that provided by the Fourteenth Amendment.'" *Cabrera v. Att'y Gen. United States*, 921 F.3d 401, 404 (3d Cir. 2019) (quoting *United States v. Pollard*, 326 F.3d 397, 406 (3d Cir. 2003)). Even where a policy does not otherwise warrant heightened scrutiny, a policy based on animus violates equal protection because it lacks a legitimate governmental purpose. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 34 (2020) (citing *Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). In addition, a plaintiff may show an equal protection violation where "there are policies that are facially discriminatory and that, by their own terms single out members of a protected class for different treatment." *Hassan v. City of New York*, 804 F.3d 277, 294 (3d Cir. 2015), *as amended,* (Feb. 2, 2016) (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213 (1995)); *accord Rd.-Con, Inc. v. City of Philadelphia*, 120 F.4th 346, 359 (3d. Cir. 2024). Finally, equal protection prohibits "facially neutral policies that the government purposefully 'designed to impose different burdens' on members of a protected class." *Hassan,* 804 F.3d at 295–95 (quoting *Arlington Heights*, 429 U.S. at 264–65).

The Order and Implementing Guidance fail constitutional scrutiny for all these reasons. They were adopted "to harm a politically unpopular group," which is never a legitimate governmental objective. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). In addition, they facially discriminate based on sex and transgender status—classifications requiring heightened scrutiny which the policy cannot withstand. And finally, even if viewed as merely having disparate effects on transgender personnel, the record amply demonstrates they were adopted for a discriminatory purpose and therefore fail equal protection review.

### A.    The Order and Implementing Guidance Are Motivated by Unconstitutional Animus and, But for Animus, Would Not Have Been Enacted

Under any level of scrutiny, government action violates equal protection when its "discontinu[ity] with the reasons offered for it" renders it "inexplicable by anything but animus toward the class it affects." *See*, *e.g.*, *Romer v. Evans,*, 517 U.S. 620, 632 (1996); *Moreno*, 413 U.S. at 534 ("[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."). Under this longstanding doctrine, Plaintiffs need only show that animus was "a motivating factor," not the sole or even primary factor. *Arlington Heights*, 429 U.S. at 265–66 ("When there is a proof that a discriminatory purpose has been a motivating factor in the decision, . . . judicial deference is no longer justified."); *see also Doe v. Ladapo,* 737 F. Supp. 3d 1240, 1273 (N.D. Fla. 2024) (same).

The Order and Implementing Guidance clearly demonstrate unconstitutional animus.  The Order was issued at the same time as several other executive orders targeting transgender people across virtually every area of federal law. It abruptly reversed a carefully developed military policy based on extensive study.  The Order cited no evidence of problems with transgender service, ignored the successful service of thousands of transgender personnel since 2015, and contained openly derogatory language—characterizing transgender identity as "false" and incompatible with an "honorable, truthful, and disciplined lifestyle" or with "humility and selflessness."

The Implementing Guidance issued on February 26 also openly targets and demeans transgender people.  It portrays transgender identity as delusional, defining gender identity as "a fully internal and subjective sense of self, disconnected from biological reality and sex" that "does not provide a meaningful basis for identification" (Complaint Ex. 7 at G2).  Without evidence, it declares transgender service "incompatible with military service" and "not in the best interests of

the Military Services" (§ 1.c). It falsely claims transgender individuals cannot meet military standards of "readiness, lethality, cohesion, honesty, humility, uniformity, and integrity," (§ 1.b) and makes unsubstantiated claims about "medical, surgical, and mental health constraints" that contradict both medical evidence and transgender service members' actual service records. It abruptly cancels existing non-discrimination policies permitting transgender people to serve, terminates all transition-related healthcare, and requires virtually immediate identification and separation of transgender service members. The policy reverses previous military leadership determinations while citing no new evidence and completely disregards years of successful service by transgender personnel, including those with exemplary records.

Several aspects of the process created by the Implementing Guidance are unprecedented. For the first time in military history, the policy uses the process of "voluntary separation" to eliminate an entire group of service members based on a characteristic unrelated to their ability to serve and applies administrative separation (typically reserved for misconduct) to individuals who are meeting standards and serving honorably. *See* Complaint Ex. 6; Wagner Decl. ¶¶ 63-66; Cisneros Decl. ¶¶ 37-38; Soper Decl. ¶ 8-16. In addition, the Guidance treats gender dysphoria unlike any other medical condition: while others receive individual fitness evaluations, those with gender dysphoria face automatic separation. In addition, it inexplicably bars service members with gender dysphoria from the individualized assessment provided in the Disability Evaluation System, which is available to service members with every other medical condition. *See* Wagner Decl. ¶¶ 63–65; Cisneros Decl. ¶ 38; Soper Decl. ¶ 11-13. Defendants' avoidance of this system suggests the policy stems from anti-transgender animus rather than genuine medical fitness concerns.

The timing, context, and sweeping nature of the Order and Implementing Guidance demonstrate that they reflect "negative attitudes," "fear," and "irrational prejudice" rather than legitimate military needs. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985). Multiple factors establish this impermissible animus.

First, the Order's text openly expresses hostility toward transgender individuals as a class, declaring their identity a "falsehood" incompatible with military values of "honesty" and "integrity." Order at §§ 1, 2. The Implementing Guidance repeats and amplifies these group-based negative characterizations, which are directly refuted by the distinguished and decorated service of transgender service members in the record. Such overt expressions of animosity toward a disfavored group—especially when proffered as an official explanation of government action—are rare and warrant careful consideration by this Court. *Romer*, 517 U.S. at 633 (holding that "laws singling out a certain class of citizens for disfavored legal status or general hardships are rare" and warrant careful consideration for that reason).

