# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LOGAN IRELAND, and NICHOLAS BEAR BADE, | Hon. Christine P. O'Hearn, U.S.D.J. |
| *Plaintiffs,* | Case No. 1:25-cv-01918 |
| v. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' APPLICATION FOR TRO** |
| PETER B. HEGSETH, *et al.,* | |
| *Defendants.* | Motion Day: By Court Order, ECF No. 7 |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 4

    A.    DoD Policy Prior to 2015 ............................................................... 4

    B.    The 2016 Carter Policy .................................................................. 5

    C.    The 2018 Policy ............................................................................. 6

    D.    President Biden's Policy ................................................................ 7

    E.    President Trump's Executive Orders ............................................. 8

    F.    DoD's 2025 Policy ........................................................................ 9

    G.    Prior Litigation in the First Trump Administration ...................... 11

    H.    The Instant Action ....................................................................... 12

LEGAL STANDARDS .................................................................................................... 12

ARGUMENT .................................................................................................................... 13

    I.    PLAINTIFFS ARE UNLIKELY TO SUFFER IRREPARABLE HARM. ................. 13

    II.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS. ..................... 15

        A.    Plaintiffs Are Unlikely to Succeed on Their Equal Protection Claim ........................... 15

            1.    The military's judgment is entitled to significant deference. ............................. 15

            2.    The Policy does not classify based on sex. ........................................................ 16

            3.    The Policy does not classify based on "transgender status," and even if it did, heightened scrutiny would not apply. ................................. 18

            4.    The Policy's other standards are likewise subject to rational basis review. .............................. 20

            5.    The Policy survives constitutional scrutiny. ...................................................... 22

            6.    Alleged animus is not a reason to grant Plaintiff's motion. ............................... 31

        B.    Plaintiffs Have Failed to Exhaust Their Administrative Remedies ........................... 35

    III.    THE EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST A PRELIMINARY INJUNCTION. ................................. 37

CONCLUSION ................................................................................................................. 38

# TABLE OF AUTHORITIES

## Cases

*Adams v. Freedom Forge Corp.,*
204 F.3d 475 (3d Cir. 2000) ........................................................................... 12, 13

*Austin v. U.S. Navy Seals 1-26,*
142 S. Ct. 1301 (2022) ........................................................................................ 1

*Bostock v. Clayton County,*
590 U.S. 644 (2020) ........................................................................................... 18

*Bowen v. Gilliard,*
483 U.S. 587 (1987) ........................................................................................... 20

*Cerro Metal Prods. v. Marshall,*
620 F.2d 964 (3d Cir. 1980) ............................................................................. 36

*Church v. Biden,*
573 F. Supp. 3d 118 (D.D.C. 2021) ................................................................. 13

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985) ....................................................................................... 19, 20

*City of Dallas v. Stanglin,*
490 U.S. 19 (1989) ............................................................................................ 22

*Craig v. Boren,*
429 U.S. 190 (1976) ........................................................................................... 19

*D'Amico v. CBS Corp.,*
297 F.3d 287 (3d Cir. 2002) ............................................................................. 37

*Dandridge v. Williams,*
397 U.S. 471 (1970) ........................................................................................... 21

*Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.,*
108 F.4th 194 (3d Cir. 2024) ............................................................................ 12

*Doe 1 v. Trump,*
275 F. Supp. 3d 167 (D.D.C. 2017) ................................................................. 11

*Doe 2 v. Shanahan,*
755 F. App'x 19 (D.C. Cir. 2019) ................................................................... 4, 15

*Doe 2 v. Shanahan,*
917 F.3d 694 (D.C. Cir. 2019) ................................................................... *passim*

*Doe ex. rel. Doe v. Boyertown Area Sch. Dist.,*
   897 F.3d 518 (3d Cir. 2018) ............................................................. 20, 21, 25

*Eknes-Tucker v. Governor of Alabama,*
   114 F.4th 1241 (11th Cir. 2024) ............................................................... 17, 18

*Facchiano v. U.S. Dep't of Lab.,*
   859 F.2d 1163 (3d Cir. 1988) ............................................................................ 34

*Farris v. Rice,*
   453 F. Supp. 2d 76 (D.D.C. 2006) ................................................................... 13

*FCC v. Beach Commc'ns, Inc.,*
   508 U.S. 307 (1993) ........................................................................................... 21

*First Jersey Sec., Inc. v. Bergen,*
   605 F.2d 690 (3d Cir. 1979) ............................................................................ 33

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ........................................................................................... 32

*Gilligan v. Morgan,*
   413 U.S. 1 (1973) ........................................................................................... 1, 35

*Goldman v. Weinberger,*
   475 U.S. 503 (1986) ..................................................................................... 14, 28

*Hartikka v. United States,*
   754 F.2d 1516 (9th Cir. 1985) ......................................................................... 13

*Heller v. Doe,*
   509 U.S. 312 (1993) ........................................................................................... 21

*In re Dep't of Com.,*
   586 U.S. 956 (2018) ........................................................................................... 31

*Karnoski v. Trump,*
   No. C17-1297 (MJP), 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) ............. 11

*L.W. ex rel. Williams v. Skrmetti,*
   83 F.4th 460 (6th Cir. 2023) ................................................................. 1, 17, 18

*Lying v. Castillo,*
   477 U.S. 635 (1986) ........................................................................................... 16

*Mass. Bd. of Ret. v. Murgia,*
   427 U.S. 307 (1976) ..................................................................................... 16, 17

*McCarthy v. Madigan,*
   503 U.S. 140 (1992) ............................................................................................. 34

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) .............................................................................................. 31

*Myers v. Bethlehem Shipbuilding Corp.,*
   303 U.S. 41 (1938) .............................................................................................. 33

*Nelson v. Miller,*
   373 F.2d 474 (3d Cir. 1967) ......................................................................... 13, 35

*New Jersey Staffing All. v. Fais,*
   749 F. Supp. 3d 511 (D.N.J. 2023) .................................................................. 12

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................................................. 12

*Obergefell v. Hodges,*
   576 U.S. 644 (2015) ............................................................................................. 16

*Orloff v. Willoughby,*
   345 U.S. 83 (1953) ................................................................................................. 1

*Parisi v. Davidson,*
   405 U.S. 34 (1972) ............................................................................................. 34

*Pelcha v. MW Bancorp, Inc.,*
   988 F.3d 318 (6th Cir. 2021) ............................................................................ 19

*Punnett v. Carter,*
   621 F.2d 578 (3d Cir. 1980) .............................................................................. 12

*Rostker v. Goldberg,*
   453 U.S. 57 (1981) ............................................................................14, 15, 26, 28

*Sampson v. Murray,*
   415 U.S. 61 (1974) ............................................................................................. 13

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
   411 U.S. 1 (1973) ......................................................................................... 17, 23

*Schlesinger v. Ballard,*
   419 U.S. 498 (1975) ............................................................................................. 14

*Smith v. Biden,*
   No. 21-19457, 2021 WL 5195688 (D.N.J. Nov. 8, 2021) .................................. 14

*Stockman v. Trump*,
   No. EDCV 17-1799, 2017 WL 9732572 (C.D. Cal. Dec. 22, 2017) .................................................11

*Stone v. Trump*,
   280 F. Supp. 3d 747 (D. Md. 2017) .................................................11

*Talbott v. United States*,
   No. 25-cv-00240, 2025 WL 842332 (D.D.C. Mar. 18, 2025) ..........................................*passim*

*Taylor v. United States*,
   711 F.2d 1199 (3d Cir. 1983) .................................................34

*Tennessee v. Cardona*,
   No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024) .................................................18

*Trump v. Hawaii*,
   585 U.S. 667 (2018) .................................................3, 30, 32

*United States v. Virginia*,
   518 U.S. 515 (1996) .................................................21, 25, 26

*Vance v. Bradley*,
   440 U.S. 93 (1979) .................................................21

*Wilson v. MVM, Inc.*,
   475 F.3d 166 (3d Cir. 2007) .................................................35

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................12, 14

**Statutes**

10 U.S.C. § 1552 .................................................13

10 U.S.C. § 7419 .................................................5

28 U.S.C. § 1491 .................................................13

42 U.S.C. § 2000e-2 .................................................18

**Regulations**

86 Fed. Reg. 7471 (Jan. 25, 2021) .................................................7

90 Fed. Reg. 8615 (Jan. 20, 2025) .................................................8

Exec. Order No. 14183, *Prioritizing Military Excellence and Readiness*,
   90 Fed. Reg. 8757 (Jan. 27, 2025) ..........................................*passim*

## INTRODUCTION

"Under Article II of the Constitution, the President of the United States, not any federal judge, is the Commander in Chief of the Armed Forces." *Austin v. U.S. Navy Seals 1-26*, 142 S. Ct. 1301, 1302 (2022) (Kavanaugh, J., concurring). "[J]udges are not given the task of running the [military]," and indeed, "[o]rderly government requires that the judiciary be as scrupulous not to interfere with legitimate [military] matters as the [military] must be scrupulous not to intervene in judicial matters." *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953).

The Judiciary must be especially careful to adhere to the usual—and highly deferential—rules governing judicial review of military decisionmaking when it involves "a vexing and novel topic of medical debate" about which the people, the States, and the federal government are engaged in policy debates. *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 471–72 (6th Cir. 2023), *cert. granted*, 144 S. Ct. 2679 (June 24, 2024). "Constitutionalizing new areas of American life is not something federal courts should" ever "do lightly." *Id.* Courts should be especially cautious about doing so in the military context when the Supreme Court repeatedly has upheld military policies that, according to some, "would unquestionably have fallen had any government attempted to apply them in the civilian world." *Doe 2 v. Shanahan*, 917 F.3d 694, 732 (D.C. Cir. 2019) (Williams, J., concurring).

In an exercise of "professional military judgment[]" about the composition of our Nation's armed forces, *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973), the Department of Defense ("DoD") has long disqualified individuals from entering military service who have physical or emotional impairments. DoD has been particularly cautious about service by individuals with mental health conditions, given the unique mental and emotional stresses of military service. For that reason, more than 70% of Americans between ages 17 and 24 are ineligible to join the military for mental, medical, or behavioral reasons. In any context other than the one at issue in this case, DoD's professional military judgment about the risks of allowing individuals with physical or emotional impairments to serve in the military would be virtually unquestionable. Indeed, "[i]t would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible—as the Judicial Branch is not—to the electoral process." *Id.*

Here, multiple Administrations have acknowledged the risks stemming from service by individuals with gender dysphoria, a mental health condition associated with clinically significant distress or impairment in social, occupational, or other important areas of human functioning. That the policies have differed reflects only that military leaders have had varying degrees of willingness to tolerate such risks and have drawn lines based on different cost-benefit calculations. But all such decisions are committed to the military's discretion because the composition of the military is an area where the Supreme Court has long recognized that judicial deference is at its highest point. Not only are courts ill-equipped to determine the impact that any intrusion upon military authority might have, but as noted above, our constitutional scheme charges the Executive and Legislative Branches with carrying out the Nation's military policy. Separation-of-powers concerns thus significantly constrain the Judiciary's intrusion into military regulations in this area.