Second, the timing of the Order and Implementing Guidance suggest pretext rather than military necessity, as does the highly unusual process by which they were developed and promulgated. The government has offered no explanation for reversing an existing policy in such an abrupt and precipitous manner, with none of the deliberation or care normally involved in adopting new military policies.

The rollout of the new policies has been chaotic. "It has been rolled out on an extremely expedited timeline that puts the affected service members under enormous pressure to make life-altering decisions without adequate time to seek counsel or reflect. It comes with no guidance on how units should adapt, reconfigure, or adjust to the loss of a teammate performing an important role." Wagner Decl. ¶ 70.

- 19 -

Third, the Order is part of a broader pattern of targeted discrimination. From its first days, this administration has moved to strip protections from transgender people across multiple domains—including housing, social services, schools, sports, healthcare, employment, international travel, and family life. *See, e.g.,* Exec. Order 14168, 90 F.R. 8615 (Jan. 20, 2025) (Gender Ideology Order); Exec. Order 14187, 90 FR 8771 (Jan. 28, 2025) (seeking to withdraw federal funding from hospitals that provide gender-affirming care to anyone under 19); Exec. Order No. 14201, 90 FR 9279 (Feb. 5, 2025) (directing Department of Education to take steps to prohibit transgender women and girls from playing on female sports teams). This context reinforces that the ban reflects "a bare desire to harm a politically unpopular group," which cannot survive any level of scrutiny. *United States v. Windsor*, 570 U.S. 774, 770 (2013); *see also Arlington Heights*, 429 U.S. at 267 ("The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes.").

Finally, the Supreme Court has repeatedly struck down laws that impose "a broad and undifferentiated disability on a single named group," particularly where the gap between the stated justifications and actual effects shows the classification was drawn "for the purpose of disadvantaging" the group. *Romer*, 517 U.S. at 632. The transgender military ban is such a measure. Its sweeping exclusion of all transgender individuals regardless of their demonstrated ability to serve, combined with its reliance on stereotypes and its emergence from a context of broader discrimination, reveal it as unconstitutional animus that "the Equal Protection Clause does not permit." *Id.* at 634–35.

**B. The Order and Implementing Guidance Warrant Heightened Scrutiny Because They Facially Classify Based on Sex and Transgender Status and Mandate Disparate Treatment of Transgender Service Members.**

By singling out transgender people for differential treatment, the Order and Implementing Guidance facially discriminate against transgender people in multiple ways:

- First, they declare that "adoption of a gender identity inconsistent with an individual's [birth] sex" renders a person unfit to serve. Order § 1. The Order and Implementing Guidance are replete with statements rejecting transgender people in the military, including that, "An individual's sex is immutable, unchanging during a person's life," Guidance § 1.(f), and that "a man's assertion that he is a woman," Order § 1, is not consistent with military values. *See also* Gender Ideology Order § 1.

- Second, they exclude anyone who has gone through gender transition or even "attempted to transition," Guidance § 4.3(c)(2), by requiring them to serve, if at all, only by suppressing their transgender identity and serving in their birth sex. These include provisions concerning the use of pronouns, housing, and facilities and the denial of transition-related medical care.

- Third, they incorporate a federal rule that defines "sex" as an "immutable biological classification" that is fixed at "conception"—a definition adopted for the first time across all federal law and with the avowed purpose and intended effect of eradicating all federal legal recognition of transgender people. By incorporating this definition, Defendants' policies seek to eradicate even the possibility of recognizing that transgender people exist and to purge them from military service. *See* Declaration of Dr. Carrie Baker ("Baker Decl."), ¶ 24.

By expressly classifying—and discriminating against—service members based on transgender status, the Order and Implementing Guidance classify based on sex because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020). Multiple circuit courts have concurred that classifications based on transgender status are inherently sex-based. *See Fowler v. Stitt*, 104 F.4th 770, 793 (10th Cir. 2024); *Kadel v. Folwell*, 100 F.4th 122, 153 (4th Cir. 2024); *Hecox v. Little*, 104 F.4th 1061, 1074 (9th Cir. 2024), *as amended* (June 14, 2024); *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,* 858 F.3d 1034, 1051 (7th Cir. 2017); *Dodds v. U.S. Dep't. of Educ.*, 845 F.3d 217, 221 (6th Cir. 2017). As such, transgender classifications warrant heightened scrutiny. *United States v. Virginia (VMI)*, 518 U.S. 515, 555 (1996) ("[A]ll gender-based classifications . . . warrant heightened scrutiny.") (internal quotations and citations omitted). They also warrant heightened scrutiny because transgender status meets the criteria for a quasi-suspect

characteristic.  *Evancho v, Pine-Richland Sch. Dist*., 237 F. Supp. 3d 267, 288-89 (W.D. Pa. 2017). Because Defendants can offer no "exceedingly persuasive" justification for the accession and retention policies' facial targeting of transgender people, those policies fail the exacting demands of heightened scrutiny. *Id.* at 533.