Against this backdrop, Plaintiffs, who are two Air Force servicemembers. seek a temporary restraining order ("TRO") to prevent DoD from initiating administrative separation proceedings against them pending resolution of challenges to the constitutionality of (1) the Commander in Chief's Executive Order 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025) ("*Military* EO"), which stated that "the medical, surgical, and mental health constraints on individuals with gender dysphoria" are incompatible with the high standards demanded for military service, and (2) DoD's implementing Policy that presumptively disqualifies individuals with gender dysphoria from military service. Plaintiffs' TRO motion rests on equal protection claims and asserts as irreparable harm the loss of employment with the military and purported reputational harm.

This Court should deny the TRO motion. There is no need for emergency relief. Military separation processing takes time, depending on the servicemember's rank, Service, length of service, and other factors. Additionally, not only will any servicemember separated under the DoD Policy be given an honorable discharge, *see* 2025 DoD Policy § 1.e, but Plaintiffs' potential loss of employment with the military is subject to remediation, which means any alleged harm is not irreparable. If Plaintiffs are to be separated under the DoD Policy, they are also entitled to an administrative

separation board with all applicable rights and protections, including the right to counsel.  *See* DoD Policy § 4.4.a.6, ECF No. 1-8; DoD Instruction 1332.14, § 5.3 ("Administrative Board Procedures").

More importantly, Plaintiffs are unlikely to succeed on the merits of their equal protection claims.  Contrary to Plaintiffs' assertion that the DoD Policy is intended to "identify the broadest pool of anyone who might possibly be transgender and separate them," Pls.' Br. at 25, the Policy turns on a medical condition—gender dysphoria—and a history of that condition.  Even if military deference were inapplicable, a classification based on a medical condition is subject only to rationale basis review.  And the DoD Policy—the focal point of judicial review because Plaintiffs cannot be separated from the military based on the *Military* EO alone—easily withstands that level of scrutiny.  In fact, the Policy would satisfy heighted scrutiny as well.

The Commander in Chief has determined that "[t]he Armed Forces must adhere to high mental and physical health standards to ensure our military can deploy, fight, and win, including in austere condition and without the benefit of routine medical treatment or special provisions." *Military* EO § 1.  DoD has likewise announced its policy that "service in the Military Services is only open to persons who can meet the high standards for military service and readiness without special accommodations."  DoD Policy § 1.a.  These are legitimate interests, and DoD's policy of presumptively disqualifying individuals with gender dysphoria is substantially related to the important government interests in military readiness and lethality.

Plaintiffs contend that the *Military* EO and the DoD policy are motivated by animus toward trans-identifying people and is thus unconstitutional.  But that argument is foreclosed by Supreme Court precedent.  It is not "impossible to discern a relationship to legitimate state interests" nor is the Policy "inexplicable by anything but animus." *Trump v. Hawaii*, 585 U.S. 667, 706 (2018).  Where, as here, a policy "has a legitimate grounding in national security concerns," the Court "must accept that independent justification." *Id.*

The parties are not starting from a clean slate, given the prior litigation on DoD's 2018 policy that closely resembles the current policy.  The Supreme Court and D.C. Circuit allowed that policy to go into effect.  The D.C. Circuit, in particular, recognized that the military had "substantial arguments

for why the [2018 policy] complies with the equal protection principles of the Fifth Amendment." *Doe 2 v. Shanahan*, 755 F. App'x 19, 25 (D.C. Cir. 2019). Although the U.S. District Court for the District of Columbia recently came to a contrary conclusion about the 2025 DoD Policy, that court erred in several respects—by engaging in its own weighing of the relative costs and benefits, by questioning the persuasiveness of DoD's evidence, and by faulting DoD for not conducting the type of analysis the court thought appropriate. But that is not the role of an Article III court when assessing core military judgment under rational basis review or even under heighten scrutiny review. Plaintiffs' motion for a temporary restraining order should be denied.

## BACKGROUND

### A.    DoD Policy Prior to 2015

DoD has long disqualified individuals from entering military service who have "physical or emotional impairments that could cause harm to themselves or others, compromise the military mission, or aggravate any current physical or mental health conditions that they may have." DoD Report & Recommendations on Military Service by Transgender Persons ("2018 Report") (Feb. 2018). Ex. 1 at 9. The military has sensibly taken a particularly cautious approach with respect to mental health standards, considering "the unique mental and emotional stresses of military service." *Id.* at 10; *see also id.* at 20 (noting that "[m]ost mental health conditions . . . are automatically disqualifying" for entry into the military). As a result, 71 percent of Americans between ages 17 to 24 are ineligible to join the military (without a waiver) for mental, medical or behavioral reasons. *Id.* at 6.

In general, the military has aligned these disqualifying conditions with the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), published by the American Psychiatric Association. *Id.* at 10. Military standards for decades therefore presumptively disqualified individuals with a history of "transsexualism," consistent with the inclusion of that term in the DSM. *Id.* at 7, 9–10. Indeed, "[p]rior to 2015, the Department of Defense . . . effectively banned all transgender persons from either joining or remaining in the military." *Doe 2*, 917 F.3d at 696 (Wilkins, J., concurring). In 2013, the American Psychiatric Association replaced the term "gender identity disorder" (itself a replacement for "transsexualism") with "gender dysphoria" in the DSM. 2018 Report at 10, 12. It explained that

it no longer viewed identification with a gender different from one's sex (*i.e.*, trans-identifying status), on its own, to be a disorder. *See id.* at 12. It stressed, however, that a subset of trans-identifying people suffers from a medical condition called "gender dysphoria," which is a "marked incongruence between one's experience/expressed gender and assigned gender, of at least 6 months' duration." *Id.* at 12. Importantly, the DSM (5th ed.) observed that gender dysphoria "is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id.* at 13.

Aside from imposing stringent medical standards, the military also has long treated servicemembers differently according to their sex as necessary. 2018 Report at 37 (noting that because of the "unique nature of military service," servicemembers "of the same biological sex are often required to live in extremely close proximity to one another"). "Given their biological differences, males and females have long been assigned to separate berthing, bathroom, and shower facilities, and subject to different sets of physical fitness, body fat, uniform, and grooming standards." *Doe 2*, 917 F. 3d at 707 (Williams, J., concurring). Congress too has required the military to separate the sexes and to ensure their privacy in various contexts. *See* 10 U.S.C. §§ 7419, 7420, 8431, 8432, 9419, 9420.

## B.    The 2016 Carter Policy

In 2015, then-Secretary of Defense Ashton Carter ordered the creation of a working group to study the policy and readiness implications of open service by trans-identifying persons, but instructed the group to "start with the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness." Memorandum from Secretary Carter (July 28, 2015), Ex. 2. DoD commissioned the RAND National Defense Research Institute to conduct a study, which concluded that the proposed policy change would have "an adverse impact on health care utilization and costs, readiness, and unit cohesion," but that these harms would be "'negligible' and 'marginal' because of the small, estimated number" of trans-identifying servicemembers relative to the size of the armed forces as a whole. 2018 Report at 14.

In 2016, Secretary Carter adopted a policy that allowed trans-identifying servicemembers to transition if they were diagnosed with gender dysphoria by a military medical provider and could adhere to the standards associated with their biological sex until a military medical provider determined

that their gender transition was complete. *Doe 2*, 917 F.3d at 710 (Williams, J., concurring). The policy also allowed trans-identifying individuals, including those who had already transitioned, to enter military service if they met certain medical criteria. *See* DoDI 6130.03 Vol I § 6.28(t), Ex. 3. Under that policy, trans-identifying individuals who lacked a history or diagnosis of gender dysphoria, whether they were currently serving or seeking to serve, could serve if they met the standards associated with their biological sex. 2018 Report at 4.

The Carter Policy was not immediately implemented, however, because of concerns raised by multiple military branches and requests for up-to-three-year' delays in implementing the policy. *See* May 26, 2018, Testimony of Secretary James Mattis at 62, Ex. 4. In June 2017, Secretary Mattis approved the Services' recommendation to delay the implementation of the accession standards. *Doe 2*, 917 F.3d at 712.

### C. The 2018 Policy

In August 2017, President Trump issued a memorandum stating that the Carter policy had "failed to identify a sufficient basis to conclude that terminating [DoD's] longstanding policy . . .would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources." Presidential Mem. at 2–3, Ex. 5. The President called for "further study" to ensure that implementation of the Carter policy "would not have those negative effects." *Id.* at 3. Secretary Mattis then convened a panel of experts to "conduct an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members." 2018 Report at 17.

The panel consisted of senior military leaders who were selected because of "their experience leading warfighters," "their expertise in military operational effectiveness," and their "statutory responsibility to organize, train, and equip military forces." 2018 Report at 18. In addition to being "uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force," the panel drew on experts dedicated to issues involving personnel, medical treatment, and military lethality. *Id.* The panel also met with commanders of trans-identifying servicemembers and those servicemembers themselves. *Id.* It further examined information regarding gender

dysphoria; its treatment; the impact of this condition on military effectiveness, unit cohesion, and resources; and data regarding servicemembers diagnosed with gender dysphoria. *Id.* at 18, 31.

Upon the panel's recommendation, and following President Trump's approval (see March 23, 2018 President Memorandum, Ex. 6), Secretary Mattis adopted the 2018 policy. Under that policy trans-identifying persons with a history or diagnosis of gender dysphoria were presumptively disqualified from military service, because "[i]n the Department's military judgment," service by such individuals is "not conducive to, and would likely undermine, the inputs—readiness, good order and discipline, sound leadership, and unit cohesion—that are essential to military effectiveness and lethality." *Id.* at 32, 41. Servicemembers were excepted from disqualification: (1) if they had been stable for 36 consecutive months in their biological sex prior to accession; (2) if they were diagnosed with gender dysphoria after entering into service, did not require a change of gender, and remained deployable within applicable retention standards; and (3) currently serving servicemembers who had been diagnosed with gender dysphoria after the Carter policy took effect and prior to the effective date of the 2018 policy could continue to serve in their preferred gender and receive medically necessary treatment for gender dysphoria. 2018 Policy at 2. With limited exceptions, trans-identifying persons who required or had undergone gender transition were disqualified. *Id.* Trans-identifying persons without a history or diagnosis of gender dysphoria, who are otherwise qualified for service, could serve in their biological sex. *Id.*

### D.    President Biden's Policy

Immediately after taking office, President Biden issued Executive Order 14004, largely reverting to the Carter policy based on his judgment that "the Secretary of Defense's 2016 conclusions remain valid[.]" *See* 86 Fed. Reg. 7471 (Jan. 25, 2021). A history or diagnosis of gender dysphoria was still a bar to military accession unless the applicant had been asymptomatic for 18 months. 2024 DoDI 6130.03 Vol I § 6.28(t). An applicant who had undergone sex reassignment surgery was disqualified unless (1) the surgery was more than 18 months prior and (2) no further surgery was required. *Id.* §§ 6.13(g)(1), (4); *id.* §§ 6.14(n)(1), (4). Prior cross-sex hormonal interventions were likewise disqualifying, unless the applicant was "stab[le]" as specified in the medical standards. *See id.*

§§ 6.24(t)(1)–(4). All servicemembers were "subject to the standard[s], requirement[s], or polic[ies] associated with their gender marker in the [Defense Enrollment Eligibility Reporting System]." *See* DoDI 1300.28 § 3.1(a). A servicemember could change his or her gender marker only upon "a diagnosis from a military medical provider" that "gender transition [was] medically necessary," *id.* § 3.4(a), and upon approval of the commanding officer, *id.* §§ 3.4(b)–(c), among other steps and requirements, including the completion of the prescribed medical treatment plan, *id.* § 3.3(d)(2).