> 1.    *The Order and Guidance facially exclude transgender people from military service.*

The plain terms of the Order repeatedly state that being transgender is incompatible with military service.  The Order establishes a policy that transgender status is incompatible with "high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity" and bars transgender individuals from military service.   Order 8757 § 2.   It declares as binding government policy that "expressing a false 'gender identity' divergent from an individual's [birth] sex cannot satisfy the rigorous standards necessary for military service" and that "adoption of a gender identity inconsistent with an individual's [birth] sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle, even in one's personal life." *Id*. § 1.  The Order then restates this group-based exclusion a third time, providing that "[a] man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member." *Id.*

The Implementing Guidance repeats and amplifies the Order's facial denigration and exclusion of transgender service members.  Like the Order, the Guidance provides that military service by transgender individuals is inconsistent with standards of "readiness, lethality, cohesion, honesty, humility, uniformity, and integrity."   Implementing Guidance § 1(b).   It directs that transgender individuals will no longer be eligible for accession to military service, and that current transgender service members will be identified and then processed for administrative separation and dismissed from service. *Id.* §§ 1(d), (e); 3.4(e), (f); 4.1(a), (b); 4.3(a), (b); 4.4(a).

- 22 -

The Order and Implementing Guidance exclude transgender people from military service through the use of various substantively equivalent terms: "expressing a false 'gender identity,'" "adoption of a gender identity inconsistent with an individual's sex," "a man's assertion that he is a woman," "individuals with gender dysphoria," "exhibit[ing] symptoms consistent with, gender dysphoria," "history of sex reassignment," "pursuit of a sex transition," and "attempt" at transition. Order 757 §§ 1, 2; Guidance §§ 1(b)–(e); 4.1(b); 4.3(b), (c)(2). All these terms are simply different ways of facially discriminating against transgender people.

>    2.    *The Order and Guidance facially discriminate against transgender people by requiring them to suppress their transgender identity and barring anyone who has transitioned.*

The Order and Implementing Guidance also facially discriminate against transgender service members by subjecting them to discriminatory terms of service that require them to suppress or deny their transgender identity. The Order expressly commands the military to require all transgender service members, including those who have completed their transition, to use housing, bathing, and other facilities based on their birth sex rather than their current sex as reflected in DEERS. *See* Order. § 4(d). Because of the Hobson's Choice this presents transgender service members, more recent guidance explains that the only way these provisions can be reconciled is to put transgender service members on administrative leave pending their separation following administrative separation proceedings. The Order also requires that transgender service members be referred to (and refer to themselves) using pronouns based on their birth sex rather than their current sex. *See id.* § 4(b).

The Implementing Guidance parallels the Order by providing that "all Service members will only serve in accordance with their [birth] sex" and by requiring that standards related to "medical fitness for duty, physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards," as well as pronoun usage, will be based on birth

sex.  Implementing Guidance § 1(f), (g), (h).  As the Third Circuit has recognized, such policies facially discriminate against transgender people and cause them serious harms. *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 523 (3d Cir. 2018).  The Order and Implementing Guidance further provide that no transition-related medical care, including previously "scheduled, or planned" care, will be provided to transgender service members, with a limited exception for hormone therapy for certain service members already receiving it until they are separated. Implementing Guidance §§ 1(j), 4.2; *see also* Stapleton Decl. Ex. I ("FAQ").

In effect, these provisions compel transgender service members to stop being transgender (an impossibility) for the brief time they may be able to remain in military service before facing separation.  Because no transgender service member can do this, including the Plaintiffs here, Defendants authorize command to place transgender service members on administrative absence pending administrative separation proceedings.

The Supreme Court and many other courts have held that policies such as these discriminate based on sex.  In *Bostock*, the Supreme Court held that an employer's termination of a transgender woman because she could not comply with the employer's requirement that she present at work as male constituted discrimination based on sex.  590 U.S. at 654. Many courts have similarly held that requiring transgender people to use facilities based on their birth sex rather than their post-transition sex also discriminates based on transgender status and therefore on sex. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd*., 972 F.3d 586, 608–13 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *Whitaker*, 858 F.3d at 1050–54.

Any argument that the Order and Implementing Guidance classify based on a medical condition—gender dysphoria—rather than on sex or transgender status fails for two reasons. First, many of their restrictions barring transgender service are not tied to a medical diagnosis. These

include requirements that (1) access to housing and facilities, (2) compliance with uniform and grooming standards, and (3) pronoun usage all must be based on a service member's birth sex. These requirements make no reference to medical diagnosis. Additionally, the policy includes changing every transgender person's DEERS marker to their birth sex, regardless of medical condition, history, or circumstance. *See* FAQ at 4. These discriminatory terms apply to all transgender service members regardless of any current or past gender dysphoria diagnosis and do not claim any medical justification. *See* Implementing Guidance § 3.4.

Second, courts have recognized that classifications based on gender dysphoria facially target transgender people. This is because "gender dysphoria is so intimately related to transgender status as to be virtually indistinguishable from it." *Kadel*, 100 F.4th at 146. "The excluded treatments aim at addressing incongruity between sex assigned at birth and gender identity, the very heart of transgender status." *Id.*; *Doe v. Austin,* No. 22-cv-368, 2024 WL 4653290, at *11–12 (D. Me. Nov. 1, 2024)  (concluding insurance coverage exclusion for "sex gender changes" facially discriminates based on sex and transgender status and is subject to heightened scrutiny); *Brandt v. Rutledge*, 677 F. Supp. 3d 877, 917–22 (E.D. Ark. 2023); *Flack v. Wis. Dep't of Health Servs*., 328 F. Supp. 3d 931, 951–53 (W.D. Wis. 2018); *Doe v. City of Philadelphia*, No. 24-cv-468, 2024 WL 3634221 at *5 (E.D. Pa. Aug. 2, 2024).