### E.    President Trump's Executive Orders

On January 27, 2025, President Trump issued the *Military* EO, revoking President Biden's Executive Order 14004. The *Military* EO noted that "[l]ongstanding Department of Defense . . . policy (DoD Instruction (DoDI) 6130.03) provides that it is the policy of the DoD to ensure that service members are '[f]ree of medical conditions or physical defects that may reasonably be expected to require excessive time lost from duty for necessary treatment or hospitalization.'" *Id.* § 1. "As a result, many mental and physical health conditions are incompatible with active duty, from conditions that require substantial medication or medical treatment to bipolar and related disorders, eating disorders, suicidality, and prior psychiatric hospitalization." *Id.* The *Military* EO further stated that "[t]he Armed Forces must adhere to high mental and physical health standards to ensure our military can deploy, fight, and win, including in austere conditions and without the benefit of routine medical treatment or special provisions." *Id.*

The *Military* EO thus declared that "[i]t is the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity." *Id.* § 2. The *Military* EO further stated that "this policy is inconsistent with the medical, surgical, and mental health constraints on individuals with gender dysphoria" and "with shifting pronoun usage or use of pronouns that inaccurately reflect an individual's sex." *Id.* Section 3 of the *Military* EO incorporated the definitions of Executive Order 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("*Defending Women* EO"), which provided that "[i]t is the policy of the United States to recognize two sexes, male and female," and that "'sex' shall refer to an individual's immutable biological classification as either male or female," *id.* § 2.

The *Military* EO set certain deadlines for DoD to update the medical standards for accession and retention, *id.*, § 4(a), to end pronoun usage inconsistent with biological sex, *id.* § 4(b), and to identify all additional steps and issue guidance necessary to fully implement the order, *id.* § 4(c). It further provided that "[a]bsent extraordinary operational necessity, the Armed Forces shall neither allow males to use or share sleeping, changing, or bathing facilities designated for females, nor allow females to use or share sleeping, changing, or bathing facilities designated for males." *Id.* § 4(e).

On February 7, 2025, Secretary of Defense Pete Hegseth delegated authority to the Under Secretary of Defense for Personnel and Readiness "to provide additional policy guidance and implementation guidance outside of the normal DoD issuance process." ECF No. 13-4. He also paused accession by anyone with a history of gender dysphoria, and stopped certain medical procedures—including "newly initiated gender-affirming hormone therapy." *See id.* at 1 & n.1.

### F.    DoD's 2025 Policy

On February 26, 2025, DoD issued "Additional Guidance on Prioritizing Military Excellence and Readiness." *See* ECF No. 13-7. As relevant, the Policy provides the following:

First, the Policy affirms that "the medical, surgical, and mental health constraints on individuals with gender dysphoria or who have a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria," are inconsistent with the standards of military service. 2025 Policy § 1.b.[1] Accordingly, persons meeting the criteria are generally disqualified from serving. *Id.* § 1.d.

Second, the Policy sets accessions and retention standards to further the stated policy. For accession, the policy disqualifies anyone with gender dysphoria or a history of hormonal/surgical transitioning from joining the military, unless given "a waiver on a case-by-case basis, provided there is a compelling Government interest in accessing the applicant that directly supports warfighting capabilities." *Id.* §§ 4.1.a–c. To be eligible for such a waiver, the applicant must be willing to serve in his or her biological sex. *Id.* § 4.1.c. Per a subsequent clarifying guidance, "a compelling Government interest" can include "special experience, special training, and advanced education in a highly technical

---

[1] For brevity, Defendants will refer to "a current diagnosis or history of, or exhibit symptoms consistent with, gender dysphoria," as having gender dysphoria.

career field designated as mission critical and hard to fill by the Secretary of a Military Department." ECF No. 13-10.  The clarifying guidance further provides that, to be eligible for such a waiver, an individual must meet the following criteria:

> 1. The individual demonstrates 36 consecutive months of stability in the individual's sex without clinically significant distress or impairment in social, occupational, or other important areas of functioning; and
>
> 2. The individual demonstrates that he or she has never attempted to transition to any sex other than his or her sex; and
>
> 3. The individual is willing and able to adhere to all applicable standards, including the standards associated with his or her sex.

*Id.* at 1–2.  With respect to current servicemembers, gender dysphoria or transition is likewise disqualifying unless there is a compelling government interest in retention and the member meets the same three criteria above.  *See* 2025 Policy §§ 4.3.a–c.

Third, the Policy establishes that disqualified servicemembers will be processed for administrative separation pursuant to DoD Instruction ("DoDI") 1332.14 (enlisted members) or DoDI 1332.30 (commissioned officers).  If they wish, involuntarily separated enlisted servicemembers will be afforded an administrative separation board, whereas commissioned officers will be afforded a board of inquiry.  2025 Policy § 4.4.a.6, 7.  In this way, the 2025 Policy expands the right to such boards.  For example, a servicemember with fewer than six years of total active and reserve military service typically would not be entitled to an administrative separation board, but would be separated under the Notification procedures.  *See* DoDI 1332.14, § 5.2.

Fourth, the Policy sequences the separation process.  Before any separation proceedings take place, the Military Departments must first "[e]stablish procedures and implement steps to identify servicemembers who have [gender dysphoria]."  *See* 2025 Policy §§ 3.3.e, 4.4.b.  Pursuant to clarifying guidance, the deadline to establish such procedures is March 26, 2025.  ECF No. 13-8.  Before then, "DoD personnel shall take no action to identify Service members pursuant to the [2025 Policy]."  *Id.*

Fifth, the Policy reiterates the Secretary's February 7, 2025, instruction that all surgical procedures associated with facilitating sex reassignment are cancelled but that existing cross-sex

hormonal interventions may continue until separation is complete. 2025 Policy § 4.2.b, c. Servicemembers, however, may consult with a DoD healthcare provider concerning a diagnosis of gender dysphoria and receive mental health counseling for such a diagnosis. *Id.* § 4.2.d.

Sixth, the Policy affirms adherence to the definitions in the *Defending Women* EO, and provides that in keeping with good order and discipline, "[p]ronoun usage when referring to Service members must reflect a Service member's [biological] sex." *Id.* § 1.f, 1.h. And "[w]here a standard, requirement, or policy depends on whether the individual is a male or female . . . all persons will be subject to the standard, requirement or policy associated with their sex." *Id.* § 1.g.

The Policy was informed "through consideration of, among other things, the President and Secretary's written direction, existing and prior DoD policy, and prior DoD studies and reviews of service by individuals with gender dysphoria," including "a review of medical literature regarding the medical risks associated with presence and treatment of gender dysphoria. *See* Feb. 26, 2025 Action Memo at 3, Ex. 7.

### G.    Prior Litigation in the First Trump Administration

There was extensive litigation following President Trump's August 2017 memorandum, and four federal district courts entered preliminary injunctions prohibiting enforcement of certain directives in that memorandum. *See Karnoski v. Trump*, No. C17-1297 (MJP), 2017 WL 6311305, at *10 (W.D. Wash. Dec. 11, 2017); *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 177, 217 (D.D.C. 2017); *Stone v. Trump*, 280 F. Supp. 3d 747, 769 (D. Md. 2017); *Stockman v. Trump*, No. EDCV 17-1799, 2017 WL 9732572, at *16 (C.D. Cal. Dec. 22, 2017). Upon the adoption of the 2018 policy, the defendants moved to dissolve those preliminary injunctions. The D.C. Circuit vacated the injunction in *Doe 2* in January 2019. *See id.* The Supreme Court likewise stayed the injunctions entered in *Karnoski* and *Stockman*. *See Trump v. Karnoski*, No. 18A625 (U.S. Jan. 22, 2019) (order staying preliminary injunction); *Trump v. Stockman*, No. 18A627 (U.S. Jan. 22, 2019) (same). And the *Stone* court dissolved the preliminary injunction it had issued in August 2019. *See Stone*, 400 F. Supp. 3d 317. Each case was dismissed following President Biden's revocation of the 2018 policy.

### H.    The Instant Action

On March 17, 2025, Plaintiffs Master Sergeant Logan Ireland and Staff Sergeant Nicholas Bear Bade, both of whom are Air Force servicemembers, filed the instant action.  On March 18, 2025, they moved for a TRO.  Later that day, the U.S. District Court for the District of Columbia issued a nationwide preliminary injunction in *Talbott v. Trump*, No. 1:25-cv-00240, 2025 WL 842332 (D.D.C.) (Mar. 18, 2025), which enjoined the implementation of the *Military* EO and any DoD policies issued pursuant thereto.  Defendants have filed a copy of the injunction with this Court.  ECF Nos. 10-1, 10-2.  Because that preliminary injunction essentially requires DoD to return to the *status quo* immediately before the issuance of the *Military* EO, if it is not stayed, it would address Plaintiffs' asserted irreparable injury for purpose of the TRO motion.

## LEGAL STANDARDS

A party seeking a temporary restraining order must make "a clear showing" that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202 (3d Cir. 2024), *cert. denied sub nom. Gray v. Jennings*, No. 24-309, 2025 WL 76443 (U.S. Jan. 13, 2025); *see New Jersey Staffing All. v. Fais*, 749 F. Supp. 3d 511, 519 (D.N.J. 2023), *aff'd*, 110 F.4th 201 (3d Cir. 2024) ("The standard for granting a temporary restraining order . . . is the same as that for issuing a preliminary injunction" (citation omitted)).  Where, as here, the defendants are government entities or official sued in their official capacities, the balance of equities and the public interest factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  But courts may only enter preliminary injunctive relief if plaintiffs satisfy the first two requirements, "regardless of what the equities seem to require."  *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir. 2000).  And even then, "[t]his equitable remedy is never automatic:  It always involves a district court's sound discretion."  *Delaware State*, 108 F.4th at 197; *see New Jersy Staffing*, 749 F. Supp. 3d at 511 ("[I]njunctive relief is an extraordinary remedy and should be granted only in limited circumstances." (citation omitted)).