That polices about gender dysphoria are targeted at transgender people is also obvious from the definition of the group to be identified for separation, which is not even limited to those with a "current diagnosis or history of . . . gender dysphoria," but includes anyone identified even who "exhibit[s] symptoms consistent with" gender dysphoria.  Implementing Guidance § 3.4(e).  The Implementing Guidance thus itself makes clear the goal—identify the broadest pool of anyone who might possibly be transgender and separate them.

3.    *The Order and Guidance facially discriminate against transgender people by incorporating a definition of "sex" that deliberately excludes transgender people.*

The Order and Implementing Guidance also facially discriminate against transgender people by incorporating definitions from the Gender Ideology Order that define "sex" as "an individual's immutable biological classification" at birth, 90 Fed. Reg. 8615 § 2(a), in order to exclude transgender people. As another federal district court recently observed: "The Court cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist." *PFLAG, Inc. v. Trump*, No. 25-cv-337, 2025 WL 68514, at * 24 (D. Md. Mar. 4, 2025) (noting that the definition of sex in the Gender Ideology Order "appears . . . to deny the existence of transgender persons altogether").

These provisions purport to impose universal definitions of "male" and "female" that apply across all federal programs, consistent with the administration's stated goal of eliminating any legal recognition or protection of transgender people in employment, healthcare, education, housing, sports, social services, military service, and other arenas.  The breadth of their application and the timing and context of their issuance shows—as the administration has openly asserted—that they were adopted for the express purpose of eliminating all legal recognition of transgender people across the entire federal government and federal law.  Baker Decl. ¶¶ 13–15, 23–25.  In this respect, the Gender Ideology Order bears a striking resemblance to an earlier federal enactment—the Defense of Marriage Act (DOMA)—which employed a similar approach of adopting a federal definition of "marriage" in order to deny federal recognition to the marriages of same-sex couples.  *See id.* ¶¶ 4–7.

In *Windsor*, the Supreme Court recognized that the sweeping breadth and unusual character of such an enactment belied any suggestion that it simply established a benign and

uniform definition, and that in fact it was designed to "impose inequality" on legally married same-sex couples. 570 U.S. at 772. The Court noted that Congress had not previously found it necessary to establish a federal definition of marriage but elected to do so only in response to efforts by same-sex couples to seek the freedom to marry under state law. *See id.* at 767–69. The same is true here where neither Congress nor the Executive has ever before found it necessary to define sex for federal law purposes. The Executive has done so here, for the first time in our Nation's history, as part of a comprehensive effort to deny equal protections of law for transgender people. *See* Baker Decl. ¶¶ 13–15, 23–25.

As Dr. Baker explains, the context in which these definitions were adopted demonstrates that they represent a "reaction to increasing social recognition of transgender individuals" rather than an effort to enact a definition for legitimate policy reasons. Baker Decl. ¶ 21. This approach is a "sharp break from . . . historical precedent and practice" and follows "a recognizable pattern of using selective definitions to restrict rights when marginalized groups gain social visibility and recognition." *Id.* ¶¶ 21, 24.

In other cases, courts have readily found that similar definitions of sex facially discriminate based on transgender status. *Hecox*, 104 F. 4th at 1078 ("The definition of 'biological sex' in the Act is written with seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." (quotation omitted)); *Doe v. Horne*, 115 F.4th 1083, 1105 (9th Cir. 2024) (similar); *L.E. by Esquivel v. Lee*, 728 F. Supp. 3d 806, 831 (M.D. Tenn. 2024) (similar); *Tirrell v. Edelblut*, 748 F. Supp. 3d 19, 32 (D.N.H. 2024) (similar). As the Fourth Circuit has explained, "[t]he undisputed purpose—and the only effect—of [such] definition[s] is to exclude transgender [individuals] from the definition of ['male' or] 'female'

and thus to exclude them . . . .  That is a facial classification based on gender identity." *B.P.J. v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 556 (4th Cir. 2024) *cert. denied*, 145 S. Ct. 568 (2024).

   *4. Classifications based on transgender status warrant heightened scrutiny.*

  The Order also independently warrants heightened scrutiny because the class it targets—transgender individuals—satisfies the criteria for at least a quasi-suspect classification. *Evancho*, 237 F. Supp. 3d at 288-89.  First, being transgender is an immutable characteristic. *Id*. at 289 ("It is deeply ingrained and inherent in their very beings."); Declaration of Dr. George Brown ("Brown Decl."), at ¶ 20 (transgender identity is immutable and biologically based).  Second, "transgender people as a class have historically been subject to discrimination or differentiation." *Evancho*, 237 F.Supp.3d at 288. Third, despite this history of discrimination, being transgender "bears no relation to an ability to perform or contribute to society."  *Id.*  And finally, transgender people "make up a small . . . proportion of the American population." *Id.* Courts across the country agree that discrimination against transgender individuals warrants heightened scrutiny. *See, e.g.*, *Hecox*, 104 F.4th at 1079; *Grimm*, 972 F.3d at 586; *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015); *Bd. of Educ. of Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 873 (S.D. Ohio 2016); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 718–19 (D. Md. 2018); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018); *Doe 1 v. Trump,* 275 F. Supp. 3d 167, 208–09 (D.D.C. 2017).