# ARGUMENT

## I.    PLAINTIFFS ARE UNLIKELY TO SUFFER IRREPARABLE HARM.

As a threshold matter, Plaintiffs have failed to carry their "burden of demonstrating an imminent threat of irreparable harm." *Punnett v. Carter*, 621 F.2d 578, 586 (3d Cir. 1980). Even outside the military context, the standard for an irreparable injury is a demanding one: "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" to qualify as irreparable, and "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). In the military context, the moving party must "make a much stronger showing of irreparable harm than the ordinary standard for injunctive relief." *Hartikka v. United States*, 754 F.2d 1516, 1518 (9th Cir. 1985); *see also Church v. Biden*, 573 F. Supp. 3d 118, 145 (D.D.C. 2021) (noting that "the showing of irreparable harm must be *especially strong* before an injunction is warranted, given the national security interests weighing against judicial intervention in military affairs.").

Alleged constitutional violations alone do not necessarily constitute irreparable harm. *Delaware State*, 108 F.4th at 203 ("[C]onstitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." (quoting *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989)). Indeed, "[the Third Circuit] explicitly refused to presume that an alleged equal-protection violation irreparably injured the plaintiff." *Id.* (*citing Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 819–20 (3d Cir. 1978)). As the Third Circuit has explained, "[e]ven as some courts presumed constitutional harms irreparable, [it] still favored 'traditional prerequisites for injunctive relief' over categorical presumptions." *Id.* (citing *Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997)). Thus, where "challengers have shown no harms beyond ones that can be cured after final judgment," the denial of a preliminary injunction is proper. *Id.* at 205.

Plaintiffs' asserted harms relating to the loss of employment and other collateral consequences, including reputational damage, *see* Pls.' Br. at 14–15, are insufficient to meet that high burden. They have not shown that any separation will be imminent, given that the military separation process takes

time, depending on the Service, length of service, rank and other factors.  Moreover, as the Third Circuit has held, allegedly unconstitutional discharge from the military does not in and of itself amount to irreparable harm.  *Nelson v. Miller*, 373 F.2d 474, 480 (3d Cir. 1967) (no irreparable harm where servicemember alleging that his separation would violate the constitution could obtain complete relief from the Board for Correction of Naval Records).  Further, because any servicemember separated pursuant to the 2025 Policy will be given an honorable discharge, 2025 Policy § 1.e, any "interim damage is minimized."  *Id.*

Importantly, "given the court's equitable powers to remedy for loss in employment through, for example, back pay and time in service credit, cases are legion holding that loss of employment does not constitute irreparable injury."  *Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006); *Adams*, 204 F.3d at 485 (explaining that even when a plaintiff demonstrates that they are likely to succeed on the merits of a claim that they were unlawfully discharged from their employment, "loss of income alone" does not "constitute[] irreparable harm."); 28 U.S.C. § 1491(a)(1) (authorizing courts "to issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records").  Indeed, in a different challenge to federal employee policies, this Court recognized the "well established precedent that loss of employment itself is not sufficient to give rise to irreparable injury."  *Smith v. Biden*, No. 21-19457, 2021 WL 5195688 (CPO), at *8 (D.N.J. Nov. 8, 2021) (citing cases) (quotations omitted), *appeal dismissed as moot*, No. 21-3091, 2023 WL 5120321 (3d Cir. Aug. 10, 2023).  Here, Plaintiffs can first contest any separation in the administrative separation board or board of inquiry and can seek further review with the relevant record correction board, *see* 10 U.S.C. § 1552.  Because their asserted injuries are subject to remediation, Plaintiffs' alleged injuries are not irreparable.  And in any event, this Court should exercise its discretion and deny Plaintiffs' TRO motion because the alleged injury does not "jeopardize[] the court's ability to see a case through."  *Delaware State*, 108 F.4th at 197.

14

II.    **PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.**

A.    **Plaintiffs Are Unlikely to Succeed on Their Equal Protection Claim.**

1.    **The military's judgment is entitled to significant deference.**

Courts extend great deference to the political branches when reviewing the "complex, subtle, and professional decisions as to the composition . . . of a military force." *Winter*, 555 U.S. at 24. "Judicial deference is at its apogee" in this area because "[n]ot only are courts ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have, but the military authorities have been charged by the Executive and Legislative Branches with carrying out our Nation's military policy." *Goldman v. Weinberger*, 475 U.S. 503, 507–08 (1986) (citation omitted); *see also Schlesinger v. Ballard*, 419 U.S. 498, 510 (1975) ("[I]t is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise[, and] [t]he responsibility for determining how best our Armed Forces shall attend to that business rests with Congress [] and with the President." (citations omitted)). Because "it is difficult to conceive of an area of governmental activity in which the courts have less competence," *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981), the Supreme Court has stressed that "the tests and limitations to be applied may differ because of the military context," *id.* at 67.

Thus, in *Rostker*, for example, the Supreme Court applied a deferential standard to hold that a facially discriminatory, sex-based draft-registration statute was "not invidious, but rather realistically reflect[ed] the fact that the sexes [were] not similarly situated." *Id.* at 79 (citation omitted). The Court explained that the sex-based classification was within constitutional bounds because Congress determined that the statute minimized "added burdens" and "administrative problems" and promoted "the important goal of military flexibility," and "[i]t is not for this Court to dismiss such problems as insignificant in the context of military preparedness and the exigencies of a future mobilization." *Id.* at 81–82. Instead of conducting its own "evaluation" of the evidence, the Court adopted "an appropriately deferential examination of Congress' evaluation of that evidence." *Id.* at 83. The Court also accepted *post hoc* justifications, even when an analogous policy in the civilian context would call

for closer scrutiny. *Id.* at 81. In other words, the Supreme Court has allowed Congress and the Executive wide latitude to choose "among alternatives" in furthering military interests. *Id.* at 71–72.

Thus, when vacating the preliminary injunction entered in *Doe 2* concerning DoD's 2018 policy, the D.C. Circuit recognized that "any review must be 'appropriately deferential' in recognition of the fact that the [2018] Plan concerned the composition and internal administration of the military." *Doe 2*, 755 F. App'x at 25 (citing *Rostker*, 453 U.S. at 83).[2] This Court should proceed in a similar fashion in reviewing the Equal Protection challenge here.[3]

### 2.     The Policy does not classify based on sex.

Plaintiffs next contend that DoD's 2025 Policy "classifies based on sex" and therefore should be subject to heightened scrutiny. Pls.' Br. at 21. Plaintiffs are incorrect.

The 2025 Policy does not distinguish based on sex in the way that sex-based classifications typically distinguish based on sex. It regulates all servicemembers, "regardless of sex." *Skrmetti*, 83 F.4th at 480. It is an "across-the-board regulation [that] lacks any of the hallmarks of sex discrimination." *Id.* "It does not prefer one sex over the other." *Id.* "It does not include one sex and exclude the other." *Id.* "It does not bestow benefits or burdens based on sex." *Id.* "And it does not apply one rule for males and another for females." *Id.*

Plaintiffs cite the Supreme Court's Title VII-specific conclusion in *Bostock v. Clayton County*, 590 U.S. 644 (2020), in arguing that the 2025 Policy constitutes sex discrimination. *See* Pls.' Br. at 21, 24. In *Bostock*, the Supreme Court reasoned that Title VII's prohibition on sex discrimination

---

[2] This deference owed the military is not diminished by former DoD officials' different opinions. Plaintiffs have attached several such declarations. *See* ECF Nos. 28, 30, 31. As the Supreme Court has noted, such contrary judgment is "quite beside the point" because the desirability of any military regulation "is decided by the appropriate military officials." *Goldman*, 475 U.S. at 509.

[3] Indeed, the cases Plaintiffs cite are not to the contrary. *See* Pls.' Br. at 32. *Dillard v. Brown*, 652 F.2d 316, 320 (3d Cir. 1981), addressed whether constitutional claims "concerning the composition of the military are textually committed to Congress and the Executive" and thus not justiciable under the political question doctrine—an argument Defendants do not raise here. And *Kyle-Labell v. Selective Serv. Sys.*, 364 F. Supp. 3d 394, 417 (D.N.J. 2019), held that the plaintiff had stated a claim in her equal protection challenge to the Military Select Service Act (MSSA) because she had alleged "substantial factual changes since *Rostker* was decided" as to MSSA's constitutionality.

incorporated a but-for causation standard and held that when an employer fires an employee because that employee is gay or trans-identifying, sex is necessarily a but-for cause of such discrimination if, among other things, the individuals are "similarly situated."  590 U.S. at 656, 668–69, 683.

*Bostock* is inapposite.  The Supreme Court's conclusion in *Bostock* was derived entirely from Title VII's "plain terms," *id.* at 676, which provide, in relevant part, that it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1).  The text of the Equal Protection Clause does not contain any similar language, and for that reason, Title VII's "text-driven reasoning applies only to Title VII," not to constitutional equal protection claims.  *Skrmetti*, 83 F.4th at 484–85; *see also, e.g.*, *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *2 (6th Cir. July 17, 2024) ("As many jurists have explained, Title VII's definition of discrimination, together with the employment-specific defenses that come with it, do not neatly map onto other areas of discrimination.  Title VII's definition of sex discrimination under *Bostock* simply does not mean the same thing for other anti-discrimination mandates, whether under the Equal Protection Clause, Title VI, or Title IX."); *id.* (collecting cases); *Eknes-Tucker*, 114 F.4th at 1263 (11th Cir. 2024) (Lagoa, J., concurring) (collecting analysis of the issue).

Tellingly, the Supreme Court in *Bostock* rejected the employer's argument that to isolate sex, the Court had to keep all other variables constant.  590 U.S. at 671.  The Court reasoned that "[t]he employers might be onto something if Title VII only ensured equal treatment between groups of men and women[.]"  *Id.*  Equal treatment, of course, is the Equal Protection analysis here.  Lest there be any doubt, "the Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself."  *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021).  *Bostock*'s Title VII-specific analysis is thus inapplicable here.

Moreover, *Bostock* proceeds from the premise that an employer discriminates against a person because of sex where the employer "treat[s] that individual worse than others who are similarly situated."  *Bostock*, 590 U.S. at 657.  While in the Title VII context individuals are generally "similarly situated" because "[a]n individual's homosexuality or transgender status is not relevant to employment

decisions," *id.* at 660, men and women are not similarly situated when it comes to certain military standards. And DoD's retention and accessions standards treat everyone equally regardless of sex.