  The record before the Court amply supports that transgender status satisfies each of the factors that define a quasi-suspect classification.  In particular, transgender individuals have been subject to pervasive discrimination both historically and today.  Historically, governments have criminally punished transgender people for wearing the "wrong" clothing, barred them from being teachers or federal employees or from serving in the military, excluded them from

- 28 -

nondiscrimination laws, prevented them from correcting sex markers on government-issued identity documents, excluded coverage of transition-related care under Medicare and Medicaid and for incarcerated transgender people, stripped transgender parents of custody and even parental rights, and barred transgender people from marriage.[3]  This discrimination continues in the present day.  "The hostility and discrimination that transgender individuals face in our society today is well-documented."  *Brocksmith v. United States*, 99 A.3d 690, 698 n.8 (D.C. 2014).  This historical discrimination has escalated dramatically over the past five years, as many states have passed laws denying transgender people basic rights and protections.  *See* Stapleton Decl. Ex. M.

### C.    The Order and Guidance Also Violate Equal Protection Because They Were Adopted at Least in Part for a Discriminatory Purpose.

Even if the Order and Guidance did not facially discriminate against transgender people, they would be subject to heightened scrutiny because a facially neutral policy is subject to heightened scrutiny under equal protection principles if it was "designed to impose different burdens" on the disfavored group. *Hassan*, 804 F.3d at 294 (quoting *Arlington Heights*, 429 U.S. at 266); *see also Fowler*, 104 F.4th at 784–85 (state policy of denying transgender applicants amendment of birth certificates was subject to heightened scrutiny where plaintiffs "alleged facts from which we may reasonably infer purposeful discrimination on the basis of transgender status"); *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1230 (11th Cir. 2023) (facially neutral statute is subject to heightened scrutiny if it is "a pretext for invidious discrimination against

---

[3] *See, e.g.*, *Cisek v. Cisek*, No. 80 C.A. 113, 1982 WL 6161 at *1–2 (Ohio Ct. App. July 20, 1982) (denying visitation to parent on the basis of parent's transgender status); *Daly v. Daly*, 715 P.2d 56, 59-60 (Nev. 1986) (terminating parental rights on the basis of parent's transgender status); *M.B. v. D.W.*, 236 S.W.3d 31, 35–38 (Ky. Ct. App. 2007) (same); Stapleton Decl. Ex. J, K, and L.

[transgender] individuals"); *Doe v. Ladapo*, 737 F. Supp. 3d at 1282 (subjecting state statute banning medical care for transgender minors to intermediate scrutiny under *Arlington Heights*).

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. A court may infer purposeful discrimination based on the "totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976). Where a "clear" and "stark" pattern of disparate impact "emerges from the effect" of the challenged policy, "[t]he evidentiary inquiry is . . . relatively easy," and "impact alone" may be "determinative." *Arlington Heights*, 429 U.S. at 266. Other relevant facts include the "historical background" of the challenged policy, the "sequence of events leading up to the challenged" policy, and "[d]epartures from the normal procedural sequence" in the adoption of the policy. *Id.* at 267.

Applying the *Arlington Heights* factors, the record overwhelmingly demonstrates that purposeful discrimination was a motivating factor underlying the Order and Guidance—in other words, that the Order and Guidance were issued "at least in part 'because of,' not merely 'in spite of,' [their] adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

First, the starkly disparate impact of the Order and Guidance is clear: only transgender service members are affected. *See, e.g.*, *Fowler*, 104 F.4th at 786 (finding discriminatory purpose where challenged "[p]olicy affects transgender people but not cisgender people"); *Doe v. Ladapo*, 737 F. Supp. 3d at 1269 (same).

Second, the Order continues President Trump's longstanding effort to exclude transgender people from military service, dating back to 2017, as well as contemporaneous orders targeting transgender people in every other arena of federal law. *See Church of Lukumi Babalu Aye, Inc. v.*

*City of Hialeah*, 508 U.S. 520, 540 (1993) (noting relevance of contemporaneous resolution));

*Hecox v. Little*, 479 F. Supp. 3d 930, 984 (D. Idaho 2020) (noting relevance of companion law

targeting transgender people; *Doe v. Ladapo*, 737 F. Supp. 3d at 1274 ("Perhaps the best evidence

of [animus] is another statute passed on the very same day as the statute at issue here.").

Third, the Order and Implementing Guidance include overt expressions of animosity

toward transgender people.  The Order itself accuses transgender people of lacking the "honesty,"

"humility," "integrity," "honor[]," "truthful[ness]," and "discipline[]" needed for military service,

and the Implementing Guidance repeats those accusations.  90 Fed. Rep. 8757 §§ 1–2.

Fourth, the Order and Implementing Guidance were issued in a rushed and highly unusual

manner that reflects multiple departures from the normal procedural sequence for adoption of

military policies.  *See* Skelly Decl. ¶¶ 16–18; Wagner Decl. ¶¶ 69-70.  The Order was issued a

week after President Trump took office and was preceded by no apparent study.  The Implementing

Guidance was issued 30 days later in a similarly rushed manner that involved no evident effort to

study in any meaningful way the record of open service by transgender service members during

the years the Austin Policy was in effect.  And, rather stunningly, a core direction of the

Implementing Guidance, identifying the group subject to separation, remains subject to

forthcoming instruction.  *See* FAQ at 2 ("The Department will provide supplemental guidance

which will address the identification of Service members diagnosed with gender dysphoria.").