### 3. The Policy does not classify based on "transgender status," and even if it did, heightened scrutiny would not apply.

Plaintiffs also contend that DoD's policy is subject to heightened scrutiny because it facially classifies based on transgender status.[4] Pls.' Br. at 22–23. But that is also incorrect; DoD's new retention standards do not exclude all trans-identifying individuals. Instead, they turn on gender dysphoria and a history of hormonal or surgical transition.

Plaintiffs' argument repeats the error that the D.C. Circuit noted in *Doe 2*. *See* 755 F. App'x at 24 ("Plaintiffs contended that the Mattis Plan's exclusion of transgender persons who have gender dysphoria or who are unwilling to serve in their biological sex constitutes a blanket ban, arguing this case as if all transgender individuals either (1) have gender dysphoria or (2) transition to their preferred gender."). As the D.C. Circuit observed, even though the *Doe* plaintiffs "characterized these as 'essential' and 'defining' aspects of being transgender," "all the reports supporting both the Carter Policy and the Mattis Plan defined transgender persons as 'identifying' with a gender other than their biological sex." *Id.* Importantly, as the D.C. Circuit noted, those reports "repeatedly state that not all transgender persons seek to transition to their preferred gender or have gender dysphoria," and some were willing and able to serve in their biological sex. *Id.* (citing 2016 Implementation Handbook at 13; 2016 RAND Report at x, 6–7, 20; 2014 Palm Center Report at 5). Indeed, the 2018 DoD Report found that there were "many" such servicemembers, who "have served, and [we]re serving, with great dedication under the standards of their biological sex." DoD 2018 Report at 32 (noting that of the 8,980 trans-identifying servicemembers at that time, only 937 had been diagnosed with gender dysphoria). Thus, it is not surprising that both *Doe 2* concurrences rejected the notion that gender

---

[4] To the extent Plaintiffs seek to challenge the *Military EO*, they lack standing to do so. No Plaintiff can be separated or prevented from joining the military based on the Executive Order alone. In other words, those harms are not traceable to the Executive Order. Nor would enjoining the Executive Order necessarily remedy Plaintiffs' harms, as the DoD policy may remain. The focus of the Court's analysis, therefore, should be the 2025 Policy and its implementing guidance.

dysphoria is something with which all trans-identifying people have been diagnosed.  *See Doe 2*, 917 F.3d at 696 (Wilkins, J., concurring); *id.* at 707 (Williams, J., concurring).

The district court in *Talbott* repeated this same error in concluding that the DoD Policy "bans all transgender troops."  2025 WL 842332, at *10.  It does not.  In concluding otherwise, the court relied on the fact that the Policy disqualifies not only individuals with a diagnosis of gender dysphoria, but also individuals with "symptoms consistent with" gender dysphoria.  *See id.* at *29, *32.  But this language was not intended to "capture persons who have never had gender dysphoria," as the *Talbott* court surmised.  *Id.* at *29.  If DoD had intended that result, it could have simply said so, issuing a policy that disqualifies all trans-identifying individuals.  But, as the *Talbott* court acknowledged, "the word transgender does not appear" in the 2025 Policy.  *Id.* at *10.  Instead, the 2025 Policy—like the 2018 Policy—is expressly tied to *gender dysphoria*.  At a minimum, the *Talbott* court's broad construction of the scope of the Policy was premature, as DoD will be issuing further guidance by March 26, 2025, on how it intends to identify servicemembers covered by the Policy.  *See* ECF No. 13-8.

Even assuming that the DoD policy classifies based on trans-identifying status, rational-basis review still applies because such persons do not constitute a suspect or quasi-suspect class.  The Supreme Court has not recognized any new suspect class or quasi-suspect class in almost half a century.  *See Craig v. Boren*, 429 U.S. 190 (1976) (sex constitutes quasi-suspect class).  Instead, it has repeatedly declined to do so.  *See, e.g., City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985) (mental disability); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313–14 (1976) (age); *see also Obergefell v. Hodges*, 576 U.S. 644 (2015) (declining to address whether gay individuals qualify as a quasi-suspect class).  Given the high bar to establishing a quasi-suspect class and the deference owed in the military context, heightened scrutiny should not apply.

The same conclusion results from an application of the factors the Supreme Court has used to determine whether a quasi-suspect class exists: a "discrete group" defined by "immutable" characteristics that is "politically powerless" and has suffered a history of discriminatory treatment.  *See Lying v. Castillo*, 477 U.S. 635, 638 (1986) (citing *Murgia*, 427 U.S. at 313–14).  Trans-identifying persons do not "exhibit obvious, immutable, or distinguishing characteristics that define them as a

discrete group." *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987). "Transgender status" is not "necessarily immutable, as the stories of 'detransitioners' indicate." *Skrmetti*, 83 F.4th at 487. It further is not characterized by a specific defining feature, but instead may be said to include "a huge variety of gender identities and expressions." *Id.*; *see also* Br. of American Psychological Association at 6 n.7, *United States v. Skrmetti*, No. 23-477 (U.S. 2024) (stating that "transgender" is an "umbrella term" that covers "varied groups" and "many diverse gender experiences").

Trans-identifying persons, moreover, are not "political[ly] powerless[]" either. *San Antonio Indep. Sch. Dist.*, 411 U.S. 1, 28 (1973). "A national anti-discrimination law, Title VII, protects transgender individuals in the employment setting[,]" and many "States have passed laws specifically allowing some of the treatments sought here." *Skrmetti*, 83 F.4th at 487. Indeed, the trans-identifying people have attracted the support of twenty States, former high-ranking military officials, and the large law firm that has entered an appearance in this case, among others. *Cf. id.* at 487. And trans-identifying persons achieved at least some version of their desired military policy from the last two Democratic Administrations. It is therefore untenable to claim that trans-identifying persons "have no ability to attract the attention of lawmakers." *Cleburne*, 473 U.S. at 445. The mere fact that trans-identifying persons may not be able to "mandate the desired . . . responses" from every Administration, and that they may "claim some degree of prejudice from at least part of the public at large," is insufficient. *Id.* Similarly, claims of historical injustice towards trans-identifying individuals are not sufficient to establish a quasi-suspect class. The Supreme Court in *Cleburne* "rejected the argument that mental disability is a suspect classification, despite a history of compulsory sterilization, exclusion from public schools, and a system of state-mandated segregation and degradation." *Eknes-Tucker*, 114 F.4th 1241, 1266 (11th Cir. 2024) (Lagoa, J., concurring). If that combination of historical injustices was not enough to establish a quasi-suspect class, neither are Plaintiffs' claims of historical injustice.

### 4. The Policy's other standards are likewise subject to rational-basis review.

The 2025 Policy provides that access to intimate spaces, and other military standards—such as uniforms, grooming, and physical fitness—shall be determined according to a servicemember's

biological sex.  2025 Policy § 5.  Plaintiffs argue that these provisions present a "Hobson's Choice" for trans-identifying servicemembers, "including those who have completed their transition," by "requir[ing] them to suppress or deny their transgender identity."  Pls.' Br. at 23.  But that is a red herring, because anyone with a history of gender dysphoria, or who has transitioned medically, will be processed for separation (absent a waiver) under the new retention standards.  *See* 2025 Policy §§ 4.3.a–b.  Plaintiffs themselves contend that they are not entitled to a waiver.  *See* Pls.' Br. at 14.

The relevant question, therefore, is whether DoD can constitutionally require trans-identifying persons without gender dysphoria, and who have not transitioned medically, to abide by the standards of their biological sex, as has always been DoD's policy —including under the prior Administration and under the 2016 Carter Policy.  *See* DoDI 1300.28 § 3.1.a. (Apr. 30, 2021, ch. 1 eff. Dec. 20, 2022) ("When a standard, requirement, or policy depends on whether the individual is male or female (e.g., medical fitness for duty; physical fitness and body fat standards; berthing, bathroom, and shower facilities; and uniform and grooming standards), all Service members will be subject to the standard, requirement, or policy associated with their gender marker in DEERS."); DoDI 1300.28 § 1.2.b (June 30, 2016) ("Coincident with that gender marker, the Services apply, and the member is responsible to meet, all standards for uniforms and grooming; body composition assessment (BCA); physical readiness testing (PRT); Military Personnel Drug Abuse Testing Program (MPDATP) participation; and other military standards applied with consideration of the member's gender."); *id.* ("As to facilities subject to regulation by the military, the Service member will use those berthing, bathroom, and shower facilities associated with the member's gender marker in DEERS.").

Indeed, under the Austin policy—the status quo that Plaintiffs' motion would preserve—a servicemember could only change his or her gender marker in DEERS upon "a diagnosis from a military medical provider" that "gender transition [was] medically necessary," DoDI 1300.28 § 3.4.a. (2022); upon approval of the servicemember's commanding officer, *id.* §§ 3.4.b–c.; and after many other steps and requirements, including the completion of the prescribed medical treatment plan, id. § 3.3.d.2.  Absent a change of the gender marker in DEERS, trans-identifying servicemembers had to abide by their biological sex.  If that is unconstitutional, then no Administration in the history of this

Nation has ever administered a constitutional policy regarding trans-identifying people. At bottom, the DoD Policy merely confirms the military's longstanding requirement in this regard, and it does so without distinguishing between the two sexes or classifying based on trans-identifying status.

Finally, policies requiring sex-segregated intimate spaces do not, as Plaintiffs suggest, automatically amount to facial discrimination against trans-identifying persons under Third Circuit precedent. *See* Pls.' Br. at 24 (citing *Doe ex. rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018). In *Boyertown*, the Third Circuit held that the defendant school district had a compelling interest in "protecting transgender students from discrimination," when assessing whether a high school's policy allowing trans-identifying students to use the bathrooms and locker rooms of their choice violated other students' constitutional right to privacy. *Id.* at 528–31. The Third Circuit did not address or decide whether the school's prior policy—requiring students to use facilities in accordance with their birth sex—facially discriminated against trans-identifying students in violation of the equal protection clause. *See id.* at 524.

### 5.     The Policy survives constitutional scrutiny.

As explained above, because the Policy does not discriminate based on sex or against any constitutionally protected class, rational-basis review applies. Rational-basis review "is a paradigm of judicial restraint." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993). It is "the most relaxed and tolerant form of judicial scrutiny under the Equal Protection Clause." *City of Dallas v. Stanglin*, 490 U.S. 19, 26 (1989). Under this standard, the challenged policy enjoys "a strong presumption of validity," and the challenger bears "the burden to negative every conceivable basis which might support it" without regard to "whether the conceived reason for the challenged distinction actually motivated the [decision]." *Beach*, 508 U.S. at 314–15. Courts are further "compelled under rational-basis review to accept . . . generalizations even when there is an imperfect fit between means and ends." *Heller v. Doe*, 509 U.S. 312, 321 (1993). That is, a classification does not fail simply because it "is not made with mathematical nicety or because in practice it results in some inequality." *Dandridge v. Williams*, 397 U.S. 471, 485 (1970). Rather, classifications may be "both underinclusive and overinclusive" and "perfection is by no means required." *Vance v. Bradley*, 440 U.S. 93, 108 (1979).