### D.    The Order and Guidance Cannot Survive Any Level of Review.

#### 1.    *Deference to military judgment does not shield a facially discriminatory policy from heightened scrutiny.*

The government is not "free to disregard the Constitution when it acts in the area of

military affairs." *Rostker v. Goldberg*, 453 U.S. 57, 67 (1981); *Dillard v. Brown*, 652 F.2d 316 (3d

Cir. 1981) ("The military has not been exempted from constitutional provisions that protect the

rights of individuals, even though the rights of those in the armed forces may differ from those of civilians."); *Kyle-Labell v. Selective Serv. Sys.*, 364 F. Supp. 3d 394, 417 (D.N.J. 2019) (declining to dismiss Equal Protection challenge to Selective Service registration requirement because "[military] deference does not mean abdication").

The Supreme Court in *Rostker* expressly declined to adopt a lower level of scrutiny when assessing the validity of a sex-based military classification. 453 U.S. at 69. Applying heightened scrutiny, the Court upheld the military's sex-based selective service registration based on the then-existing exclusion of women from combat, which put men and women into dissimilar positions with respect to a potential draft.  453 U.S. at 77–79; *see also Frontiero v. Richardson*, 411 U.S. 677, 688–91 (1973) (plurality) (applying heightened scrutiny in equal protection sex-discrimination challenge to military benefits rules); *Owens v. Brown*, 455 F. Supp. 291, 305–09 (D.D.C. 1978) (invalidating ban on assignment of female service members and rejecting government's morale and discipline rationales where the ban's overbreadth belied asserted purpose of preserving combat effectiveness).  Because the Order and Guidance facially discriminate based on sex, these holdings require the application of heightened scrutiny.

Courts must be "appropriately deferential" in reviewing "the 'considered professional judgment' of 'appropriate military officials,'" *Goldman v. Weinberger*, 475 U.S. 503, 509 (1986)); however, they do not reflexively defer to government decisions simply because they relate to the military. Rather, courts have deferred to the military's assessment of the importance of interests that might not be considered important in civilian settings.  For example, in *Goldman*, the Court credited the importance of the military's asserted interest in the need for uniformity—a consideration with little relevance to civilian workplaces. *See* 475 U.S. at 507.  But that deference to the importance of the government's asserted interest does not convert heightened scrutiny into

mere rational basis review; to the contrary, courts must still carefully examine whether a challenged policy actually furthers the asserted interest.

Plaintiffs do not question the military's interests in readiness, lethality, and unit cohesion. Rather, they argue that there is no rational—much less substantial—relationship between advancing these interests and excluding transgender people from service. Defendants' claim that transgender service members with gender dysphoria must be excluded to advance these interests conflicts with the military's individualized approach to all other medical conditions. Proper deference to military judgment does not eliminate the need for heightened scrutiny regarding the fit between the government's interests and its policy.

> 2.    *Defendants cannot meet their burden under heightened scrutiny and the challenged policy fails even rational basis review.*

Under heightened review, the government must make an "exceedingly persuasive" showing that the Order and Implementing Guidance serve important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives. *VMI*, 518 U.S. at 533. "The justification must be genuine, not hypothesized or invented post hoc in response to litigation," and cannot rely on "overbroad generalizations" about transgender people. *Id*. Even without heightened scrutiny, the Order and Implementing Guidance fail basic equal protection requirements—there must be a rational relationship between the classification and objective. *Cleburne*, 473 U.S. at 442. The asserted justifications are so disconnected from the ban's broad sweep that they fail even this basic test.

Defendants are likely to claim that barring military service by transgender people advances the same governmental interests that were asserted in support of the 2018 Mattis Plan: (1) promoting military readiness, based on purported concerns about the deployability of transgender troops; (2) promoting unit cohesion, based on concerns about maintaining sex-based standards;

and (3) lowering costs.  Stapleton Decl. Ex. O ("Action Memo").  None of these asserted justifications justifies singling out and disqualifying transgender people from service as Defendants have done.

(i)     <u>The Ban does not promote military readiness.</u>

Banning individuals from military service because they are transgender undermines military readiness.  The military already has universal policies for enlistment, deployment, and retention.  *See* DODi 6130.03, Vol. 1, Stapleton Decl. Ex. C at 2; Soper Decl. ¶ 22.  Apart from transgender people, the military relies on these universal standards to determine fitness to serve; no other class of people is excluded from individualized evaluation under those standards or presumed to be unfit simply by virtue of their membership in a particular class.  Because transgender service members must already comply with military-wide policies, having a separate policy that excludes them from service simply for being transgender serves only to bar transgender individuals who are fit to serve and to deploy.

First, all prospective service members undergo rigorous examination for preexisting physical or mental health conditions that might preclude enlistment.  *See* Stapleton Decl. Ex. C, Soper Decl. ¶ 17; Wagner Decl. ¶ 48.  Ignoring this existing screening process, the Order and Implementing Guidance justify banning transgender people by claiming higher rates of suicidality and psychiatric diagnoses.  But anyone with a history of suicidal behavior—transgender or not—is barred from enlisting.  *See* DODi 6130.03, Vol. 1, Stapleton Decl. Ex. C at 6.28(m).  Anyone with anxiety or depression history—transgender or not—faces the same enlistment criteria.  *See id.* at 5.29(f), (q); *see also* Soper Decl. ¶ 20, Wagner Decl. ¶¶ 22, 24, 34 and Brown Decl. ¶¶ 71, 72.  Under these universal standards, all enlistees are screened to ensure medical and mental health history meets service requirements.  Defendants do not (and cannot) claim all transgender people

share characteristics raising fitness concerns. Therefore, the ban only excludes qualified transgender applicants, impeding rather than advancing military readiness.