Plaintiffs contend that intermediate scrutiny applies. Under that standard, the policy must "serve[] important governmental objectives" and be "substantially related to the achievements of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996). Under either standard, however, the presumptive disqualification of individuals with gender dysphoria satisfies constitutional scrutiny.

As DoD explained with respect to the 2018 policy, generally allowing such individuals to serve poses "substantial risks" and would "undermine readiness, disrupt unit cohesion, and impose an unreasonable burden on the military that is not conducive to military effectiveness and lethality." 2018 Report at 2. DoD reached the same conclusion in the 2025 Policy, finding that "[s]ervice by [] individuals [with gender dysphoria] is not in the best interest of the Military Services and is not clearly consistent with the interests of national security." 2025 Policy, § 1.c. As explained below, ample evidence supports the military's judgment on this issue.

### a)     Military Readiness

As DoD explained in 2018 and reiterated as to its current policy (which expressly relies on the 2018 report, *see* Action Memo at 3), service by individuals with gender dysphoria poses at least two significant risks to military readiness.

*First*, DoD is concerned about subjecting those with a history of gender dysphoria to the unique stresses of military life. *See* 2018 Report at 21, 42. At the outset, any mental-health condition characterized by clinically significant distress or impairment in functioning raises readiness concerns. That is why servicemembers suffering from "[a]ny DSM-5 psychiatric disorder with residual symptoms" that "impair social or occupational performance[]" need "a waiver . . . to deploy," as the military must consider the "risk of exacerbation if the individual were exposed to trauma or severe operational stress." *Id.* at 34. Particularly given "the absence of evidence on the impact of deployment on individuals with gender dysphoria," DoD concluded that this condition posed readiness risks. *Id.*; *see also id.* at 42. That judgment has also been reflected in the Carter and Austin policies, which disqualified individuals with a history of gender dysphoria absent proof that they had been stable without clinically significant distress for 18 months.

In forming this conclusion, DoD's panel of experts reviewed evidence that military service can be a contributor to suicidal thoughts. *Id.* at 21–22. Data pertaining to servicemembers with gender dysphoria reflected similar trends. *See id.* The 2018 Report noted that "[s]ervice members with gender dysphoria are eight times more likely to attempt suicide than Service members as a whole (12% versus 1.5%)." *Id.* The data reflected that servicemembers with gender dysphoria were also nine times more likely to have mental health encounters than the servicemember population as a whole (28.l average encounters per servicemember versus 2.7 average encounters per servicemember). *Id.* For example, from October 2015 to October 3, 2017, the 994 active-duty servicemembers diagnosed with gender dysphoria accounted for 30,000 mental health visits. *Id.* Especially given the evidence that military service in itself can be a contributor to suicidal thoughts, DoD had legitimate concerns that allowing individuals with gender dysphoria to serve would subject them and their comrades to unacceptable risks. *Id.* at 19, 21.

As noted, the current DoD Policy expressly relied on these findings from the 2018 Report. *See* Action Memo at 3. DoD also relied on a 2021 review that found that "rates of disability evaluation were estimated to be higher among [trans-identifying] service members." Action Memo at 3 (alterations in original). Looking at data over a 24-month period, this review found that "nearly 40% of Service members with gender dysphoria in an observed cohort were non-deployable" at some time during that period. *Id.* DoD determined that "[t]his level of non-deployability creates significant readiness risk and places additional burdens on Service members without gender dysphoria to meet requirements." *Id.*

The current DoD Policy further relied on a 2025 medical literature review, which found that "55% of transgender individuals experienced suicidal ideation and 29% attempted suicide in their lifetime[.]" *Id.* The review further found that "the suicide attempt rate is estimated to be 13 times higher among transgender individuals compared to their [non-trans-identifying] counterpart," that "transgender individuals are approximately twice as likely to receive a psychiatric diagnosis compared to [non-trans-identifying] individuals," and "the strength of evidence on transgender mental health and [sex-reassignment] care is low to moderate." *Id.* at 3–4.

These concerns are not new.  The 2016 RAND Report relied on by both Secretary Carter and President Biden cautioned that "it is difficult to fully assess the outcomes of treatment" for gender dysphoria as a general matter, given "the absence of quality randomized trial evidence"—"the gold standard for determining treatment efficacy"—and that, in any event, "it is not known how well these findings generalize to military personnel."  RAND Report at 10, Ex. 8.  Although Secretary Carter and President Biden were more willing to tolerate these suicide-related risks, the current Commander in Chief and Secretary of Defense are not constitutionally compelled to hew to the risk tolerance of their predecessors.  "[T]here's nothing unusual about a new administration coming to office inclined to favor a different policy direction.'"  *Doe 2*, 917 F.3d at 729 (Williams, J., concurring) (cleaned up).

*Second*, even if it were guaranteed that the risks associated with gender dysphoria could be fully addressed by sex-reassignment interventions, it remains the case that transition-related medical treatment—namely, cross-sex hormonal intervention and sex-reassignment surgery—could render transitioning servicemembers "non-deployable for a potentially significant amount of time."  2018 Report at 35.  The Endocrine Society recommends "quarterly bloodwork and laboratory monitoring of hormone levels during the first year" of transition intervention, meaning that if "the operational environment does not permit access to a lab for monitoring hormones," then the transitioning servicemember must forgo "treatment, monitoring, or the deployment," each of which "carries risks for readiness."  *Id.* at 33.  That period of potential non-deployability only increases for those who obtain sex-reassignment surgery, which in addition to a recommended "12 continuous months" of cross-sex hormonal intervention "prior to genital surgery," comes with "substantial" recovery time, even without complications.  *Id.*

In addition to being inherently problematic in the military setting, these limits on deployability could have harmful effects on transitioning servicemembers' units as a whole.  Any increase in the number of non-deployable servicemembers requires those who can deploy to bear "undue risk and personal burden," which itself "negatively impacts mission readiness."  *Id.* at 35.  On top of these personal costs, servicemembers who deploy more frequently to "compensate for" their unavailable comrades face risks to family resiliency.  *Id.*  And when servicemembers with medical conditions do

25

deploy but then fail to meet fitness standards in the field, "there is risk for inadequate treatment within the operational theater, personal risk due to potential inability to perform combat required skills, and the potential to be sent home from the deployment and render the deployed unit with less manpower." *Id.* at 34.  All of this, DoD has concluded, poses a "significant challenge for unit readiness."  *Id.* at 35.

### b)    Unit cohesion, good order, and discipline

Apart from these readiness concerns, DoD reasonably determined that exempting individuals with gender dysphoria who have undergone gender transition or seek to do so from the military's sex-based standards would undermine "good order, discipline, steady leadership, unit cohesion, and ultimately military effectiveness and lethality."  2018 Report at 28.

As DoD has explained, a contrary approach would risk, among other things, "erod[ing] reasonable expectations of privacy" by other servicemembers.  *Id.* at 31, 37.  Indeed, "[g]iven the unique nature of military service," servicemembers must often "live in extremely close proximity to one another when sleeping, undressing, showering, and using the bathroom."  *Id.* at 37.  To protect reasonable expectations of privacy, the military has therefore "long maintained separate berthing, bathroom, and shower facilities for men and women."  *Id.*  In DoD's judgment, allowing trans-identifying individuals to use the facilities of their preferred gender "would invade the expectations of privacy" of the other servicemembers sharing those facilities.  *Id.*  Thus, absent the creation of separate facilities for transitioned or transitioning servicemembers, which could be both "logistically impracticable for the Department," as well as unacceptable to those servicemembers, the military would face irreconcilable privacy demands.  *Id.*

Such considerations are not animated by animus toward trans-identifying individuals.  The implementation handbook for the Carter policy, for example, repeatedly stressed the need to respect the "privacy interests" and "rights of Service members who are not comfortable sharing berthing, bathroom, and shower facilities with a transitioning Service member[,]" and urged commanders to try to accommodate competing interests to the extent that they could.  *See, e.g.*, 2016 Implementation Handbook at 38, Ex. 9; *see id.* at 22, 29, 33, 60–61, 63–64; *see also* 2018 Report at 38.  In addition, the Supreme Court has recognized that it is "necessary to afford members of each sex privacy from the

other sex in living arrangements," *Virginia*, 518 U.S. at 550 n.19, and "[i]n the context of recruit training, this separation is even mandated by Congress," 2018 Report at 37.

Plaintiffs argue that, under *Boyertown*, 897 F.3d 518, privacy is not a legitimate government justification for sex-segregated spaces. *See* Pls.' Br. at 37. This reliance is misplaced. As discussed above, *Boyertown* addressed whether a high school policy allowing trans-identifying students to use bathrooms and locker rooms of their choice violated other students' constitutional privacy rights, not whether the high school's policy was justified on privacy grounds. In any event, the Third Circuit did not, as Plaintiffs suggest, hold that the student plaintiffs had no right to privacy with respect to trans-identifying students' use of bathrooms and locker rooms. Rather, the Third Circuit recognized the discomfort other students felt in those spaces, and upheld the school's policy on the grounds that single-user accommodations were available to all students, which the student plaintiffs conceded "resolve[d] all privacy concerns." *Id.* at 530. Here, Plaintiffs are not asking for the military to create any such single-user spaces, nor is DoD required to make such accommodations.

Aside from these privacy-related considerations, DoD has expressed concerns that exempting servicemembers from sex-based standards in training and athletic competitions based on gender identity would generate perceptions of unfairness in the ranks. 2018 Report at 36. For example, requiring female servicemembers to compete with males who identify as female but retain male physiology, DoD reasoned, would likely put the former at a disadvantage. *Id.* at 31, 36. And in violent activities, "pitting biological females against" those with male physiology but a female gender identity, and vice versa, could pose "a serious safety risk as well." *Id.* at 36.

Again, these are legitimate military concerns. Congress and the Supreme Court have recognized that it is "necessary" to "adjust aspects of the physical training programs" for servicemembers to address biological differences between the sexes. *Virginia*, 518 U.S. at 550 n.19. Indeed, the Supreme Court has deferred to Congress's judgment that including women in the draft would create "administrative problems such as housing and different treatment with regard to . . . physical standards." *Rostker*, 453 U.S. at 81. Especially given DoD's view that "physical competition[]

27

is central to the military life and is indispensable to the training and preparation of warriors," 2018 Report at 36, DoD's judgments in this respect are entitled to deference.