The irrationality of excluding fit applicants explains why the military does not categorically exclude other demographic groups with disproportionate rates of mental health conditions. Soper Decl. ¶¶ 19, 21. For example, children of service members have significantly elevated suicide attempt rates, Brown Decl. ¶¶ 69-70, yet are not barred from service. Defendants' anomalous approach to transgender people strongly suggests animus rather than legitimate concerns. *Cf. Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 366 n.4 (2001) (noting that a policy should be struck down where its "justifications . . . made no sense in light of how the [government] treated other groups similarly situated in relevant respects").

The Order and Implementing Guidance irrationally cite deployability concerns to exclude even transgender individuals who have completed transition and require only the same routine hormone therapy many other service members receive. *See* Implementing Guidance §§ 4.3(c)(2), 4.4(a) (requiring separation based on "history" of gender dysphoria and denying waivers for anyone who has "attempted to transition"). This policy excludes medically stable and fit individuals who could meet the same accession criteria as other applicants.

Second, the policy also irrationally excludes all service members with gender dysphoria rather than relying on medical retention standards that already apply to all service members. No other medical condition is subject to this rule. Rather, under existing standards, any service member who develops any health condition that could result in unfitness must undergo a medical evaluation process, including review by a medical evaluation board. *See* DOD Instruction 1332.18 at § 3.2.a (purpose of medical evaluation board); § 3.3.a, Stapleton Decl. Ex. X, (purpose of physical evaluation board); § 5.2 (criteria for referral); *see also* Soper Decl. ¶ 13. That review

determines whether there are restrictions on the person's ability to serve and may, where appropriate, result in discharge. *See id.* The Order and Implementing Guidance divert transgender service members from individualized review and subject them to automatic discharge. Defendants do not (and cannot) claim that all transgender people requiring gender transition would fail individualized review. The policy's only effect is to discharge otherwise fit individuals— undermining, rather than advancing, military readiness.

In sum, singling out transgender people based on speculation that some may fail military standards is both dramatically overinclusive (excluding many fit to serve) and underinclusive (ignoring non-transgender people with medical needs causing nondeployment or increased health risks). Laws that are "grossly over- and under-inclusive" are "so poorly tailored" to legitimate interests that they "cannot survive heightened scrutiny." *Latta v. Otter*, 771 F.3d 456, 472 (9th Cir. 2014); *see also Bostic v. Schaefer*, 760 F.3d 352, 382 (4th Cir. 2014) (rejecting justifications "so underinclusive" that they "must have rested on irrational prejudice" (cleaned up)). As the Second Circuit held in *Crawford v. Cushman*, military policies targeting conditions associated with specific groups—there, pregnant women—in such anomalous fashion fail even rational basis review: "Why the Marine Corps should choose, by means of the mandatory discharge of pregnant Marines, to insure its goals of mobility and readiness, but not to do so regarding other disabilities equally destructive of its goals, is subject to no rational explanation." 531 F.2d 1114, 1123 (2d Cir. 1976).

(ii)    <u>Defendants' arguments about unit cohesion are circular and rest on impermissible gender stereotypes.</u>

Any claim by Defendants that transgender service members undermine sex-based standards is meritless. Plaintiffs do not challenge differing standards for men and women. Claiming that transgender servicemembers are incompatible with the deliberately discriminatory

definitions of sex established by the Gender Ideology Order merely restates the discriminatory policy as justification. Plaintiffs simply seek equal treatment. Allowing transgender men to serve as men and transgender women as women does not disrupt sex-based standards where they exist. Under the Austin Policy, a service member's sex is determined by the DEERS marker. Changing this marker requires completed gender transition and commander approval based on "expected impacts on mission and readiness." This process ensures the military maintains appropriate sex-based standards for all service members, including transgender personnel.

Any claim by Defendants that transgender service members violate others' privacy rights, *see Id.* at 29, has no merit, as demonstrated by experience under the Austin Policy. Arguing that transgender service members' mere presence violates privacy rights relies on the same impermissible gender stereotypes that make discrimination against transgender people a form of discrimination based on sex. *Evancho*, 237 F.Supp.3d at 296-97 (collecting cases recognizing that discrimination against transgender people is based on gender stereotypes). Defendants' argument essentially claims transgender people inherently undermine sex-based standards. If accepted, this reasoning would justify excluding transgender people from all institutions with sex-based facility criteria—schools, workplaces, public accommodations—effectively banishing them from civic life entirely.

The Third Circuit and other courts have rejected the invocation of privacy to justify discrimination against transgender individuals in other settings. As the Third Circuit held in *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 531 (3d Cir. 2018), "we decline to recognize . . . a right that would be violated by the presence of students [in restrooms or locker rooms] who do not share the same birth sex." *See also A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 772–73 (7th Cir. 2023); *Grimm*, 972 F.3d at 614; *Parents for Privacy v. Barr*, 949

F.3d 1210, 1225 (9th Cir. 2020); *Whitaker*, 858 F.3d at 1052 ("A transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than the presence of . . . any other student who used the bathroom at the same time.").

As these courts have recognized, permitting transgender individuals to live in accord with their gender identity does not undermine the existence of sex-based activities or facilities, nor does it threaten the privacy or safety interests of others. The same analysis applies here. To the extent Defendants claim there is anything unique about the military justifying a departure from this established precedent, that argument is belied by the military's successful implementation of extensive guidance and training since the adoption of the Carter and Austin policies and the continued service of openly transgender service members under the Mattis grandfather clause. With many years of experience integrating transgender people into the service, Defendants present no evidence to support any significant problems related to privacy or anything else. And "[t]o the extent this is a thinly-veiled reference to an assumption that other service members are biased against transgender people, this would not be a legitimate rationale for the challenged policy." *Doe 1*, 275 F. Supp. 3d at 212 n.10 (citing *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.")).