Moreover, the "collision of interests" injected by the Carter and Austin policies' departure from military uniformity poses "a direct threat to unit cohesion and will inevitably result in greater leadership challenges without clear solutions." 2018 Report at 37. As DoD previously noted regarding the Carter policy, the "routine execution of daily activities" could become a recurring source of uncertainty, if not "discord in the unit," requiring commanders "to devote time and resources to resolve issues not present outside of military service." *Id.* at 38. Given that "[l]eaders at all levels already face immense challenges in building cohesive military units," DoD concluded that it would be unwise to maintain a policy that "will only exacerbate those challenges and divert valuable time and energy from military tasks." *Id.* at 37–38. That conclusion remains the same today.

Plaintiffs nevertheless contend that trans-identifying servicemembers have been serving under the Austin Policy for years without disruption to unit cohesion. PI Mot. at 4. But they rely only on declarations and testimony of former military officials who claim that they were unaware of problems regarding unit cohesion. *See id.* This includes a declaration from the former Under Secretary of Defense for Personnel and Readiness. But as the declaration of the current official performing the duties of the Assistant Secretary of Defense for Manpower and Reserve Affairs explains, "it would be highly unusual for individualized service member complaints regarding unit cohesion, military readiness, medical readiness, deployability, and lethality to reach the level of the Under Secretary." Dill Decl. ¶ 6, Ex. 12.

c)    **Disproportionate costs**

Finally, DoD noted that a review of cost data by the Office of the Assistant Secretary of Defense for Health Affairs indicated that between 2015 and 2024, DoD spent $52,084,407 providing care to active-duty Service members to treat gender dysphoria, including $15,233,158 for psychotherapies; $3,135,593 for cross-sex hormonal intervention, and $14,324,739 for surgical care. Action Memo at 4. This is consistent with DoD's finding in 2018 that transition-related interventions under the Carter policy was "proving to be disproportionately costly on a per capita basis[.]" 2018

Report at 41.  Specifically, DoD noted that the medical costs for servicemembers with gender dysphoria was "nearly three times" compared to servicemembers without this condition.  *Id.*  And that was "despite the low number of costly sex reassignment surgeries that have been performed so far"— 34 non-genital procedures and one genital surgery—which likely increased as more servicemembers avail themselves of these measures in the last few years.  *Id.*

Several commanders had also reported that providing servicemembers in their units with transition-related interventions "had a negative budgetary impact" because of the use of "operations and maintenance funds to pay for . . . extensive travel throughout the United States to obtain specialized medical care."  *Id.*  This is not surprising, given that transition-related interventions "require[] frequent evaluations" by both a mental-health professional and an endocrinologist, and most military treatment facilities "lack one or both of these specialty services."  *Id.* at 41 n.164. Transitioning servicemembers consequently "may have significant commutes to reach their required specialty care," with those "stationed in more remote locations fac[ing] even greater challenges."  *Id.* To be sure, the healthcare cost for treating servicemembers' gender dysphoria is small relative to DoD's total healthcare expenditure, but such cost and benefit analysis is decidedly for DoD, not this Court, to make.  Given the military's general interest in maximizing efficiency through minimizing costs, *see* 2018 Report at 3, DoD reasonably concluded that its disproportionate expenditures on facilitating gender transition should be better devoted elsewhere, *see id.* at 41.  That considered judgment is entitled to significant deference.

\*       \*       \*

In enjoining the 2025 Policy, the *Talbott* court erred in independently weighing the evidence underlying that policy and in concluding that there was insufficient evidence supporting the policy. *See* 2025 WL 842332, at *11–15.  As noted above, in the military context, the Supreme Court has deferred to the political branches on military matters even in the face of significant evidence to the contrary, including testimony from current and former military officials.  *See Goldman*, 475 U.S. at 509; *Rostker*, 453 U.S. at 63.  And it has granted the political branches significant latitude to choose "among

alternatives" in furthering military interests, *Rostker*, 453 U.S. at 71-72, as well as where to "draw[] the line," *Goldman*, 475 U.S. at 510.

For instance, the Supreme Court in *Goldman* confronted an argument by the plaintiff that the Air Force had "failed to prove that a specific exception for his practice of wearing an unobtrusive yarmulke would threaten discipline" and "that the Air Force's assertion to the contrary is mere *ipse dixit*, with no support from actual experience or a scientific study in the record, and is contradicted by expert testimony." 475 U.S. at 509. The Court did not question whether the Air Force's judgment rested on adequate evidence or deliberation, but deemed it sufficient that the issue had been "decided by the appropriate military officials" in their "considered professional judgment." *Id.*

In any event, the *Talbott* court's evaluation of the evidence ignored the ample evidence in the 44-page report underlying the 2018 policy, which DoD relied on in issuing the 2025 policy. *See* Action Memo at 3. The *Talbott* court reasoned that the 2018 report does not support the 2025 policy because DoD did not assemble and analyze data from the past four years of the Austin policy. 2025 WL 842332, at *12. But in making determinations about composition of the force, DoD considers the long-term risks and consequences of service by individuals with medical conditions. *See* Dep't of Defense Instruction 6130.03, Vol. 1, at 4, 5. That judgment takes into account not only the current status and severity of a particular medical condition, or how controlled it has been over the past four years, but also how it may progress over time or lead to other complications in the future, such as side effects from treatment or potential comorbidities. The 2018 report and the conclusions of the panel of experts who conducted a "comprehensive" study are thus entitled to military deference and reasonably support the 2025 Policy, despite the examination of more recent data.

The *Talbott* court also faulted DoD's reliance on a 2021 review and a 2025 medical literature review because some of the data in these reviews could support a different policy and because some data was not available. 2025 WL 842332, at *12–14. But as DoD explained, the 2025 medical literature review indicated that "[t]he strength of the evidence on transgender mental health and gender-affirming care is low to moderate," Ex. 10 at 1, and the 2021 review contained some data underscoring readiness risks and deployability limitations associated with individuals with gender

dysphoria, Ex. 11 at 21-24. The fact that studies are imperfect or contain some data or findings that could cut in different ways or could support different policies is no reason to discredit the military's judgment and its conclusions about the level of risk it is willing to tolerate. Even under intermediate scrutiny, the question is whether the policy "serves important governmental objectives" and is "substantially related to the achievement of those objectives," *Virginia*, 518 U.S. at 533, not whether every piece of available data unequivocally supports the policy.

The same is true with the *Talbott* court's own value judgment that the total expenditure on medical care for individuals with gender dysphoria must be compared to expenditure for other medical conditions—in its view, "[t]here must be *some* benchmark," 2025 WL 842332, at *15. DoD did have some benchmark; it chose to consider the expenditure on a per capita basis and reasonably determined that the medical costs for servicemembers with gender dysphoria was "nearly three times" compared to servicemembers without this condition. 2018 Report at 41. The *Talbott* court also found it "striking" that DoD does not know the total number of trans-identifying individuals, when Defendants purportedly "claim transgender persons impact military readiness." 2025 WL 842332, at *15. But the observation about the purported "missing evidence" merely repeats the same mistaken premise that the DoD Policy is intended to cover all trans-identifying servicemembers, when, in fact, the DoD Policy disqualifying servicemembers and applicants from serving turns on the medical condition of gender dysphoria.

### 6. Alleged animus is not a reason to grant Plaintiff's motion.

Plaintiffs contend that even if the Policy would otherwise survive constitutional scrutiny, it must be struck down because the *Military EO* and the DoD Policy were allegedly "motivated by unconstitutional animus." Pls.' Br. at 17. In Plaintiffs' view, this is so even if animus is "not the sole or even primary factor," but just one "motivating factor" for the Policy. *Id.* But *Trump v. Hawaii* forecloses this argument.

In *Hawaii*, as in this case, the plaintiffs challenged a policy that they alleged "was motivated not by concerns pertaining to national security but by animus toward Islam." 585 U.S. at 681. The plaintiffs—and the dissent—thus contended that "a more stringent standard of review" applied. *Id.*

at 741 (Sotomayor, J., dissenting). But the *Hawaii* majority rejected that argument, holding that, in the national security context, the Court must "uphold the policy so long as it can be understood to result from a justification independent of unconstitutional grounds." *Id.* at 705.

"The *Hawaii* Court offered two justifications for this standard of review—both of which readily apply here." *Doe 2*, 917 F.3d at 732 (Williams, J., concurring). "For one, judicial inquiry into the national-security realm raises concerns for the separation of powers by intruding on the President's constitutional responsibilities." *Id.* (cleaned up). "For another, when it comes to collecting evidence and drawing inferences on questions of national security, the lack of competence on the parts of the courts is marked." *Id.* "For both of these reasons, [a court's] review into matters of national security is highly constrained." *Id.*

Here, as in *Hawaii*, "[i]t cannot be said that it is impossible to 'discern a relationship to legitimate state interests' or that the policy is 'inexplicable by anything but animus.'" 585 U.S. at 706. "[B]ecause there is persuasive evidence that [the Policy] has a legitimate grounding in national security concerns, quite apart from any [animus], [the Court] must accept that independent justification." *Id.* The Policy "is expressly premised on legitimate purposes[,]" *id.*, to ensure "the high mental and physical standards necessary for military service." 2025 Policy at 1. Plaintiffs may challenge the Policy "based on their perception of its effectiveness and wisdom," but courts "cannot substitute [their] own assessment for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy." *Id.* at 707–08 (citation omitted).

As for Plaintiffs' contention that a law subject to rational-basis review is unconstitutional if animus was a motivating factor, Pls.' Br. at 17, it is incorrect as a matter of law. Under *Hawaii*, the question is whether the Policy "can reasonably be understood to result from a justification independent of unconstitutional grounds," not whether animus is one motivating factor. 585 U.S. at 705. In any event, Plaintiffs' allegations of animus are unfounded.

*First*, Plaintiffs inferred animus from their view that the timing of the *Military* EO and subsequent guidance "suggest pretext rather than military necessity." Pls.' Br. at 19. But as noted above, "'there's nothing unusual about a new' administration 'coming to office inclined to favor a

different policy direction[.]'" *Doe 2*, 917 F.3d at 729 (Williams, J., concurring) (quoting *In re Dep't of Com.*, 586 U.S. 956, 957 (2018) (Gorsuch, J., concurring in part, dissenting in part)). "A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part, dissenting in part). Indeed, President Biden did just that within days of taking office in issuing Executive Order 14004. An "energetic Executive" action does not equate to an Executive acting with animus. *Cf.* The Federalist No. 70.