> (iii) <u>Banning transgender people from military service cannot be justified based on cost.</u>

Since President Trump issued the Order on January 27, Defendants have not cited medical costs as justification; however, in the February 26, 2025 Action Memo, they newly claim that "the costs associated with their health care . . . make continued service by such individuals incompatible with the Department's rigorous standards and national security imperative to deliver a ready, deployable force." Stapleton Decl. Ex. O. Under heightened review, Defendants "must

do more than show that denying . . . medical care . . . saves money." *Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974).  "The conservation of the taxpayers' purse is simply not a sufficient state interest" to justify an equal protection violation under heightened scrutiny. *Id.*; *see also Graham v. Richardson*, 403 U.S. 365, 375 (1971).  Even under rational basis review, "a concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources." *Plyler v. Doe*, 457 U.S. 202, 227 (1982).  The government must justify why it chose a particular group to bear the cost-saving burden. *Id.* at 229; *see also Diaz v. Brewer*, 656 F.3d 1008, 1013 (9th Cir. 2011).

Defendants have not explained why the cost savings they seek should be borne by transgender service members.  That cost is miniscule compared both to the overall health budget and to the much higher costs of many other types of commonly provided care. *See, e.g.*, Brown Decl. ¶ 73; Cisneros Decl. ¶¶ 44-49. Former Deputy Undersecretary Skelly confirms that under the Austin Policy, no concerns were raised by the Assistant Secretary for Health Affairs or Defense Health Agency staff concerning the cost of treating transgender service members. *See* Skelly Decl. ¶ 41; *see also* Wagner Decl. ¶¶ 67-69.[4] Moreover, Defendants already provide the same medical services to non-transgender troops. Brown Decl. ¶ 74. As such, their cost-savings argument does nothing more than attempt to "justify [their] classification with a concise expression of an intention to discriminate." *Plyler*, 457 U.S. at 227.

---

[4] By way of comparison, for the 2025 Defense Health Program budget, DoD requested approximately $2.6 million for veterinary services alone.  Def. Health Program, U.S. Dep't of Def., *Fiscal Year (FY) 2025 President's Budget Operation and Maintenance Def. Health Program Justification Estimates* 53 (2024).  Since 2015, the Department has requested over $200 million for veterinary services as part yearly budgets. *See* Def. Health Program, U.S. Dep't of Def., *Fiscal Year (FY) 2015-2024 President's Budget Operation and Maintenance Def. Health Program Estimates* (2015-2025), available at https://comptroller.defense.gov/Budget-Materials/FY2025BudgetJustification/.

### III.      The Balance of Equities Favors an Injunction

The balance of equities and public interest both favor an injunction.  The Court must "balance the competing claims of injury and consider the effect on each party of the granting or withholding of the requested relief." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 52 (D.D.C. 2014). These factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Defendants will suffer no harm from a temporary restraining order preventing the military from initiating administrative separation for Ireland and Bade. Both are currently on a leave status and fully cooperating with military officials. Ensuring that Defendants do not initiate administrative separation in order to preserve their reputations and prevent further irreparable harm to their military careers costs Defendants nothing.

The public interest also favors an injunction. Despite military deference, "Military interests do not always trump other considerations." *Doe 2*, 755 F. App'x at 24.  A "bare invocation of 'national defense' simply cannot defeat every motion for preliminary injunction that touches on the military." *Doe 1*, 275 F. Supp. 3d at 217.  Since the Orders and Implementing Guidance are likely unconstitutional, enjoining their enforcement with respect to separation serves the public interest.  *See Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020).

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter a temporary restraining order preventing Defendants from initiating administrative separation proceedings against them.

DATED: March 18, 2025

Respectfully submitted,

**GLBTQ LEGAL ADVOCATES & DEFENDERS**

Jennifer Levi
    (*pro hac vice application forthcoming*)
Michael Haley
    (*pro hac vice application forthcoming*)
18 Tremont Street, Suite 950
Boston, MA 02108
617.426.1350
jlevi@glad.org
mhaley@glad.org

**NATIONAL CENTER FOR LESBIAN RIGHTS**

Shannon P. Minter
    (*pro hac vice application forthcoming*)
870 Market Street, Suite 370
San Francisco, CA 94102
415.392.6257
sminter@nclrights.org

**STAPLETON SEGAL COCHRAN LLC**

By: */s/ John S. Stapleton*
    John S. Stapleton, ID 032622005
Eli Segal, ID 030792007
Jonathan Cochran, ID 028142012
Lowry Yankwich, ID 418582022
Four Greentree Centre
601 Route 73 N, Suite 303
Marlton, NJ 08053
856.259.3300
jstapleton@stapletonsegal.com
esegal@stapletonsegal.com
jcochran@stapletonsegal.com
lyankwich@stapletonsegal.com

**LANGER GROGAN & DIVER P.C**

By: */s/ John Grogan*
    John Grogan, ID 026971993
Mary Catherine Roper
    (*pro hac vice application forthcoming*)
Daniel Nagdeman
    (*pro hac vice application forthcoming*)
1717 Arch Street, Suite 4020
Philadelphia, PA 10001
215.320.5662
jgrogan@langergrogan.com
mroper@langergrogan.com
dnagdeman@langergrogan.com