The *Talbott* court nonetheless faulted this Administration for "rush[ing]" the 2025 Policy, stating that it took "8 months" for DoD to craft all of the implementing guidance for President Biden's policy. 2025 WL 842332, at *10. But regardless of how long it took DoD to craft guidance, the fact remains that both Presidents Biden and Trump *directed* the change in policy within days of taking office. Both Administrations did so based on available prior data—in President Biden's case, the 2016 RAND report, and in President Trump's case, the 2018 DoD report. That DoD report was no more "stale" than the 2016 report on which the President Biden relied when he changed course within days of taking office. *Id.* at *30. If anything, whereas the RAND report began with "the presumption that transgender persons can serve openly without adverse impact on military effectiveness and readiness," *see* July 28, 2015 Memorandum from Secretary Carter, the 2018 DoD report was not so constrained. Secretary Mattis directed a panel of experts to study in a "comprehensive, holistic, and objective" manner, "military service by transgender individuals focusing on military readiness, lethality, and unit cohesion[.]" 2018 DoD report at 17. The panel consisted of senior military leaders who were selected because of "their experience leading warfighters," "their expertise in military operational effectiveness," and their "statutory responsibility to organize, train, and equip military forces." *Id.* at 18. In addition to being "uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force," the military expert panel also drew on experts dedicated to issues involving personnel, medical treatment, and military lethality. *Id.*

*Second*, Plaintiffs contend that animus can be inferred because the *Military* EO "cited no evidence of problems with" service by individuals with gender dysphoria. Pls.' Br. at 17. The *Talbott* court expressed the same skepticism. *See* 2025 WL 842332, at *10 ("President Trump issued EO14183 seven days after taking office. No one knows what he relied on, if anything."). But Executive Orders are not agency actions, *Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992), and they would not typically provide the sort of supporting rationale that would be required for an agency action. By contrast, the 2018 policy was based on an analysis of problems with service by individuals with gender dysphoria. And the President was of course aware of the evidence supporting the 2018 policy when he issued the Executive Order, as he himself approved that policy. *See* March 23, 2018 Presidential Memorandum. He therefore was not starting from a clean slate when he issued the *Military* EO. The 2025 Policy in turn provided additional support for the decision to presumptively disqualify those with gender dysphoria. *See* Action Memo and its attachments.

*Third*, Plaintiffs contend that the Policy was motivated by animus because of alleged "derogatory language" in the *Military* EO and 2025 Policy, which they contend is "part of a broader pattern of targeted discrimination." Pls.' Br. at 17, 20. As an initial matter, now that DoD has issued an actual Policy that directly affects Plaintiffs, the focus of the Court's inquiry is that Policy—not the *Military* EO, and certainly not Executive Orders arising in different contexts. *See Hawaii*, 585 U.S. at 704–05. Further, the allegedly derogatory language in the 2025 Policy itself is merely an enumeration of the high standards for military service. 2025 Policy § 1.b. ("It is the policy of the United States Government to establish high standards for Service member readiness, lethality, cohesion, honesty, humility, uniformity, and integrity[.]"). And the following sentence clarifies that the Policy is addressing the medical condition of gender dysphoria, not all trans-identifying servicemembers. *Id.*

*Fourth*, Plaintiffs contend that there is no evidence that the government "would have enacted [the Policy] if animus were not a factor." Pls.' Br. at 25. But that argument is refuted by the historical record. Under President Trump, DoD did enact a substantially similar policy in 2018 after conducting an extensive study of the issue, and the Supreme Court and D.C. Circuit allowed that policy to go into effect. And these policies were less restrictive than the policies of every presidential Administration

of any party prior to 2015.  Thus, contrary to Plaintiffs' contention, there is substantial evidence that the government would have issued the same policy regardless of any alleged animus.

*Fifth*, Plaintiffs argue that it is "highly unusual" to "separate[] members based on a medical condition that would normally undergo individualized assessment through the Disability Evaluation System."  Pls.' Br. at 23.  But DoD treats at least 11 other conditions as presumptively disqualifying and does not afford an individualized determination.  If the Service member has "any [heart] valve replacement," for example, that is "not compatible with retention" and "Paragraph 5.11.a does not apply."  *See* DoDI 6130.03-V2 § 5.11(b)(1) (ch. 1, eff. June 6, 2022).  "Paragraph 5.11.a" refers to the otherwise-applicable requirement that a condition "must persist despite appropriate treatment and impair function to preclude satisfactory performance of required military duties of the Service members office, grade, rank, or rating."  *Id.* ¶ 5.11.a.  That individualized determination is not made with respect to heart-valve replacements, nor with cardiomyopathy or heart failure (*id.* § 5.11.c.2.); a pacemaker (*id.* § 5.11.d.); or Catecholiminergic Polymorphic Ventricular Tachycardia (*id.* § 5.11.f.3.).  There are other conditions that are likewise not subject to an individualized determination: kidney transplants (*id.* § 5.15.h.); chronic kidney disease (*id.* § 5.15.l.); hereditary angioedema (*id.* § 5.23.g.); recurrent rhabdomyolysis (*id.* § 5.23.h.); permanent or progressive cognitive impairment due to Alzheimer's disease or other dementias (*id.* § 5.26.d.); and epilepsy (*id.* § 5.26.k.).  With respect to behavioral health, specifically, the DoD Policy provides that disqualifying conditions "should either be referred to the DES or processed for administrative separation, based on whichever is appropriate for that condition."  *Id.* § 5.28.e.

### B.    Plaintiffs Have Failed to Exhaust Their Administrative Remedies.

Plaintiffs are also unlikely to succeed on the merits because they have not yet exhausted the administrative remedies prescribed by the Policy.  *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 695 (3d Cir. 1979) ("[N]o one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." (quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51 (1938))).  "The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record,

to apply its expertise, and to correct its own errors so as to moot judicial controversies." *Parisi v. Davidson*, 405 U.S. 34, 37 (1972); *see Cerro Metal Prods. v. Marshall*, 620 F.2d 964, 970 (3d Cir. 1980) ("When a party presses a constitutional claim, exhaustion serves the additional purpose of furthering parsimony in judicial decisionmaking."). This is especially true "in the context of military regulation," because "the exhaustion requirement ensures that the military, a highly specialized society with goals separate from those of the general community will be able to perform those tasks—such as developing a factual record and applying its expertise—for which it is uniquely qualified." *Taylor v. United States*, 711 F.2d 1199, 1206 (3d Cir. 1983). Even where a controversy survives administrative review, "exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration, especially in a complex or technical factual context." *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992).

Here, Plaintiffs, who are enlisted servicemembers, have not satisfied the requirement that they "first use all prescribed administrative measures for resolving a conflict before they seek judicial remedies." *Facchiano v. U.S. Dep't of Lab.*, 859 F.2d 1163, 1166 (3d Cir. 1988). The DoD Policy provides that all enlisted servicemembers identified for involuntary separation pursuant to the Policy will, if desired by the enlisted servicemember, be afforded an administrative separation review board and "be afforded all applicable administrative processing protections." *See* 2025 Policy § 4.4.a. & a.6, 7; DoDI 1332.14 (Aug. 1, 2024) § 5.3 (administrative separation board procedures). Enlisted servicemembers may be administratively separated "following a determination that doing so is in the best interest of the relevant Military Service." 2025 Policy § 4.4.a.

No exception to the exhaustion requirement applies. *See Facchiano*, 859 F.2d at 1168 (discussing three exceptions to the exhaustion doctrine: "[1] when the challenged agency action presents a clear and unambiguous violation of statutory or constitutional rights, [2] when resort to administrative procedures is "clearly shown to be inadequate to prevent irreparable injury," or [3] when exhaustion is "futile." (citation omitted)). As demonstrated by this opposition brief, the Policy does not present any violation of Plaintiffs' constitutional rights, let alone a clear and unambiguous violation. And, as discussed above, any Plaintiff separated pursuant to the Policy will not suffer

irreparable harm, as available administrative remedies both before and after separation, and judicial review after separation, can provide complete remediation. *See Nelson*, 373 F.2d at 480. Plaintiffs also have not "'provide[d] a clear and positive showing' of futility." *Wilson v. MVM, Inc.*, 475 F.3d 166, 175 (3d Cir. 2007) (quoting *D'Amico v. CBS Corp.*, 297 F.3d 287, 293 (3d Cir. 2002)). Again, Plaintiffs can contest their separation before an administrative separation board. Administrative separation boards may recommend that servicemembers subject to this policy be retained, and that recommendation may be approved by the separation authority or Secretary of the relevant service. *See* DoDI 1332.14 § 5.3.e(7), f(4)(b). Neither the Court nor Defendants can prejudge what the administrative separation board may ultimately decide with respect to Plaintiffs.

## III.    THE EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST A PRELIMINARY INJUNCTION.

The balance of equities also tips against preliminary relief. The Commander in Chief has determined that it is "the policy of the United States Government to establish high standards for troop readiness, lethality, cohesion, honesty, humility, uniformity, and integrity," and that this policy is "inconsistent with the medical, surgical and mental health constraints on individuals with gender dysphoria." *Military* EO § 2. The Constitution charges the Commander in Chief with ultimate responsibility over the Nation's military policy. *See Doe 2*, 917 F.3d at 730 (Williams, J., concurring). "It is this power of oversight and control of military force *by elected representatives and officials* which underlies our entire constitutional system." *Id.* (quoting *Gilligan*, 413 U.S. at 10). There is a strong public interest in deferring to the Commander in Chief's judgment on which military policies would best protect the Nation. This is especially true where, as here, the judgment is based on, among other things, the recommendation of senior military leaders and experts who conducted "extensive review and deliberation" and were "uniquely qualified to evaluate the impact of policy changes on the combat effectiveness and lethality of the force." 2018 Report at 18.

Moreover, Plaintiffs make no attempt to show that a TRO is necessary to "keep [the] case[] alive until trial" or "ensure that, at the end of the case, the court can still grant an adequate remedy." *Delaware State*, 108 F.4th at 200. Nor could they. Plaintiffs have other avenues to challenge any

separation and courts have the power to remedy loss employment here. This Court should thus exercise its discretion and deny the TRO. *See id.* at 197 ("This equitable remedy is never automatic: It always involves a district court's sound discretion.").

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a temporary restraining order.


Dated: March 20, 2025                                  Respectfully submitted,
                                                       YAAKOV M. ROTH
                                                       Acting Assistant Attorney General

                                                       ALEX HAAS
                                                       Director, Federal Programs Branch

                                                       JEAN LIN
                                                       Special Litigation Counsel

                                                       */s/ John Robinson*
                                                       JOHN ROBINSON
                                                       JASON C. LYNCH
                                                       ELIZABETH B. LAYENDECKER
                                                       Trial Attorneys
                                                       U.S. Department of Justice
                                                       Civil Division, Federal Programs Branch
                                                       1100 L. Street, NW
                                                       Washington D.C. 20005
                                                       (202) 616-8489
                                                       john.j.robinson@usdoj.gov
                                                       *Counsel for Defendants*